# EXHIBIT A

1   John J. McNutt, State Bar No. 243975 Gray,
    Plant, Mooty, P.A.
2   The Watergate – Suite 700
    600 New Hampshire Avenue, N.W.
3   Washington, DC  20037
    Telephone:  (202) 295-2227
4   john.mcnutt@gpmlaw.com

5   Attorneys for Plaintiff Donald Glatts

6   Elizabeth Anne Tresp State Bar No. 290339
    Tresp Law, APC
7   341 South Cedros Avenue, Suite F
    Solana Beach, California 92075-1985
8   Telephone: (858) 248-2779
    elizabeth@tresplaw.com
9
    Attorneys for Plaintiffs Ronald Glatts,
10  Robert Glatts, and Thomas Glatts

11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                        COUNTY OF SAN DIEGO

14

15  DONALD GLATTS, RONALD GLATTS,        Case No. 37-2018-00032115-CU-MC-CTL
    ROBERT GLATTS, AND THOMAS
16  GLATTS,                              COMPLAINT FOR DECLARATORY
                                         RELIEF
17                  Plaintiffs,

18         v.

19  WELLS FARGO BANK, N.A. and DOES 1    **VIA-FAX**
    through 25, inclusive,
20
                    Defendants.
21

22

23

24         Plaintiffs Donald Glatts, Ronald Glatts, Robert Glatts, and Thomas Glatts (collectively

25  ("Glatts") as successors-in-interest to Katarina Duban ("Duban"), hereby bring the following

26  complaint for declaratory relief against Wells Fargo Bank, N.A. ("Wells Fargo," the "Bank" or

27  "Defendant"), and Does 1 through 25, inclusive, as follows:

28

                                            1
GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW        _____
WASHINGTON, D.C.                         COMPLAINT

## GENERAL ALLEGATIONS

1.      This action arises from a dispute over a $500,000 home equity line of credit extended by the Bank to Duban in November 2014.  The loan was secured by a deed of trust against a parcel of improved residential property owned by Duban located at 3572 Copper Crest Road (the "Property") in Encinitas, California.

2.      On November 17, 2014, Gerald S. Glatts ("Gerald") and Katarina Duban executed an agreement titled "Wells Fargo Home Equity Account Agreement and Disclosure Statement" (the "HELOC" or "Loan Agreement").  A copy of the HELOC is attached as Exhibit 1 to this complaint.

3.      Under the terms of the HELOC, the Bank agreed to provide a revolving line of credit to Duban and to Gerald with a maximum borrowing limit of $500,000.  The HELOC included a provision stating that the Bank was also receiving a Security Instrument against the Property that could result in the loss of the Property if Duban failed to repay the loan according to the terms of the HELOC.

4.      Concurrently with the execution of the HELOC, Duban and Gerald executed a deed of trust, drafted by the Bank, that granted the Bank a security interest in the Property and the right to initiate a trustee's sale of the Property if Duban did not repay the funds she had borrowed from the Bank.

5.      Although Duban and Gerald executed the deed of trust on November 17, 2014 (the same day they executed the HELOC), the Bank did not record the deed of trust until December 18, 2014. A copy of the deed of trust, recorded in the San Diego County Recorder's Office as Document No. 2014-0559457, is attached as Exhibit 2 to this complaint.

6.      Gerald died in December 2015.

7.      In March 2017, Donald Glatts, as trustee of Gerald's revocable trust, filed a verified complaint against the Bank seeking to expunge the Bank's deed of trust against the Property. A copy of the verified complaint in *Glatts v. Wells Fargo Bank, N.A.*, Superior Court of California, County of San Diego, Case No. 37-2017-00011090-CU-BC-NC (the "Quiet Title Action"), is attached as Exhibit 3.

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 2 -

COMPLAINT

1     8.     In response to the verified complaint in the Quiet Title Action, the Bank filed a

2 *verified* answer in July 2017 *denying* that its deed of trust against the Property was invalid or

3 otherwise unenforceable. The Bank's answer was verified by Amber N. Ott, a Vice President of

4 the Bank. In addition to denying that its deed of trust was invalid or unenforceable, the Bank

5 denied all three claims asserted against it in the verified complaint. Specifically, the Bank denied

6 that Donald was entitled to quiet title to the Property against the interests of the Bank, denied that

7 Donald was entitled to declaratory relief against the interests of the Bank, and denied that the

8 Bank was required to return any funds previously paid to the Bank by Donald. A copy of the

9 verified answer filed by the Bank is attached as Exhibit 4.

10     9.     In August 2017, more than a month after filing a verified answer denying that its

11 deed of trust was invalid or unenforceable, the Bank executed and caused to be recorded a FULL

12 RECONVEYANCE of the deed of trust it had obtained and recorded against the Property in

13 December 2014. A copy of the FULL RECONVEYANCE, recorded in the San Diego County

14 Recorder's Office as Document No. 2017-0383049, is attached as Exhibit 5 to this complaint.

15     10.     Prior to executing and recording the FULL RECONVEYANCE, the Bank did not

16 obtain the written consent of Duban. The Bank did not obtain Duban's consent to release its lien

17 against the Property even though the Bank had actual notice that Duban and the Glatts brothers

18 had been involved in litigation against each other related to the Property.

19     11.     Although the Bank released its security interest against the Property without

20 obtaining Duban's consent, the Bank has sent correspondence to Duban claiming that she is liable

21 to the Bank for the remaining balance on the HELOC.

22     12.     In May 2018, the Superior Court of California, County of San Diego (Probate

23 Division) entered an order assigning Duban's rights and obligations under the HELOC to the

24 Glatts brothers. Under the order, the Glatts brothers are Duban's successors-in-interest and have

25 standing to pursue this declaratory relief action against the Bank.

26     13.     With this complaint, the Glatts brothers seek a judgment confirming that the Bank

27 has no right to pursue Duban personally for repayment of any of the funds the Bank loaned to

28

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 3 -

COMPLAINT

EXHIBIT A, page 10

1    Duban under the HELOC because the Bank violated the security first rule codified at Code of

2    Civil Procedure section 726(a).

3         14.    Under longstanding California law, banks and other creditors seeking to collect

4    debts secured by real property assets are prohibited from pursuing personal judgments against

5    borrowers if the bank or creditor fails to comply with the strict requirements of California real

6    property law. Specifically, Code of Civil Procedure section 726(a) mandates that there is but one

7    form of action a creditor can employ to collect on a debt that is secured by real property.

8         15.    Under the statute, a creditor must first seek to foreclose on the real property prior

9    to taking any action to pursue a personal judgment against any borrower. If a creditor fails to first

10    enforce its security interest through a foreclosure action, the creditor is barred from pursuing a

11    personal judgment against the borrower. (Code Civ. Proc. section 726(a).) This doctrine, known

12    as the security first rule, has been enshrined in California law for more than one hundred years.

13    And the fundamental protections it provides to borrowers has never been challenged or disputed

14    by the courts or the legislature.

15         16.    A creditor waives its right to seek a deficiency judgment against a borrower (in

16    this case, Duban) if the creditor fails to follow the mandates of section 726 and fails to obtain the

17    consent of the borrower to do so. The consequences of a waiver by the creditor are described in

18    section 726(b) as follows: "In the event of waiver, the decree shall so declare and there shall be

19    **no judgment for a deficiency.**" (Code Civ. Proc. § 726(b), emphasis added.)

20         17.    The security first rule requires the creditor to proceed initially against all the real

21    property security, in a single judicial foreclosure action, before enforcing the underlying debt.

22    Stated another way, the creditor must pursue all of the security first in the form of a single legal

23    action for judicial foreclosure. "Security first" means that a creditor must first exhaust all real

24    property security through judicial process in the "one form of action" authorized by section 726 –

25    that is, a judicial foreclosure. (*Pacific Valley Bank v. Schwenke* (1987) 189 Cal.App.3d 134, 140.)

26         18.    When debtors and a creditor enter into a note and deed of trust, those documents

27    constitute one loan contract. (Schwenke at 141.) By choosing this form of debt instrument, the

28    creditor is consenting to a relationship that is subject to the rules of law that govern deeds of trust

-4 -

COMPLAINT

1   and deficiencies, including the borrower protections codified in section 726. (Id. at 141.)

2   Similarly, the debtors are entitled to rely on those laws. (Id.) Thus, "the debtor by signing a note

3   secured by a deed of trust, does not make an absolute promise to pay the entire obligation, but

4   rather makes only a __conditional promise to pay any deficiency__ that remains if a judicial sale of

5   the encumbered property does not satisfy the debt." (Id. at 140, emphasis added.)

6        19.    It is undisputed that the Bank initially attempted to enforce the validity of its lien.

7   In July 2017, the Bank filed a verified answer to the quiet title complaint that claimed that its lien

8   against the Property was a valid and enforceable lien.

9        20.    Although the Bank defended the validity of its security interest in the litigation, the

10  Bank ultimately relinquished its lien against the property and did not file a cross-complaint to

11  foreclose on its security interest. These facts are undisputed.

12       21.    It is also undisputed that the Bank failed to obtain Duban's consent when the Bank

13  reconveyed its deed of trust for the Property in August 2017. By failing to obtain her consent, the

14  Bank cannot avoid the protections provided to Duban by the "security first" rule. A creditor, like

15  Wells Fargo Bank, is not allowed to circumvent the statute by divesting itself of its security

16  without the consent of the debtor. (*Cooper v. Burch* (1906) 3 Cal.App. 470, 471.) If the creditor

17  does so then the creditor has waived any right to proceed on the promissory note. "[W]hen the

18  mortgagee, by his own act or neglect, deprives himself of the right to foreclose the mortgage, he

19  at the same time deprives himself of the right to an action upon the note." (*Hibernia S. & L. Soc.*

20  *v. Thornton* (1895) 109 Cal. 427, 429.)

21       22.    In sum, by extinguishing its security interest without Duban's consent, the Bank

22  waived any right under California law to claim that Duban is personally liable for the unpaid

23  balance remaining on the HELOC. (*Schwenke* at 146 ("In summary, we hold that Schwenke as

24  co-maker of a promissory note secured by a deed of trust is entitled to the protection of the one-

25  action rule of Code of Civil Procedure section 726.   Bank's release of security in violation of the

26  statute relieved Schwenke of any personal liability on the promissory note.").)

27       23.    On October 10, 2017, the Bank sent a notice of default to Duban claiming that she

28  is personally liable for the unpaid balance of the HELOC. The Bank's notice was defective and

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 5 -
COMPLAINT

EXHIBIT A, page 12

1   there has been no finding by any court that the Bank has the right to pursue Duban personally for

2   the unpaid balance on the HELOC.  As a matter of California real property law, the

3   "security first" rule bars the Bank from claiming that the Bank is entitled to seek personal liability

4   against Duban.  Plaintiffs seek a declaratory relief judgment from the Court that there is no valid

5   debt owed by Duban to the Bank.  Pursuant to an enforceable order of the Superior Court of

6   California, County of San Diego, the Glatts brothers are the successors-in-interest to Duban's

7   contractual rights and obligations under the HELOC and have standing to file this action and seek

8   declaratory relief from the Bank as the real parties in interest.

9       24.     The specific identities of the Defendants named as Does 1-25 in this action are

10  currently unknown to Plaintiff.  On information and belief, Plaintiff alleges that Does 1-25 are

11  jointly responsible with the Bank and the other defendants for the damages suffered by Plaintiff

12  or are assignees of the Bank's rights under the HELOC.  Plaintiff will name specific additional

13  defendants to this action when Plaintiff learns the identity of those specific defendants.

14      25.     Plaintiffs Donald Glatts, Ronald Glatts, and Robert Glatts are residents of San

15  Diego County, California.  Wells Fargo Bank, N.A. is registered to do business in California and

16  is doing business in California, including in San Diego County.  The Bank has done business in

17  San Diego County at all relevant times.  Venue (and specific personal jurisdiction over the Bank)

18  is appropriate in this forum because the conduct that led to the controversy took place in San

19  Diego County.  The conduct that to the controversy took place in San Diego County which is

20  where the deed of trust was executed by Gerald and Duban and recorded by the Bank.

21                    **FIRST CAUSE OF ACTION**

22                 **Declaratory Relief (CCP § 1060)**

23             **(Against Wells Fargo Bank, N.A. and Does 1-25)**

24      26.     Plaintiffs incorporate by reference all preceding paragraphs of this complaint.

25      27.     A controversy has arisen between Plaintiffs and Wells Fargo.

26      28.     Plaintiffs, as successors-in-interest to Duban, are entitled to a judgment declaring

27  that the Bank and Does 1-25 have no rights against Duban related to the HELOC and no right to

28  file an action against Duban seeking repayment of the HELOC balance.

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 6 -
COMPLAINT

EXHIBIT A, page 13

29.  Plaintiffs' right to the requested relief is based on California law regarding the collection of debts secured by real property. (Code Civ. Proc. § 726(a), et seq.)

30.  Plaintiffs are entitled to a judgment declaring that the Bank and Does 1-25 have no claims, rights, or liens against Duban related to the HELOC.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for a judgment by the Court as follows:

### For the First Cause of Action for Declaratory Relief

1.  For a judgment that Wells Fargo has no claims, rights, or liens against Duban;

2.  For costs; and

3.  For such other and further relief as the Court deems just and proper.

Dated: June 21, 2018                    Gray, Plant, Mooty, P.A.

                                        By: _____

                                        John J. McNutt

                                        Attorneys for Plaintiff Donald Glatts

                                        TRESPLAW, APC

                                        By: _____

                                        Elizabeth Anne Tresp

                                        Attorneys for Plaintiffs Ronald Glatts, Robert
                                        Glatts, and Thomas Glatts

GPM Doc ID # 4789828

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW,
WASHINGTON, D.C.

- 7 -

COMPLAINT

EXHIBIT A, page 14

# EXHIBIT 1

**WELLS FARGO BANK, N.A.**

AGREEMENT DATE:   11/17/2014
ACCOUNT #:           682-682-2408147-1998
REFERENCE #:        20142679900063

---

*Wells Fargo Home Equity Account* **Agreement**
and **Disclosure Statement (the "Agreement")**

Prep - 308

NOV 2 5 2014

HE – BIL

---

Borrower Name:
GERALD S GLATTS, KATARINA DUBAN,

Property Address:
3572 COPPER CREST RD, ENCINITAS, CA 92024

Mailing Address for Billing Purposes (if different):
3572 COPPER CREST RD, ENCINITAS, CA 92024

Credit Line Limit:
$500,000.00

## SECTION 1: MY ACCOUNT AGREEMENT

In this Agreement, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A. and any successor or assign or subsequent holder of this Agreement. This Agreement governs my *Wells Fargo Home Equity Account* (the "Account") with the Bank. If more than one person signs this Agreement, we are jointly and individually bound by its terms. We are separately liable to the Bank for the entire amount owed on the Account. We are each liable as a principal and not merely as a guarantor, even if one or more of us does not use the Account.

## SECTION 2: SECURITY INTEREST

I am giving the Bank a deed of trust, mortgage or other security instrument including all modifications, addenda and amendments thereto (the "Security Instrument"), signed the same date as this Agreement. The Security Instrument gives you a security interest in the property located at the address shown above (the "Property").

## SECTION 3: MY *WELLS FARGO HOME EQUITY ACCOUNT*

My Account is a revolving account. My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period (described below), my available credit will be my credit limit minus the sum of all unpaid Advances posted to my Account. During the Draw Period, as I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I may apply for an increase in my credit limit, and if I do so I agree to pay any application, appraisal and other fees, including increased costs for title insurance, as the Bank may require. If the Bank approves my application and increases my credit limit, I will provide and maintain such additional hazard insurance (including flood insurance, if necessary) and sign any additional documents as the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

The Bank may from time to time in its sole discretion, approve additional credit for me under the terms of this Agreement. I will receive written notice from the Bank of any such offer to increase my credit limit. I may accept such offer of increased credit by my use of those additional funds and by signing any additional documents the Bank may require. All such increased credit amounts will be governed by the terms and conditions of this Agreement and will be secured by the Security Instrument.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

### DRAW PERIOD
I may request Advances during the Draw Period. My Account has a Draw Period of 10 years and one month from the date this Agreement is effective. This Agreement is considered effective on the day the last of us signs this Agreement (the "Effective Date"). I may not obtain Advances after the Draw Period ends.

When the Draw Period ends, the outstanding unpaid Line of Credit Advances must be repaid according to the repayment terms as detailed below in Section 5, MY ACCOUNT DURING THE REPAYMENT PERIOD.

### ADVANCES DURING THE DRAW PERIOD
There are 2 types of Advances on my Account:

- Line of Credit Advances
- Fixed Rate Advances

The Bank must honor my request for Line of Credit Advances and Fixed Rate Advances (collectively, "Advances") as long as I am in compliance with all terms of this Agreement, including all modifications, addenda and amendments to it, and the Security Instrument.

As I use my Account, my available credit will be my credit limit minus the sum of all unpaid Advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I will not request an Advance that would cause the balance in my Account to exceed my credit limit, or which would violate the terms of this Agreement or any law. If I do exceed my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I understand that the Bank may refuse to allow any Advance if the Advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an Advance that does not comply. The Bank may allow any Advances in any sequence convenient to the Bank.

The Bank is authorized to make an Advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any Advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

### LINE OF CREDIT ADVANCES
Each Line of Credit Advance I request will be in the amount of $300 or greater.

### LINE OF CREDIT ADVANCE METHODS
While my Account is not in default, closed, or suspended, I may obtain a Line of Credit Advance by:

Requesting a Line of Credit Advance in person at any Bank branch
Requesting a Line of Credit Advance by phone
Transferring funds by using Wells Fargo Online®
In other ways the Bank authorizes from time to time
Writing an Advance request check or draft which the Bank has provided to me
Obtaining a cash withdrawal or transferring funds by using my Wells Fargo ATM Card or Wells Fargo ATM & Check Card, if offered by the Bank and I select such service
Using my home equity access credit card, if offered by the Bank and I select such service

### LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES
Finance charges begin to accrue on Line of Credit Advances immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for Line of Credit Advances (including current transactions) each day. To determine the daily balance, take the Line of Credit Advances balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), add any new Line of Credit Advances, and subtract any payments or credits that apply to the repayment of Line of Credit Advances. The result is the daily balance.

The Daily Periodic Rate for Line of Credit Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Margin, the initial Daily Periodic Rate, and the initial ANNUAL PERCENTAGE RATE, are each disclosed below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on my Line of Credit Advances will be adjusted the day after an Index change is published, using the new Index value. Therefore, the Daily Periodic Rate for Line of Credit Advances may change (increase or decrease) as often as once each day based on changes in the Index. I understand that any increase may cause me to make larger monthly payments.

### LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES
The Daily Periodic Rate for Line of Credit Advances will never exceed 0.049315% (corresponding ANNUAL PERCENTAGE RATE of 18.00%). This is the Lifetime Rate Cap for Line of Credit Advances.

### LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES
The Daily Periodic Rate for Line of Credit Advances will never fall below 0.002740% (corresponding ANNUAL PERCENTAGE RATE of 1.000%). This is the Lifetime Rate Floor for Line of Credit Advances.

### MY INITIAL RATE FOR LINE OF CREDIT ADVANCES
As discussed above, my Daily Periodic Rate is based on the value of the Index plus a Margin. The initial Index value that applies to my Account will be the value of the Index on the day I open my Account. The following disclosures are based on the value of the Index in effect on November 14, 2014. I understand that if I open my Account after this date, my actual Index value, Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE may be higher or lower than the rates disclosed below. This rate takes into account any discounts for which I am eligible and I have chosen.

My Margin for Line of Credit Advances is equal to ZERO AND FIVE HUNDRED THOUSANDTH percentage points (0.500%). As a result, my initial Daily Periodic Rate is 0.010274% (corresponding ANNUAL PERCENTAGE RATE of 3.750%).

**LINE OF CREDIT ADVANCES MINIMUM MONTHLY PAYMENT**
During the Draw Period, my Minimum Monthly Payment for Line of Credit Advances shall be equal to:

**Amortizing Payment:** My Minimum Monthly Payment for Line of Credit Advances will include both principal and interest. My Minimum Monthly Payment will be equal to the amount calculated by determining substantially equal, fully amortizing payments sufficient to repay the outstanding Line of Credit Advances balance on the last day of the billing cycle over a term equal to the number of months remaining in the Draw Period plus two hundred and forty (240) months at the ANNUAL PERCENTAGE RATE in effect on the last day of the billing cycle. My Minimum Monthly Payment will never be less than the sum of all accrued and unpaid periodic FINANCE CHARGES on Line of Credit Advances. My Minimum Monthly Payment will change each month based on the outstanding Line of Credit Advances balance and applicable ANNUAL PERCENTAGE RATE in accordance with this Agreement. My Minimum Monthly Payment will never be less than the lesser of $100 or the amount sufficient to repay the Line of Credit Advances balance plus accrued periodic FINANCE CHARGES.

**FIXED RATE ADVANCES DURING THE DRAW PERIOD**
I have the option to convert outstanding unpaid Line of Credit Advances to Fixed Rate Advances during the Draw Period based on credit limit availability. The minimum Fixed Rate Advance during the Draw Period is $10,000. I may request up to 2 Fixed Rate Advances each year. For purposes of this rule, the first "year" will begin on the Effective Date. Subsequent years will begin on each anniversary of the Effective Date. I may have no more than 3 Fixed Rate Advances outstanding at any one time. On the Effective Date, I may request an initial Fixed Rate Advance in an amount that does not exceed my available credit. After the Effective Date, the sum of all outstanding Fixed Rate Advances taken after the Effective Date may not exceed the lesser of my available credit or $250000.00. I must select the repayment term for the Fixed Rate Advance at the time I request the Fixed Rate Advance.

**Fully Amortizing Payments:**
For a Fixed Rate Advance with fully amortizing payments during the Draw Period (see the section below titled **"FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD"**), the repayment term must be a period of whole years and in the range described below:

| Fixed Rate Advance Amount | Term Range |
|---|---|
| $10,000 - 19,999.99 | 5 to 15 years |
| $20,000 and above | 5 to 20 years |

**Partially Amortizing Payments:**
For a Fixed Rate Advance with the partially amortizing payments during the Draw Period (see the section below titled **"FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD"**), the repayment term must be at least one year and not more than the lesser of 5 years or the remaining term of the Draw Period minus one month. At the end of the term, the balance will convert to a Line of Credit Advance.

Wells Fargo Home Equity Account Agreement HE105011,
HCWF#922v56 (5/17/2014)
HE-105011-0214

4/18
Documents Processed 11-14-2014 20:01:41

EXHIBIT A, page 19

**FIXED RATE ADVANCE METHODS DURING THE DRAW PERIOD**
While my Account is not in default, closed, or suspended, I may obtain a Fixed Rate Advance by:
- Requesting a Fixed Rate Advance in person at any Bank branch.
- Requesting a Fixed Rate Advance by phone.

**TERMINATION OF FIXED RATE ADVANCES BY BORROWER DURING THE DRAW PERIOD**
During the Draw Period, while my Account is not in default, closed, or suspended, and as the Bank may allow, I may request that the Bank terminate any Fixed Rate Advance by sending you signed, written instructions to the Correspondence Address indicated on my billing statement. When the Fixed Rate Advance has been terminated, the outstanding balance of the Fixed Rate Advance will be added back to any Line of Credit Advances, and FINANCE CHARGES will accrue at the variable ANNUAL PERCENTAGE RATE described in the Agreement for Line of Credit Advances. Once a Fixed Rate Advance is terminated, I will not be able to reinstate the Fixed Rate Advance under the previous terms.

**FIXED RATE ADVANCES PERIODIC FINANCE CHARGES DURING THE DRAW PERIOD**
Fixed Rate Advances will accrue periodic FINANCE CHARGES beginning on the day that the Bank converts any Line of Credit Advances to a Fixed Rate Advance. I will be charged a periodic FINANCE CHARGE on all outstanding unpaid Fixed Rate Advances each day at a fixed Daily Periodic Rate. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Advance (including current transactions) each day. To determine the daily balance for the Fixed Rate Advance, take the Fixed Rate Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), and subtract any payments or credits that apply to the repayment of the Fixed Rate Advance. The result is the daily balance.

The Daily Periodic Rate for Fixed Rate Advances (other than any initial Fixed Rate Advance that I request on the Effective Date) is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a Fixed Rate Advance. The Margin for Fixed Rate Advances is eight percentage points (8.000%), but the Margin may be lower than eight percentage points (8.000%) depending upon the amount and term of the Fixed Rate Advance and other pricing indicators that exist at the time we receive your request for a Fixed Rate Advance.

The corresponding ANNUAL PERCENTAGE RATE for Fixed Rate Advances will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

**LIFETIME RATE CAP FOR FIXED RATE ADVANCES DURING THE DRAW PERIOD**
The Daily Periodic Rate for Fixed Rate Advances will not exceed 0.049315% (corresponding ANNUAL PERCENTAGE RATE of 18.00%). This is the Lifetime Rate Cap for my Fixed Rate Advances.

**INITIAL FIXED RATE ADVANCE**
On the Effective Date, I requested an initial Fixed Rate Advance in the amount of $500,000.00, and for a term of 12 months. My Daily Periodic Rate on this Initial Fixed Rate Advance is 0.004425% (corresponding ANNUAL PERCENTAGE RATE of 1.615%). The Partially Amortizing payment option will apply to this Fixed Rate Advance.

**FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD**
The following minimum payment options will apply to a Fixed Rate Advance during the Draw Period:

Wells Fargo Home Equity Account Agreement HE106011.
HCWF#922v56 (5/17/2014)
HE-106011-0214

5/16
Documents Processed 11-14-2014 20:01:41

EXHIBIT A, page 20

**Fully Amortizing Payments:** Under this option, my Minimum Monthly Payment for the Fixed Rate Advance will be equal to the amount of principal plus periodic FINANCE CHARGE sufficient to repay the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at the applicable corresponding ANNUAL PERCENTAGE RATE. This assumes that all payments will be made on their due dates, which will be the same as the due dates for my Line of Credit Advances Minimum Monthly Payment described above. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

**Partially Amortizing Payments:** Under this option my Minimum Monthly Payment for the Fixed Rate Advance will be equal to the amount calculated based on principal plus periodic Finance Charges and calculating substantially equal monthly payments sufficient to repay the Fixed Rate Advance over a term equal to the number of months remaining in the Draw Period plus two hundred and forty (240) months at the applicable ANNUAL PERCENTAGE RATE. The minimum payment will not fully repay the outstanding principal within the term I have selected for the Fixed Rate Advance. At the end of the term, the balance will no longer be subject to a fixed rate and will convert to a Line of Credit Advance.

During the Draw Period, my available credit for new Line of Credit Advances will be replenished by the amount of principal I repay on my Fixed Rate Advances.

## MY TOTAL PAYMENT DUE DURING THE DRAW PERIOD

I will receive monthly billing statements from the Bank. I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Draw Period consists of my Line of Credit Advances Minimum Monthly Payment plus my Fixed Rate Advance Minimum Monthly Payment(s) together with all past due amounts, overlimit amounts and all other charges due.

## SECTION 5: MY ACCOUNT DURING THE REPAYMENT PERIOD

### REPAYMENT PERIOD

I understand that I may not receive new Advances after the Draw Period ends. At that time, I will begin the Repayment Period, which will continue for no more than 20 years after the end of the Draw Period.

### REPAYMENT OF OUTSTANDING FIXED RATE ADVANCES

During the Repayment Period, I will continue to make the same Fixed Rate Advance Minimum Monthly Payment for any Fixed Rate Advance that was in effect at the end of the Draw Period. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

### REPAYMENT OF LINE OF CREDIT ADVANCES BALANCE

At the end of the Draw Period, my outstanding unpaid Line of Credit Advances balance must be repaid over the Repayment Period. The Repayment Period will have a term of 15 years if the unpaid Line of Credit Advances balance is less than $20,000 or 20 years if the unpaid Line of Credit Advances balance is $20,000 or more.

The Line of Credit Advances Balance Minimum Monthly Payment will be the greater of $100 or an amount sufficient to repay the unpaid Line of Credit Advances balance by the end of the scheduled term in substantially equal, fully amortizing monthly payments of principal and periodic FINANCE CHARGE at the applicable corresponding ANNUAL PERCENTAGE RATE. If my payments are not consistently made when due, the Line of Credit Advances Balance Minimum Monthly Payment may not fully repay the unpaid Line of Credit Advances balance over its term and my final payment for the unpaid Line of Credit Advances balance may be higher. The Bank will notify me in advance of any changes to my Total Payment Due as a result of the Line of Credit Advances Balance Minimum Monthly Payment.

**PERIODIC FINANCE CHARGE ON LINE OF CREDIT ADVANCES BALANCE**
Periodic FINANCE CHARGES on my unpaid Line of Credit Advances balance will begin to accrue on the first day of the Repayment Period. I will be charged a periodic FINANCE CHARGE based on the unpaid Line of Credit Advances balance at the end of each day at a fixed Daily Periodic Rate.

The Daily Periodic Rate for the unpaid Line of Credit Advances balance is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the Index value published on the last business day during the Draw Period. The Margin for the unpaid Line of Credit Advances balance is eight percentage points (8.000%), but the Margin may be lower than eight percentage points (8.000%) depending upon the amount and term of the unpaid Line of Credit Advances balance and other pricing indicators that exist at the end of the Draw Period. The corresponding ANNUAL PERCENTAGE RATE on my unpaid Line of Credit Advances balance will never be more than the Lifetime Rate Cap for my unpaid Line of Credit Advances balance shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

**LIFETIME RATE CAP FOR MY LINE OF CREDIT ADVANCES BALANCE**
The Daily Periodic Rate for my unpaid Line of Credit Advances balance during the Repayment Period will not exceed 0.0493159% (corresponding ANNUAL PERCENTAGE RATE of 18.00%).
This is the Lifetime Rate Cap for my unpaid Line of Credit Advances balance during the Repayment Period.

**MY TOTAL PAYMENT DUE DURING THE REPAYMENT PERIOD**
I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Repayment Period is the total of my Fixed Rate Advance Minimum Monthly Payment(s) still due as the result of Fixed Rate Advances in effect on the day before the end of the Draw Period, plus the Line of Credit Advances Balance Minimum Monthly Payment as described above, together with all past due amounts, overlimit amounts and all other charges due. I must pay any remaining balance in full at the end of the Repayment Period.

## SECTION 6: OTHER FINANCE CHARGES

In addition to paying periodic FINANCE CHARGES, as described in Sections 4 and 5 above, I also agree to pay the following additional fees, each of which is a FINANCE CHARGE:

**ANNUAL FEE**
Beginning on the first anniversary of the Effective Date, and continuing at each anniversary thereafter during the Draw Period, whether or not I use the Account, I will pay a $75.00 non-refundable annual fee. I will not have to pay an annual fee if my Account is open (has not been closed or suspended under Section 16 or 17 below) and the average daily balance in my Account is $20,000 or greater for the 12 monthly billing cycles up to and including my anniversary month. For the purpose of making this determination, the Bank will add the average daily balances for Line of Credit Advances and Fixed Rate Advances from the previous 12 monthly billing cycles and divide the total by 12.

EXHIBIT A, page 22

## SECTION 7: ADDITIONAL OTHER FINANCE CHARGES AND CLOSING COSTS

I agree to pay upon the opening of my Account the other FINANCE CHARGES and other charges that are enumerated and disclosed on the attached Statement of Fees, Charges, and Disbursements Addendum which is integrated by reference into this Agreement.

## SECTION 8: ADDITIONAL FEES, COSTS AND CHARGES

In addition to the FINANCE CHARGES and closing costs described above, I agree to pay the following non-refundable fees, costs and charges, which will be owed once charged to my Account.

**LATE CHARGES**
During the Draw Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the Line of Credit Minimum Monthly Payment if my payment is more than 10 days past due.

During the Repayment Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the sum of all Fixed Rate Advance Minimum Monthly Payments and the Line of Credit Advances Balance Minimum Monthly Payment if my payment is more than 10 days past due.

**PREPAYMENT FEE**
I agree to pay a prepayment fee of $400.00. This fee will be due and payable in full at any time within the first 3 years after the Effective Date if I close my Account (for any reason other than default due to non-payment, casualty loss, refinance with you or your affiliate, or termination by the Bank). If my Account remains open (is not closed or suspended under Section 16 or 17 below) for more than 3 years after the Effective Date, no prepayment fee will be assessed. No tender of a prepayment of all amounts due under this Agreement shall be effective unless and until such prepayment is accompanied by the applicable prepayment fee.

**OTHER CHARGES**
To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:

    (a) **Fax Fee:** The Bank will charge a fax fee in the amount of $10 if I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine.

    (b) **Research Fee and Photocopy Fee:** The Bank will charge a research/photocopy fee in the amount of $5 per photocopy if I request or authorize others to request that the Bank research my Account or provide photocopies of Account documents for any purpose other than a billing error inquiry.

    (c) **Reconveyance or Satisfaction Fee:** The Bank will charge reconveyance and satisfaction fees as allowed by applicable law.

    (d) **Stop Payment Fee:** The Bank will charge a stop payment fee in the amount of $25 if I request or authorize others to request that the Bank stop payment on a draft I have used to request a Line of Credit Advance.

    (e) **Return Payment Fee:** The Bank will charge a return payment fee in the amount of FORTY AND 00/100THS dollars ($40.00) if I make a payment with a check, or by any other method, which is not honored for any reason. If a payment check or any other payment item is dishonored, the Bank will notify me through information included in my billing statement covering the period in which the returned check or other payment item is reversed against my Account.

    (f) **Overlimit Fee:** The Bank will charge an overlimit fee in the amount of $25 for each billing cycle in which I have exceeded my credit limit or have requested an Advance that would have caused me to exceed my credit limit.

    (g) **Return Advance Check Fee (Insufficient funds):** The Bank will charge a return advance check fee in the amount of $25 for each check or draft used to request a Line of Credit Advance that is returned unpaid (dishonored) by the Bank due to the requested Advance not meeting all requirements of this Agreement.

    (h) **Payoff Balance Information Fee/Payoff Demand Statement Fee:** The Bank will charge a payoff balance information fee/payoff demand statement fee in the amount of thirty dollars ($30.00) when I, or another person acting on my behalf, request written payoff information on the amounts required to satisfy all obligations under my Account.

Wells Fargo Home Equity Account Agreement HE105011.                            8/16
HCWF#922v56 (5/17/2014)                                Documents Processed 11-14-2014 20:01:41
HE-105011-0214

## SECTION 9: COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument, unless prohibited by applicable law.

## SECTION 10: METHOD OF PAYMENT

The Bank will provide me with a monthly billing statement and automatically charge my qualified deposit account (under the terms of a separate written Authorization for Automatic Transfer) for the Total Payment Due. If I owe other charges (other than annual fees), I must pay them separately. If I owe past due amounts on my Account, the Bank will not collect these amounts by using an Automatic Payment, and I must pay them separately.

## SECTION 11: SCHEDULED PAYMENT DUE DATE

My monthly payment due date for my Total Payment Due is the 15th day of each and every month during both the Draw and Repayment Periods.

## SECTION 12: MY PROMISE TO PAY

I promise to pay to the order of the Bank the total of all Advances which I receive or which I authorize to be made from my Account. I promise to pay the total of any FINANCE CHARGE, plus all amounts past due, overlimit amounts, and any late charges, fees, other charges and other obligations charged to my Account under this Agreement or the Security Instrument. All payments made under this Agreement will be made in U.S. Dollars. I will not mail any cash payments to the Bank. I may not take an Advance or use funds from an Advance to make payments on my Account.

The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment in order to assure that my check or other payment is honored.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank, in which case my payment must conform to the Bank's requirements for the other payment method as specified in my billing statement. Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 13: TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 14:  REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action, or (d) any other legitimate purposes associated with my Account.  I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine and reevaluate my credit qualifications at any time.  The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 15:  PAYOFF BALANCE INFORMATION

The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request.  If such request is made, including if the request is made  by an escrow holder, settlement agent or other third party on my behalf during the Draw Period, the Bank may immediately freeze my Account.  I agree that the Bank's receipt of such a request from me, an escrow holder, settlement agent or other third party on my behalf will be considered to be a request by me to suspend credit privileges on my Account.  While my Account is frozen, I cannot receive new Advances and the Bank will return unpaid any Advance request checks the Bank receives and will refuse to honor any other Advance request made on my Account.  To reactivate the Advance feature on the Account during the Draw Period, the Bank must receive written confirmation from the escrow holder, settlement agent or other third party on my behalf that the escrow or other settlement has been cancelled; further, all Borrowers must sign a written request and send it to the address indicated on my monthly billing statement.

## SECTION 16:  DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent, failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement, or (d) I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of my entire Account balance.

If I am in default, the Bank, subject to applicable law, may do any or all of the following:  (a) close my Account immediately, without notice; (b) return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account; and (c) require immediate payment of the entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Security Instrument, which may result in the loss of the Property. All remedies are distinct, cumulative and not exclusive, and the Bank is entitled to all remedies provided at law or equity, whether or not expressly set forth. If I am in default, the method of determining the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will remain as described in this Agreement.

The Bank and I agree that notwithstanding any other provision of this Agreement or the Security Instrument, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

Wells Fargo Home Equity Account Agreement HE105011, HCWF#922v56
(5/17/2014)
HE-105011-0214

Documents Processed 11-14-2014 20:01:41

10/16

EXHIBIT A, page 25

## SECTION 17:  CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT; REINSTATEMENT OF CREDIT

### CLOSURE OR SUSPENSION OF ACCOUNT; REDUCTION OF CREDIT LIMIT BY BORROWER

Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting that the Account be closed.  Any one Borrower may request a suspension of the Advance feature, at any time during the Draw Period.  Except when a Borrower requests a suspension of the Advance feature in connection with a Borrower-initiated request to modify the Account (for example, in connection with a Borrower's request for an interest rate reduction, extension, or other forbearance, or a request that the Bank subordinate its lien), the Borrower's request must be in writing, signed by a Borrower, and sent to the Bank at the address indicated on my monthly billing statement.  To reactivate the Advance feature on the Account during the Draw Period, the Bank will require all Borrowers to sign a written request and to send it to the address indicated on my monthly billing statement.

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BANK

I will receive a written notice if the Bank suspends or freezes my Account or reduces my credit limit as required under applicable law.  The notice will include the reason(s) for such action(s).  Thereafter, if I wish to reinstate my Account or increase my credit limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s).  I also agree to provide the Bank promptly with any additional information necessary to support my request.

The Bank may suspend the use of my Account and temporarily prohibit future Advances during the Draw Period, or the Bank may reduce my credit limit, for any reason permitted by applicable law, including without limitation, (a) if the annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 16 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account.  To the extent permitted by applicable law, I agree to pay to the Bank the cost of obtaining such additional information.

If my Account is closed or suspended for any reason, the Bank may return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account.  I will continue to be responsible for full payment of the balance of my Account as well as all other Account obligations, according to the terms of this Agreement.

EXHIBIT A, page 26

## SECTION 18:  FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement are accurate, valid and enforceable, and become and continue to be secured by the Security Instrument.

## SECTION 19:  CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property.  I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property, unless prohibited by applicable law.  In this regard, I understand that my Account is secured by a Security Instrument containing the following or a substantially similar provision:

> If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 12 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## SECTION 20:  CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events.  The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which index values are determined, index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the interest or FINANCE CHARGE I am required to pay).  The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees.  In accordance with federal law, the Bank may also change the index and Margin used to determine the ANNUAL PERCENTAGE RATE(S) that apply to my Line of Credit Advances and/or Fixed Rate Advances if the original Index is no longer available.  The Bank may make any of the changes discussed above without my consent, unless applicable law provides otherwise.  The Bank will give me any notice of change that is required by law.  I may also agree to changes in writing.

## SECTION 21:  WAIVERS

### BORROWER'S WAIVERS

I waive my rights to require the Bank to do certain things.  Those things are:  (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest").  Anyone else who agrees to keep the promises made in this Agreement, or who agrees to make payments to the Bank if I fail to keep my promises under this Agreement, or who signs this Agreement to transfer it to someone else, waives these rights.  These persons are known as "guarantors, sureties and endorsers."

### BANK'S NON-WAIVER

The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations.  The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Agreement.

## SECTION 22:  GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law.  In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted by federal law with respect to national banks and, to the extent not preempted by federal law, the laws of the state in which the Property is located.

If any provision of this Agreement or the Security Instrument is determined to be invalid or unenforceable by a court of competent jurisdiction, the rest of this Agreement will remain in full force and effect and enforceable according to its terms. All references in this Agreement to the singular shall include the plural and vice versa.

## SECTION 23:  LOST OR STOLEN ADVANCE REQUEST CHECKS; BILLING ERRORS

### LOST OR STOLEN ADVANCE REQUEST CHECKS (WHERE AVAILABLE); BILLING ERRORS
I will immediately contact the Bank at the phone number on my monthly billing statement and confirm by letter if any of my Advance request checks are ever lost or stolen, if there are any errors in my monthly billing statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled Advance request checks or other Advance request instruments after paying them. The Bank will make available photocopies of my Advance request checks and other Advance request instruments upon request. I will examine my Account statements promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each Advance request check, I agree that even though I will not receive the original Advance request checks, all time periods under the Uniform Commercial Code (UCC) for examining my monthly billing statement and reporting improper entries, including the UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is first sent or made available to me.

### UNAUTHORIZED TRANSACTIONS
I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my monthly billing statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank branch office. I may also send written notice to the Bank at the address indicated on my billing statement.

### Billing Rights - Keep This Notice For Future Use
This notice contains important information about my rights and the Bank's responsibilities under the Fair Credit Billing Act.

### Notify The Bank In Case Of Errors Or Questions About My Bill
If I think my billing statement is wrong, or if I need more information about a transaction on my billing statement, I will send a letter on a separate page to the Bank at the address listed on my billing statement. Write to the Bank as soon as possible. The Bank must hear from me no later than 60 days after the Bank sent me the first billing statement on which the error or problem appears. I can telephone the Bank, but doing so will not preserve my rights.

In my letter, I will provide the Bank with the following information:
*   My name, Account number and daytime phone number, and
*   The dollar amount of the suspected error, and
*   A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized the Bank to pay my Account automatically from my savings or checking account at the Bank, I can stop the payment on any amount I think is wrong. To stop the payment, my letter must reach the Bank at least three business days before the automatic payment is scheduled to occur.

### My Rights And The Bank's Responsibilities After Receipt Of My Written Notice
The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the billing statement was correct.

After the Bank receives my letter, the Bank cannot try to collect any amount I question, or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while the Bank is researching my Account, but I am still obligated to pay the parts of my bill that are not in question.

If the Bank finds that a mistake was made on my billing statement, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank thinks I owe, the Bank may report me as delinquent.  However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports me to that I have a question about my bill.  And, the Bank must tell me the name of anyone the Bank reports me to.  The Bank must tell anyone the Bank reports me to that the matter has been settled when it finally is.

If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my billing statement was correct.

## SECTION 24: NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement  may be given by mailing it to my address as set forth above in this Agreement, or to a different address if I have properly notified Lender of that different address.  I understand that I am responsible for promptly notifying Lender of a change in my name, address (including the email address(es) I use for online banking with Lender and any other email address(es) at which I agree to be contacted) or telephone number(s) (including any wireless telephone number(s) at which I agree to be contacted).  Any notice that I may send to Lender must be given by mailing it to Lender at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

From time to time, Lender may monitor and record telephone calls regarding my account to assure the quality of its service. I agree, in order for Lender to service the account or to collect any amounts I may owe, that Lender or its designated representatives may from time to time make calls and/or send e-mails and/or text messages to me, sometimes using prerecorded/artificial voice messages and/or through the use of an automatic dialing device, at any telephone number associated with my account, including wireless telephone numbers that could result in charges to me, or at any e-mail address I provide to Lender.

## SECTION 25: ADDENDA

I agree to the following attached addenda, modifications or amendments:

Statement of Fees, Charges and Disbursements Addendum
N/A

## SECTION 26: STATE DISCLOSURES,

N/A

THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE CLOSING DOCUMENTS EXECUTED HEREWITH CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

NOTICE TO THE BORROWER
DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED.   READ THIS AGREEMENT BEFORE SIGNING IT.

## ACKNOWLEDGMENT

I have received, read and retained a copy of this *Wells Fargo Home Equity Account* Agreement and Disclosure Statement (the "Agreement"), the Security Instrument, the Agreement to Provide Insurance, and the Statement of Fees, Charges, and Disbursements Addendum provided to me at the closing, all of which I agree to by signing this Agreement. The Statement of Fees, Charges, and Disbursements Addendum is incorporated into and made a part of this Agreement. I acknowledge receipt of the *Wells Fargo Home Equity Account* Important Terms disclosure and the home equity brochure when I applied for this Account. In addition, I hereby agree that the terms of this Agreement replace the terms of any prior oral or written agreements between the Bank and me about this Account, including, for example, any and all commitment letters and pre-approval letters between the Bank and me about this Account.

_____   _____
BORROWER               DATE SIGNED
GERALD S GLATTS

_____   _____
BORROWER               DATE SIGNED
KATARINA DUBAN

Loan Originator's Name: Leah Catherine Samos Andres
NMLSR ID: 1032907

Wells Fargo Home Equity Account Agreement HE105011, HCWF#6922v56   16/16
(5/17/2014)               Documents Processed 11-14-2014*20:01:42
HE-105011-0214

# Authorization for Automatic Transfer (Payment)



Reference #: 20142679900063

| ☒ Checking or Command | ☐ Savings |

**Transfer From:** Routing transit number (9 digit number on the bottom left of your check)
121042882

Account number (to the right of the bank routing number on your check)
3530351315

**Customer name**
GERALD S GLATTS

**Institution name**
WELLS FARGO

**Transfer To:**
☐ Installment Loan
☒ Line of Credit

Account number
682-682-2408147-1998

**Customer name**
GERALD S GLATTS

## Transfer Information/Payment Options: (Limited to one payment per month, on due date)

| Payment Options | Transfer Amount |
| --- | --- |
| ☒ Regular payment (Loans & Lines of Credit) | Amount determined under my Agreement |
| ☐ Regular payment plus additional principal (Loans & Lines of Credit) | Additional principal $ _____ |
| ☐ Greater of total payment due (including annual fee, if any) or a fixed amount (Lines of Credit and Fixed Rate Advance Only) | Fixed $ _____ |

I (We) authorize Wells Fargo to make debit entries in the form of ACH transfers or other automatic transfers to the account identified above in the section entitled "Transfer From" for the purpose of completing the transfers described above. I (we) acknowledge that the origination of ACH transfers to my (our) account must comply with the provisions of U.S. Law and the Rules of the National Automated Clearing House Association. The regular payment will not be withdrawn from your account if your account is paid in advance. In that event, the regular payment will be withdrawn from your account on the next following payment due date as shown on the statement.

If the account's payment due date falls on a weekend or holiday your payment will be credited as of the date due on the next business day. If this is a new automatic payment set up or a change to your account or bank routing number for an existing automatic payment, your automatic payment feature will be established within 10 business days after the request is received. If your next scheduled payment is due within these 10 business days, you must make your payment as the automatic payment may not have taken effect. The payment amount will vary with changes in escrow or principal and interest components, if applicable. This authorization may be cancelled by calling us at or sending written notice to the applicable department indicated below or, by completing a new copy of this form. Wells Fargo must be notified of cancellation at least 10 days prior to the payment due date or payoff of the loan. I (We) further acknowledge receiving a copy of this authorization.

Wells Fargo Bank, N.A.
ACH/Customer Copies MAC: R4058/03A
P.O. Box 50010
Roanoke, VA 24022
1-866-439-3557 (toll free)

Customer signature
X _Gerald S. Glatts_     Date _11-17-14_
GERALD S GLATTS

Customer signature
X _K. Duban_     Date _11-17-14_
KATARINA DUBAN

ACH Authorization EQ HE101004 CDP v4.0 (08/17/2013)
HE-HE101004-0313FIP

1/1
Documents Processed 11-14-2014 20:01:37

RESCANS PREPPED BY DELLA ESKRO

RESCANS PREPPED BY DELLA ESKRO

RESCANS PREPPED BY DELLA ESKRO

EXHIBIT 2

AFTER RECORDING, RETURN TO:
AMERICAN TITLE, INC.
P.O. BOX 641010
OMAHA, NE 68164-1010
ATM___2014!0022152

DOC# 2014-0559457

Dec 18, 2014  04:59 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES:  $42.00

Recording Requested By/Return To:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557
MAC B6955-013
Billings, MT 59107-9900

This Instrument Prepared by:
Wells Fargo Bank, N.A.
DONA MILLER
DOCUMENT PREPARATION
2324 OVERLAND AVE
BILLINGS, MT 59102
866-537-8489

[Space Above This Line For Recording Data]

### SHORT FORM OPEN-END DEED OF TRUST

REFERENCE #:  20142679900063                    ACCOUNT #:  XXX-XXX-XXX8147-1998

DEFINITIONS

Words used in multiple sections of this document are defined below.  The Fictitious Deed of Trust includes other defined words and rules regarding the usage of words used in this document.

(A) "Security Instrument" means this document, which is dated November 17, 2014, together with all Riders to this document.
(B) "Borrower" is KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009, AND GERALD S GLATTS, A NON-VESTED SPOUSE, HUSBAND AND WIFE, whose address is 3572 COPPER CREST RD  ENCINITAS, CA 92024. Borrower is the trustor under this Security Instrument.
(C) "Lender" is Wells Fargo Bank, N.A.. Lender is a National Bank organized and existing under the laws of the United States of America.  Lender's address is 101 North Phillips Avenue, Sioux Falls, SD  57104.
(D) "Trustee" is American Securities Company P.O. Box 31557, Billings, MT 59107.
(E) "Debt Instrument" means the loan agreement or other credit instrument signed by Borrower and dated November 17, 2014. The Debt Instrument states that Borrower owes Lender, or may owe Lender, an amount that may vary from time to time up to a maximum principal sum outstanding at any one time of, FIVE HUNDRED THOUSAND AND 00/100THS Dollars (U.S. $500,000.00) plus interest.

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT                    (page 1 of 5 pages)
CA107026, HCWF#997v7 (8/16/14)  C4-102-4014          Documents Processed 11-14-2014 20:01:54

EXHIBIT A, page 35

Borrower has promised to pay this debt in Periodic Payments and to pay the debt in full not later than seven (7) calendar days after December 17, 2044.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means all amounts owed now or hereafter under the Debt Instrument, including without limitation principal, interest, any prepayment charges, late charges and other fees and charges due under the Debt Instrument, and also all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [mark as applicable]:

    N/A  Leasehold Rider
    X   Third Party Rider
    N/A  Other(s) [specify]    N/A

(I) "Fictitious Deed of Trust" means the Fictitious Open-End Deed of Trust dated June 14, 2007, and recorded on August 29, 2007, as Instrument Number 2007-0573812 in Book n/a at Page n/a of the Official Records in the Office of the Recorder of San Diego County, State of California.

TRANSFER OF RIGHTS IN THE PROPERTY

    This Security Instrument secures to Lender: (i) the repayment of the Loan, and all future advances, renewals, extensions and modifications of the Debt Instrument, including any future advances made at a time when no indebtedness is currently secured by this Security Instrument; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Debt Instrument. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

            County       of            San Diego        :
[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE ATTACHED EXHIBIT A

APN/PARCEL: 264-223-22-00

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT                  (page 2 of 5 pages)
CA107003i  HCWF#997y7 (8/1G/14)  CA45994-0914           Documents Processed 11-14-2014 20:01:54

which currently has the address of

3572 COPPER CREST RD
[Street]

ENCINITAS _____, California  92024 ,  ("Property Address"):
[City]                                      [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." The Property shall also include any additional property described in Section 20 of the Fictitious Deed of Trust.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the execution date of this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

FICTITIOUS DEED OF TRUST

By the execution and delivery of this Security Instrument, Borrower agrees that all of the provisions of the Fictitious Deed of Trust are hereby incorporated in their entirety into this Security Instrument. Borrower agrees to be bound by and to perform all of the covenants and agreements in the Fictitious Deed of Trust. A copy of the Fictitious Deed of Trust has been provided to Borrower.

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT                          (page 3 of 5 pages)
CA107008, HCWF0957v7 (8/16/14)   CV-160006-0314                    Documents Processed 11-14-2014 20:01;44

EXHIBIT A, page 37

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.  Borrower also acknowledges receipt of a copy of this document and a copy of the Fictitious Deed of Trust.

In accordance with California Civil Code Section 2924b, the undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address of the Borrower set forth above.  NOTICE: A copy of any Notice of Default and any Notice of Sale will be sent to the address contained in this recorded request.  If the Borrower's address changes, a new request must be recorded.

*Gerald S. Glatts*

GERALD S GLATTS                                                                                           -Borrower

*Katarina Duban  Trustee of the Katarina Duban Trust Dated January*

KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY     -Borrower *13, 2009*
13, 2009

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT                                           (page 4 of 5 pages)
CA10700S, HCWF8997v7 (8/16/14)   C0-10906-0216                          Documents Processed 11-14-2014 2020:04

EXHIBIT A, page 38

For An Individual Acting in His/Her Own Right:
State of California        )
                          ) ss.
County of _San Diego_     )

On _November 17 2014_ before me,_Sarah Michelle VanCoops-Bush_ Notary Public, personally appeared _Katarina Dubay, Trustee of the Katarina Dubay Trust Dated January 13, 2009, and Gerald S. Galatis, a non-vested spouse, husband and wife_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

_Sarah Michelle Van Coops-Bush_
Signature

[NOTARIAL SEAL]          _Sarah Michelle Van Coops-Bush_
                          Print Name



My commission expires: _March 8, 2018_

Loan Originator's Name: Leah Catherine Santos Andres
NMLSR ID: 1032907

CALIFORNIA - SHORT FORM OPEN-END SECURITY INSTRUMENT
CA107005, HCWF9997v7 (2/16/14)  CA107005-0014                Documents Processed 11-14-2014 20:01:48
                                                             (page 5 of 5 pages)

EXHIBIT A, page 39

## EXHIBIT A

Reference:   20142679900063                         Account: XXX-XXX-XXXX8147-1995

Legal Description:

THE FOLLOWING DESCRIBED PROPERTY SITUATED IN SAN DIEGO COUNTY, STATE OF CALIFORNIA, TO-WIT: PARCEL A: PARCEL 2, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS SHOWN AT PAGE 4460 OF PARCEL MAPS, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976. PARCEL B: EASEMENTS AND RIGHTS OF WAY FOR ROAD AND UTILITY PURPOSES AND APPURTENANCES THERETO, TO BE USED IN COMMON WITH OTHERS, OVER UNDER, ALONG AND ACROSS THOSE PORTIONS OF LOT 7 OF THE SUBDIVISION OF RANCHO LAS ENCINITAS, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 848, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JUNE 27, 1898, LYING WITHIN EASEMENT PARCELS "1" AND "2" AS FOLLOWS: EASEMENT PARCEL "1" A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE SOUTHERLY LINE OF SAID LOT 7, DISTANT THEREON SOUTH 86 DEGREES 55 MINUTES 53 SECONDS WEST, 193.36 FEET FROM THE SOUTHEAST CORNER THEREOF, BEING THE NORTHERLY TERMINUS OF THE CENTER LINE OF ROAD SURVEY NO. 554, AS SHOWN ON RECORD OF SURVEY MAP NO. 6085, SAID POINT ALSO BEING IN THE CENTER LINE OF ROAD SURVEY NO. 181: THENCE NORTHEASTERLY ALONG SAID CENTER LINE OF ROAD SURVEY NO. 181, AS ESTABLISHED BY THE CENTER LINE OF THE EXISTING TRAVELED WAY AS FOLLOWS: NORTH 08 DEGREES 15 MINUTES 03 SECONDS EAST, A DISTANCE OF 117.52 FEET TO THE BEGINNING OF A TANGENT 1000.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY: THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 19 DEGREES 42 MINUTES 30 SECONDS A DISTANCE OF 343.97 FEET; THENCE TANGENT TO SAID CURVE, NORTH 27 DEGREES 57 MINUTES 53 SECONDS: EAST, A DISTANCE OF 120.84 FEET TO THE EASTERLY LINE OF SAID LOT 7, SAID EASEMENT TO TERMINATE IN SAID SOUTHERLY AND EASTERLY LINES RESPECTIVELY OF SAID LOT 7. EASEMENT PARCEL "2" A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHERLY TERMINUS OF THE 1000.00 FOOT RADIUS CURVE, DESCRIBED IN EASEMENT PARCEL "1" ABOVE, A RADIAL LINE OF SAID CURVE BEARS NORTH 81 DEGREES 44 MINUTES 57 SECONDS WEST TO SAID POINT, THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 12 DEGREES 21 MINUTES 41 SECONDS A DISTANCE OF 215.74 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED CENTER LINE; THENCE SOUTH 86 DEGREES 55 MINUTES 53 SECONDS WEST, 510.06 FEET TO A POINT ON THE EASTERLY LINE OF THE LAND DESCRIBED IN DEED TO CHARLES A. MATLEY AND STEVEN P. KRISHE, RECORDED MARCH 16, 1972 ON FILE/PAGE 62561, PAGE 1972 OF OFFICIAL RECORDS, DISTANT THEREON SOUTH 02 DEGREES 08 MINUTES.56 SECONDS EAST, 377.16 FEET FROM THE NORTHEAST CORNER THEREOF, SAID EASEMENT TO TERMINATE IN THE EASTERLY LINE OF SAID MATLEY AND KRISHE'S LAND, AND IN THE WEST ON THE EASTERLY LINE OF PARCEL "C" HEREINAFTER DESCRIBED. PARCEL C: AN EASEMENT AND RIGHT OF WAY FOR ROAD AND UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS THOSE PORTIONS OF PARCELS 1, 3 AND 4, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS SHOWN AT PAGE 4460 OF PARCEL MAPS FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976, DELINEATED AND DESIGNATED ON SAID PARCEL MAP AS "PROPOSED 40.00 FOOT PRIVATE ROAD EASEMENT"

Exhibit A, HE101033 CDP,V1 07/2004                         Documents Processed 11-14-2014 20:01:37
HE101033-050214                                                                               1/2

AND "EXISTING 60.00 FOOT PRIVATE ROAD EASEMENT".

Exhibit A, HE101033 CDP.V1 07/2004
HE-101033-002214

Documents Processed 11-14-2014 20:01:37                    2/2

Reference Number:   20142679900063
Account Number:     XXX-XXX-XXX8147-1998

Wells Fargo Bank, N. A.

## THIRD PARTY RIDER

THIS THIRD PARTY RIDER is made on November 17, 2014 is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned Trustee(s) to secure the Debt Instrument from GERALD S GLATTS, KATARINA DUBAN, (individually and collectively referred to as the "Debtor") to Wells Fargo Bank, N. A. (the "Lender") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

3572 COPPER CREST RD , ENCINITAS, CA 92024
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, the undersigned Trustee(s) and Lender further covenant and agree as follows:

With respect to the KATARINA DUBAN TRUST (the "Trust"), the Security Instrument constitutes a third party mortgage/deed of trust and grant of security interest by the undersigned as Trustee(s) of said Trust in the Property to secure the Debt Instrument of the Debtor to the Lender.
Consequently, references in the Security Instrument to "Borrower" refer to the undersigned Trustee(s) and the Debtor if the context in which the term is used so requires. Without limiting the generality of the foregoing, the use of the term "Borrower" in the context of warranties, representations and obligations pertaining to the Property shall refer to the undersigned Trustee(s). The use of the term "Borrower" in the context of the requirements under the Debt Instrument shall refer to the Debtor.

Except with respect to the obligation(s) of the undersigned as individuals, and not as Trustee(s), with respect to the Debt Instrument before the date first set forth herein above and the obligation(s) of the undersigned as individuals with respect to the Debt Instrument prior to the transfer of the Property into the Trust, the Trust and the undersigned, as Trustee(s), are not liable for the debt evidenced by the Debt Instrument and are a party hereunder only insofar as their interest in the Property is made subject to the Security Instrument.

Further, revocation of the Trust, transfer of the Property by the Trust, or death of any Debtor shall constitute an event of default under the Security Instrument.

EXHIBIT A, page 42

By signing below, the undersigned Trustee(s) accept(s) and agree(s) to the terms and provisions contained in this Third Party Rider.

*Katar f White* TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009

KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009

Attach this Rider to the Security Instrument before Recording

Loan Originator's Name: Leah Catherine Santos Andres
NMLSR ID: 1032907

3rd Party Rider, HE1 c1137 HCWF#132.v10 (8/18/14)
HE-131137-0314

Documents Processed 11-14-2014 20:01:25

2/2

# EXHIBIT 3

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Wells Fargo Bank, N.A. and Does 1-25

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*
Donald Glatts, Trustee of Gerald S. Glatts Trust DTD December 10, 1981 as amended and restated

(FOR COURT USE ONLY)
(SOLO PARA USO DE LA CORTE)

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Diego County Superior Court
325 South Melrose Drive, Vista, CA 92081

**CASE NUMBER:**
*(Número del Caso):*

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
John J. McNutt, Gray Plant, 600 New Hampshire Ave NW (#700), Washington DC 20037 (202-295-2227)

| DATE:<br>*(Fecha)* | | Clerk, by<br>*(Secretario)* | | , Deputy<br>*(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| John J. McNutt, State Bar No. 243975<br>GRAY PLANT MOOTY MOOTY & BENNETT, P.A.<br>The Watergate, Suite 700, 600 New Hampshire Ave, NW<br>Washington, DC 20037<br>TELEPHONE NO: (202)295-2227      FAX NO: (202)295-2277<br>ATTORNEY FOR *(Name):* Plaintiff Donald Glatts TTE Gerald S Glatts Trust | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 325 South Melrose Drive
MAILING ADDRESS: 325 South Melrose Drive
CITY AND ZIP CODE: Vista, CA 92081
BRANCH NAME: North County

| CASE NAME:<br>Glatts v. Wells Fargo Bank, N.A. and Does 1-25 | |
|---|---|

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [✓] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[ ] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30) |
| Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23) | Real Property<br>[ ] Eminent domain/Inverse<br>condemnation (14)<br>[✓] Wrongful eviction (33)<br>[ ] Other real property (26) | [ ] Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41)<br>Enforcement of Judgment<br>[ ] Enforcement of judgment (20) |
| Non-PI/PD/WD (Other) Tort<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35) | Unlawful Detainer<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>Judicial Review<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11) | Miscellaneous Civil Complaint<br>[ ] RICO (27)<br>[ ] Other complaint *(not specified above)* (42)<br>Miscellaneous Civil Petition<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition (not specified above) (43) |
| Employment<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | |

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary   b.[✓] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action *(specify):* 3
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 22, 2017

John J. McNutt
_____        _____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |
|---|---|---|

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or
toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) *(not civil
harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer
or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally
complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent
domain, landlord/tenant, or
foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex
case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-
domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-
harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified
above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

EXHIBIT A, page 47

1  John J. McNutt, State Bar No. 243975
   Gray, Plant, Mooty, Mooty & Bennett, P.A.
2  The Watergate – Suite 700
   600 New Hampshire Avenue, N.W.
3  Washington, DC  20037
   Telephone:   202.295.2227
4  Facsimile:    202.295.2277
   john.mcnutt@gpmlaw.com
5
6  Attorneys for Plaintiff Donald Glatts,
   Trustee of the Gerald S. Glatts Trust DTD
7  December 10, 1981, as amended and restated

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF SAN DIEGO

10

11  DONALD GLATTS, Trustee of the Gerald S.       Case No.
    Glatts Trust DTD December 10, 1981, as
12  amended and restated                          VERIFIED COMPLAINT

13                   Plaintiff,                    1.   Quiet Title

14           v.                                    2.   Declaratory Relief

15  WELLS FARGO BANK, N.A. and DOES 1             3.   Restitution/Unjust Enrichment
    through 25, inclusive,
16                                                (Jury trial requested and demanded)
                     Defendants.
17

18

19

20          Plaintiff Donald Glatts, Trustee of the Gerald S. Glatts Trust dated December 10, 1981, as

21  amended and restated ("Glatts") hereby brings the following complaint to quiet title, for

22  declaratory relief, and for restitution/unjust enrichment against the following defendants: Wells

23  Fargo Bank, N.A., and Does 1 through 25, inclusive (collectively "Defendants"), as follows:

24                            GENERAL ALLEGATIONS

25          1.     This action arises from a dispute over the true ownership of a single family home

26  in San Diego County.  In November 2014, Wells Fargo Bank, N.A. (the "Bank") provided a

27  $500,000 loan to two joint borrowers.  The borrowers were Gerald S. Glatts and his wife Katarina

28  Duban.  As collateral for its loan, the Bank obtained and recorded a deed of trust against a

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

                                      1
                                 COMPLAINT

1   property, 3572 Copper Crest Road in Encinitas, that Duban purportedly owned and held in her
2   personal trust. Duban obtained title to the property by unduly influencing her husband Gerald to
3   execute various deeds transferring record title in the property to Duban. A copy of the legal
4   description of the property is attached as Exhibit 1 to this complaint.

5       2.    Prior to Duban's undue influence and the transfer of the property to her individual
6   trust, title to the property had been held by Gerald as trustee of a revocable trust. Gerald's son,
7   Donald Glatts ("Donald"), was the named successor trustee of Gerald's revocable trust.

8       3.    On September 17, 2014, after learning that Duban had unduly influenced his father
9   to transfer the property from Gerald's revocable trust to Duban's trust, Donald filed an action
10  against Gerald and Duban seeking to invalidate all of the documents that his father had executed
11  that purportedly transferred title to the property from Gerald's trust to Duban's trust. In his action
12  against Gerald and Duban, Donald sought to quiet title to the property, as of the date of the filing
13  of the action, in Donald's name as successor trustee of Gerald's trust. A copy of the petition
14  filed by Donald against Gerald and Duban, Case No. 37-2014-0031294-PR-TR-CTL, is attached
15  as Exhibit 2 to this complaint.

16      4.    On September 23, 2014, Gerald caused to be recorded a Notice of Pending Action
17  (Lis Pendens) putting the world on notice that true ownership of the property, both legal title and
18  record title, was held by Gerald as successor trustee to his father's trust and that no other person
19  held ownership in the property as of the date of the filing of the complaint. A copy of the Lis
20  Pendens, recorded in the County of San Diego Recorder's Office on September 23, 2014,
21  document number 2014-0004 11651, is attached as Exhibit 3 to this complaint.

22      5.    Despite having actual or constructive notice that Gerald and Duban did not hold
23  true ownership of the property, the Bank approved issuing a $500,000 loan to Gerald and Duban
24  that was to be secured by the property. At the time that it funded this loan, and obtained
25  signatures from Gerald and Duban on the loan documents and on a deed of trust against the
26  property, the Bank had actual or constructive notice that title to the property was disputed and that
27  Gerald and Duban might not have any ownership interest in the property at the time the deed of
28  trust was executed.

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 2 -

COMPLAINT

6.      Despite having actual or constructive notice that its security interest was at risk, the Bank elected to move forward with funding and disbursing the $500,000 loan to Gerald and Duban. The Bank then recorded its deed of trust on December 18, 2014 in the San Diego County Recorder's office as document number 2014-0559457. A copy of the Bank's deed of trust is attached as Exhibit 4 to this complaint.

7.      After recording a deed of trust against the property on December 18, 2014, the Bank took no further action to investigate the legitimacy of its loan transaction with Gerald and Duban. The Bank began issuing monthly statements demanding interest payments on the loan. Donald is informed and believes and on that basis alleges that the Bank received monthly payments of interest on the loan from January 2015 to the present. The Bank did not contact Donald or counsel for Donald to inquire about the merits of the action to invalidate the deeds transferring the property from Gerald to Duban. The Bank never filed any motion to intervene in the action by Donald seeking to confirm that he, rather than Gerald or Duban, was the true owner of the property.

8.      Because the Lis Pendens was already recorded at the time that the Bank obtained a deed of trust from Gerald and Duban, the Bank has no legitimate basis to argue that Donald is not entitled to a judgment that the Bank's deed of trust, signed and recorded more than six weeks after the Lis Pendens was recorded, is void and ineffective.

9.      Donald's action filed in September 2014 seeking to invalidate all deeds purportedly transferring title from Gerald to Duban or to her Trust was resolved by order of the Superior Court of California, County of San Diego (Probate Division) dated January 20, 2017. In the Court's order, title to the property was confirmed to be in the name of Donald as successor trustee of Gerald's trust. All deeds executed by Gerald purportedly transferring title to the property to Duban or to her Trust were invalidated and deemed void. A copy of the Court's order was recorded in the San Diego County recorder's office on February 1, 2017 as document number 2017-0054097. The Court's order is attached as Exhibit 5 to this complaint and incorporated by reference into the body of this complaint.

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 3 -
COMPLAINT

10.     As a result of the action filed by Donald on September 17, 2014, the Lis Pendens recorded on September 23, 2014, and the Probate Court's order dated January 20, 2017, title to the property has been held at all relevant times by Donald Glatts and not by Gerald or Duban. The Bank's deed of trust against the property is void and ineffective and must be expunged. Donald is entitled to a judgment confirming that the Bank has no lien against or interest in the property of any kind.

11.     The specific identities of the Defendants named as Does 1-25 in this action are currently unknown to Plaintiff. On information and belief, Plaintiff alleges that Does 1-25 are jointly responsible with the Bank and the other defendants for the damages suffered by Plaintiff. Plaintiff will name specific additional defendants to this action when Plaintiff learns the identity of those specific defendants.

12.     Plaintiff is a resident of San Diego County, California. Wells Fargo Bank, N.A. is registered to do business in California and is doing business in California, including in San Diego County. The Bank has done business in San Diego County at all relevant times. Venue is appropriate in San Diego County because the action is an *in rem* proceeding to quiet title to real property located in San Diego County. Venue (and specific personal jurisdiction over the Bank) is appropriate in this forum because the conduct that caused the harm took place in San Diego County. The conduct that caused the harm took place in San Diego County which is where the void deed of trust was executed by Gerald and Duban and recorded by the Bank.

## FIRST CAUSE OF ACTION

### Quiet Title

### (Against Wells Fargo Bank, N.A. and Does 1-25)

13.     Plaintiff incorporates by reference all preceding paragraphs of this complaint.

14.     Plaintiff seeks to quiet title to the following real property: 3572 Copper Crest Road, Encinitas, California 92024. A copy of the legal description is attached to this complaint as Exhibit 1 and hereby incorporated in full into the body of this complaint.

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

- 4 -

COMPLAINT

15.     Plaintiff seeks to quiet title against Wells Fargo Bank, N.A., against any successors-in-interest to Wells Fargo Bank, N.A., and against any assignees to the deed of trust recorded in San Diego County on December 18, 2014 as document number 2014-0559457.

16.     Plaintiff's basis for seeking to quiet title is that he is the true owner of the property in question and was the true owner of the property in question at all relevant times and prior to the date that the Bank obtained signatures from Gerald and Duban on the deed of trust prepared by the Bank.

17.     Plaintiff is entitled to a judgment in his favor confirming that the title to the property is free and clear and held by Plaintiff and without any adverse interest or lien in the property held by Wells Fargo Bank, its assignees and successors-in-interest, and Does 1-25.

18.     Plaintiff is entitled to a judgment quieting title in his favor as of September 17, 2014.

## SECOND CAUSE OF ACTION

### Declaratory Relief

### (Against Wells Fargo Bank and Does 1-25)

19.     Plaintiff incorporates by reference all preceding paragraphs of this complaint.

20.     A controversy has arisen between Plaintiff and Defendants.

21.     Plaintiff is entitled to a judgment declaring that the Bank and Does 1-25 have no interest in the property in question.  Plaintiff owns the property free and clear and the Bank and Does 1-25 have no interest in the property.

22.     Plaintiff is further entitled to a judgment declaring that the Bank and Does 1-25 have no claims, rights, or liens against Plaintiff.

## THIRD CAUSE OF ACTION

### Restitution/Unjust Enrichment

### (Against all Defendants and Does 1-25)

23.     Plaintiff incorporates by reference all preceding paragraphs of this complaint.

24.     Plaintiff has paid thousands of dollars to the Bank to avoid any attempt by the Bank to try and conduct a non-judicial foreclosure of the property based on the Bank's void deed

- 5 -

COMPLAINT

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

1  of trust.  Plaintiff is entitled to a judgment against the Bank for the amount of money that Plaintiff

2  has paid to the Bank servicing the loan to avoid an illegal, non-judicial foreclosure of the property.

3      25.      The Bank would be unjustly enriched if it is not required to return all funds to

4  Plaintiff that Plaintiff has paid to the Bank to avoid an illegal non-judicial foreclosure of the

5  property while the action to confirm Donald's ownership of the property was pending.

6      26.      Donald is entitled to damages in an amount to be proven at trial.

7                          **PRAYER FOR RELIEF**

8      WHEREFORE, plaintiff Donald Glatts, Trustee of the Gerald S. Glatts Trust dated

9  December 10, 1981, as amended and restated, prays for a judgment by the Court as follows:

10     For the First Cause of Action to Quiet Title.

11     1.      For a judgment that title is quieted in favor of Plaintiff and against Defendants as

12 of September 17, 2014.

13     2.      For costs; and

14     3.      For such other and further relief as the Court deems just and proper.

15     For the Second Cause of Action for Declaratory Relief

16     1.      For a judgment that Defendants have no interest in the property in question located

17 at 3572 Copper Crest Road, Encinitas, California

18     2.      For costs; and

19     3.      For such other and further relief as the Court deems just and proper.

20

21

22

23

24

25

26

27

28

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

                          - 6 -
                       COMPLAINT

<u>For the Third Cause of Action for Restitution/Unjust Enrichment</u>

     1.    For special damages in favor of Plaintiff and against all defendants (joint and several liability) in an amount to be determined at trial;

     2.    For costs; and

     3.    For such other and further relief as the Court deems just and proper.

Dated: March 21, 2017.               Gray Plant Mooty, P.A.

                                         By: _____

                                       John J. McNutt,

                                     Attorneys for Plaintiff Donald Glatts, Trustee of the Gerald S. Glatts Trust DTD December 10, 1981 as amended and restated

## VERIFICATION

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on March 22, 2017.

                                       Donald Glatts

GPM:4806298

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
ATTORNEYS AT LAW
WASHINGTON, D.C.

-7-

COMPLAINT

Exhibit 1

## Legal Description

THE FOLLOWING DESCRIBED PROPERTY SITUATED IN SAN DIEGO COUNTY, STATE OF CALIFORNIA, TO-WIT:

PARCEL A:

PARCEL 2, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS SHOWN AT PAGE 4460 OF PARCEL MAPS, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976.

PARCEL B:

EASEMENTS AND RIGHTS OF WAY FOR ROAD AND UTILITY PURPOSES AND APPURTENANCES THERETO, TO BE USED IN COMMON WITH OTHERS, OVER UNDER, ALONG AND ACROSS THOSE PORTIONS, OF LOT 7 OF THE SUBDIVISION OF RANCHO LAS ENCINITAS, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 848, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JUNE 27, 1898, LYING WITHIN EASEMENT PARCELS "1" AND "2" AS FOLLOWS:

EASEMENT PARCEL "1":

A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE SOUTHERLY LINE OF SAID LOT 7, DISTANT THEREON SOUTH 86 DEGREES 55 MINUTES 53 SECONDS WEST, 193.36 FEET FROM THE SOUTHEAST CORNER THEREOF, BEING THE NORTHERLY TERMINUS OF THE CENTER LINE OF ROAD SURVEY NO. 554, AS SHOWN ON RECORD OF SURVEY MAP NO. 6085, SAID POINT ALSO BEING IN THE CENTER LINE OF ROAD SURVEY NO. 181: THENCE NORTHEASTERLY ALONG SAID CENTER LINE OF ROAD SURVEY NO. 181, AS ESTABLISHED BY THE CENTER LINE OF THE EXISTING TRAVELED WAY AS FOLLOWS: NORTH 08, DEGREES 15 MINUTES 03 SECONDS EAST, A DISTANCE OF 117.52 FEET TO THE BEGINNING OF A TANGENT 1000.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY: THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 19 DEGREES 42 MINUTES 30 SECONDS A DISTANCE OF 343.97 FEET; THENCE TANGENT TO SAID CURVE, NORTH 27 DEGREES 57 MINUTES 53 SECONDS EAST, A DISTANCE OF 120.84 FEET TO THE EASTERLY LINE OF SAID LOT 7: SAID EASEMENT TO TERMINATE IN SAID SOUTHERLY AND EASTERLY LINES RESPECTIVELY OF SAID LOT 7.

EASEMENT PARCEL "2":

A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHERLY

TERMINUS OF THE 1000.00 FOOT RADIUS CURVE, DESCRIBED IN EASEMENT PARCEL "1" ABOVE, A RADIAL LINE OF SAID CURVE BEARS NORTH 81 DEGREES 44 MINUTES 57 SECONDS WEST TO SAID POINT, THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 12 DEGREES 21 MINUTES 41 SECONDS A DISTANCE OF 215.74 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED CENTER LINE; THENCE SOUTH 86 DEGREES 55 MINUTES 53 SECONDS WEST, 510.06 FEET TO A POINT ON THE EASTERLY LINE OF THE LAND DESCRIBED IN DEED TO CHARLES A. MATLEY AND STEVEN P, KRISHE, RECORDED MARCH 16, 1972 ON FILE/PAGE 62561, PAGE 1972 OF OFFICIAL RECORDS, DISTANT THEREON SOUTH 02 DEGREES 08 MINUTES 56 SECONDS EAST, 377.16 FEET FROM THE NORTHEAST CORNER THEREOF. SAID EASEMENT TO TERMINATE IN THE EASTERLY LINE OF SAID MATLEY AND KRISHE'S LAND, AND IN THE WEST ON THE WESTERLY LINE OF PARCEL "B-1" HEREIN ABOVE DESCRIBED.

PARCEL C:

AN EASEMENT AND RIGHT OF WAY FOR ROAD AND UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS THOSE PORTIONS OF PARCELS 1, 3 AND 4, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS SHOWN AT PAGE 4460 OF PARCEL MAPS FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976, DELINEATED AND DESIGNATED ON SAID PARCEL MAP AS "PROPOSED 40.00 FOOT PRIVATE ROAD EASEMENT" AND "EXISTING 60.00 FOOT PRIVATE ROAD EASEMENT".

Exhibit 2



1  JEREMIAH J. MOFFIT (SBN 229878)
   CATHERINE M. SWAFFORD (SBN 239333)
2  McKENNA LONG & ALDRIDGE LLP
   600 West Broadway, Suite 2600
3  San Diego, California 92101-3372
   Telephone:    619.236.1414
4  Facsimile:    619.232.8311
   E-Mail:       jmoffit@mckennalong.com
5                cswafford@mckennalong.com

6  Attorneys for Donald Glatts, Petitioner

7

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                COUNTY OF SAN DIEGO, PROBATE DIVISION

11  In re the                          Case No. 37-2014-00031294-PR-TR-CTL

12      GERALD S. GLATTS TRUST dated    PETITION TO INVALIDATE DEEDS
13      December 10, 1981, as amended and  AND LIFETIME TRANSFERS ON THE
        restated on September 23, 1997,   BASIS OF UNDUE INFLUENCE, FRAUD,
14      October 14, 2011, and October 23,  DURESS, AND MENACE; FOR DOUBLE
        2013.                              DAMAGES, ATTORNEYS' FEES AND
15                                         COSTS; FOR QUASI-SPECIFIC
16                                         PERFORMANCE OF CONTRACT TO
                                           MAKE A WILL; FOR DAMAGES FOR
17  DONALD GLATTS,                         INTENTIONAL INTERFERENCE WITH
                                           EXPECTED INHERITANCE; FOR
18          Petitioner,                    DAMAGES FOR INTENTIONAL
                                           INTERFERENCE WITH CONTRACT;
19  v.                                     FOR COMPENSATORY DAMAGES,
                                           PUNITIVE DAMAGES, AND
20  KATARINA DUBAN, an individual;         ATTORNEYS' FEES AND COSTS FOR
    GERALD S. GLATTS, individually and as  FINANCIAL ELDER ABUSE AND
21  trustee of the GERALD S. GLATTS TRUST  ISOLATION; FOR TRUSTEE'S
    dated December 10, 1981, as amended and SUSPENSION AND REMOVAL; AND
22  restated on September 23, 1997, October 14, FOR ATTORNEYS' FEES AND COSTS
    2011, and October 23, 2013; and DOES 1-
23  through 50, inclusive,                 [Civ. Code §§ 39, 1567, 1569, 1570, 1572,
                                           1573, 1575, 1689(b)(1), 1709, 2223, 2224,
24          Respondents.                   3294(c)(3), 3300; Prob. Code §§ 850(a)(3)(B),
                                           856, 859, 15642(b)(1), (2), 17200(b)(10); Welf.
25                                         & Inst. Code §§ 15610.27, 15610.30(a)(1)-(3),
                                           (b), (c), 15610.43(a), 15610.70(a), 15657.5(a),
26                                         (b); Fam. Code § 721(b)]

27                                         Date:
                                           Time:
28                                         Dept:
                                           Judge:

1  Donald Glatts, individually and as named successor trustee ("Petitioner" or "Donald"),
2  hereby files this Petition to Invalidate Deeds and Lifetime Transfers on the Basis of Undue
3  Influence, Fraud, Duress, and Menace; for Double Damages, Attorneys' Fees and Costs; for
4  Quasi-Specific Performance of Contract to Make a Will; for Damages for Intentional Interference
5  with Expected Inheritance; for Damages for Intentional Interference with Contract; for
6  Compensatory Damages, Punitive Damages, and Attorneys' Fees and Costs for Financial Elder
7  Abuse and Isolation; for Trustee's Suspension and Removal; and for Attorneys' Fees and Costs
8  (the "Petition"); and alleges as follows:

9

## FACTUAL BACKGROUND

11  **A.    Gerald Glatts' Estate Plan**

12        1.     Gerald Glatts ("Gerald") first wife was Helen Glatts ("Helen"). Gerald's first
13  marriage produced four children. Gerald and Helen's children are Petitioner, Robert C. Glatts
14  ("Robert"), Ronald B. Glatts ("Ronald"), and Thomas R. Glatts ("Thomas") (collectively, the
15  "Children"). Gerald has no other children living or deceased.

16        2.     Helen died unexpectedly at a young age in 1979. After Helen died, Gerald
17  discovered a holographic codicil to Helen's will, gifting her entire estate to their four children
18  equally (the "Codicil"). (NOL Ex. 1.) In order to avoid having to give the Children Helen's half
19  of the community property at that moment in time, Gerald asked the Children to forego their
20  interests in their mother's estate in exchange for a promise that they would receive the entire value
21  of Gerald's estate upon his death. The Children agreed to forego their interest in their mother's
22  estate based upon Gerald's promise that they would receive Helen's and Gerald's entire estate
23  upon his death (the "Oral Agreement"). The Oral Agreement has been confirmed several times
24  over the years by both Gerald and the Children.

25        3.     On December 10, 1981, Gerald executed the Gerald S. Glatts Trust dated
26  December 10, 1981. (NOL Ex. 2.) On September 23, 1997, Gerald executed the Amendment and
27  Restatement of Revocable Trust Agreement of Gerald S. Glatts. (NOL Ex. 3.) Both documents
28  named the Children as the remainder beneficiaries, which fulfilled the Oral Agreement.

4.     On October 14, 2011, Gerald executed the Second Restatement of the Gerald S. Glatts Trust. (NOL Ex. 4.) This restatement names Gerald's four children as equal beneficiaries, and specifically does not provide for Gerald's current wife, Katarina Dubravcak, also known as Katarina Duban ("Ms. Duban"). (Id., ¶ 3.5, 1.7 ("I do not intend to provide for my spouse in this instrument").) This restatement names Petitioner as the first successor trustee if Gerald is unable to act during his lifetime or upon his death. (Id., ¶ 6.1.) Schedule A of this restatement provides that Gerald grants, assigns, and transfers to himself as trustee all of his right, title, and interest in the following assets:

1. The real property at:
135 4th Avenue
Encinitas, CA 92024
Assessor's Parcel No. 258-022-04-00

2. The real property at:
228 N. Helix
Solana Beach, CA 92075
Assessor's Parcel No. 263-321-21-00

3. The real property at:
234-236-238 Hill Street
Solana Beach, CA
Assessor's Parcel No. 263-321-22-00

4. The real property at:
344-346 N. Acacia
Solana Beach, CA
Assessor's Parcel No. 263-304-17-00

5. The real property at:
3572 Copper Crest Road
Encinitas, CA
Assessor's Parcel No. 264-223-22-00

6. The real property at:
2941 Avenida Theresa
Carlsbad, CA 92009
Assessor's Parcel No. 255-144-24-00

7. The real property at:
7912 Terraza Disoma
Carlsbad, CA 92009
Assessor's Parcel No. 223-311-30-00

3

PETITION TO INVALIDATE DEEDS, ETC.

8. The real property at:
347 N. Sierra
Solana Beach, CA 92075
Assessor's Parcel No. 263-302-09-00.

9. My accounts at Chase Bank

10. My accounts at Wells Fargo Bank, N.A.

(NOL Ex. 4, Sch. A.)

5.    On October 23, 2013, Gerald executed the Third Restatement of the Gerald S. Glatts Trust. (NOL Ex. 27.) This restatement names Gerald's four children as equal beneficiaries, and specifically does not provide for Ms. Duban. (Id., ¶¶ 5.5, 1.7 ("I do not intend to provide for my spouse in this instrument").) In addition, this restatement clarifies that Ms. Duban is not Gerald's heir. (Id., ¶ 3.6 ("For the purpose of determining 'my heirs' under this paragraph, my spouse, Katarina Duban, shall not be included").) This restatement names Petitioner as the first successor trustee if Gerald is unable to act during his lifetime or upon his death. (Id., ¶ 6.1.) Schedule A of this restatement provides that Gerald grants, assigns, and transfers to himself as trustee all of his right, title, and interest in the following assets:

1. The real property at:
2941 Avenida Theresa,
Carlsbad, CA 92009
Assessor's Parcel No. 255-144-24-00

2. The real property at:
7912 Terraza Disoma
Carlsbad, CA 92009
Assessor's Parcel No. 223-311-30-00

3. My accounts at Chase Bank

4. My accounts at Wells Fargo Bank

(NOL Ex. 27, Sch. A.)

6.    The Gerald S. Glatts Trust dated December 10, 1981, the Amendment and Restatement of Revocable Trust Agreement of Gerald S. Glatts, the Second Restatement of the Gerald S. Glatts Trust, and the Third Restatement of the Gerald S. Glatts Trust are hereinafter collectively referred to as the "Revocable Trust."

1    7.    On August 30, 2012, Gerald executed the Glatts Family Irrevocable Trust (the

2  "Irrevocable Trust"). (NOL Ex. 5.) The Irrevocable Trust names Gerald's four children as equal

3  beneficiaries. (Id., ¶ 3.2.) The Irrevocable Trust names Gerald and Petitioner as co-trustees, and

4  upon Gerald's death or inability to act, the co-trustee then acting shall serve as sole successor

5  trustee. (Id., ¶ 4.1.) Schedule A of the Irrevocable Trust provides that Gerald grants, assigns, and

6  transfers to himself and Donald, as co-trustees, all of his right, title, and interest in the following

7  assets:

8                         1. The real property at:
                          135 4th Avenue
9                         Encinitas, CA 92024
                          Assessor's Parcel No. 258-022-04-00
10

11                        2. The real property at:
                          228 N Helix Avenue
12                        Solana Beach, CA 92075
                          Assessor's Parcel No. 263-321-21-00
13

14                        3. The real property at:
                          234-236-238 Hill Street
15                        Solana Beach, CA 92075
                          Assessor's Parcel No. 263-321-22-00
16

17                        4. The real property at:
                          344-346 N Acacia Avenue
18                        Solana Beach, CA 92075
                          Assessor's Parcel No. 263-304-17-00
19

20                        5. The real property at:
                          347 N Sierra Avenue
21                        Solana Beach, CA 92075
                          Assessor's Parcel No. 263-302-09-00

22  (NOL Ex. 5, Sch. A.)

23  B.    Gerald's Association with Katarina Duban

24    8.    Over the years, Gerald took in a series of roommates to bring in extra money.

25  Gerald met his current wife, Ms. Duban, in 1996 when she and her daughter moved into Gerald's

26  residence as Gerald's roommate, at 3572 Copper Crest Road, Encinitas, California 92024 (the

27  "Copper Crest Property"). Initially, Ms. Duban paid rent each month. Ms. Duban was employed

28  when she started living in Gerald's home, but sometime thereafter Petitioner believes she lost her

5

PETITION TO INVALIDATE DEEDS, ETC.

1   job. Petitioner is informed and believes and thereon alleges that after becoming unemployed, and

2   as Gerald grew older and found it harder to take care of himself, Gerald and Ms. Duban made an

3   arrangement whereby she would cook and clean Gerald's house in exchange for free rent.

4   Petitioner is informed and believes and thereon alleges that Gerald was always very careful to

5   report the value of her services on his tax returns. Petitioner is informed and believes and thereon

6   alleges that Gerald and Ms. Duban were never romantically involved and that Gerald never

7   referred to Ms. Duban as anything other than his roommate.

8          9.     On January 29, 2010, the Copper Crest Property burned down from a fire started in

9   the garage. Ms. Duban was the only person home at the time the fire started. When Ronald

10  showed up at the house later that day, Ms. Duban became upset and stormed off because she

11  believed that Ronald was accusing her of starting the fire. Ms. Duban became erratic,

12  confrontational and began walking down a dark, rural road several miles from the nearest public

13  building or accommodation.

14         10.    Ronald and Gerald got in Ronald's car and followed Ms. Duban, as they were

15  worried about her walking down a dark, rural road at night. Gerald tried speaking with Ms.

16  Duban, attempting to convince her to allow Ronald and Gerald to give her a ride to whichever

17  destination she wanted, but Ms. Duban refused. Eventually, Ronald and Gerald called Robert to

18  consult him and they collectively decided one of them should call 9-1-1 for help. Ronald then

19  called 9-1-1. Ronald and Gerald then parked to observe the outcome.

20         11.    The Sheriff and the Psychiatric Emergency Response Team ("PERT") responded

21  and drove to the intersection of Lone Jack Road and Rancho Santa Fe Road, approximately 2.5

22  miles from Gerald's home, to meet Ms. Duban. Shortly after the Sheriff and PERT arrived,

23  Ronald and Gerald departed as Ronald sensed that Gerald was becoming stressed and exhausted

24  from the situation.

25         12.    During this time Robert's wife, Kelly Harless ("Kelly"), also drove out to meet the

26  family and Ms. Duban. While talking with the Sheriff and PERT, Ms. Duban became so

27  combative that the Sheriff handcuffed her and put her in the back of the patrol car. PERT tried to

28  convince Ms. Duban that Ronald, Kelly, Robert and Gerald were trying to help her, but she

1    refused any help and threatened to sue the Glatts family after falsely accusing them of starting the

2    fire. Ms. Duban has been hostile toward Ronald, Robert, and Kelly since that event, apparently

3    believing that they hoped to have her arrested by calling the police. Petitioner's concerns

4    regarding Ms. Duban escalated dramatically after this event.

5        13.    The day after the fire, Petitioner helped Gerald to sort through the rubble at the

6    Copper Crest Property. While there, Petitioner observed Ms. Duban ranting and screaming. Ms.

7    Duban began breaking things and then smashed the window to her room in a fit of rage. Petitioner

8    gave Ms. Duban a key to the gate so that she could come and collect her things, but requested that

9    she lock the gate, because the house remained in a dangerous state after the fire. Ms. Duban

10    responded by verbally attacking Petitioner and would not comply with his request to lock the gate.

11        14.    After the fire, Gerald stayed with Robert and Kelly for about two months until the

12    tenant living in one of Gerald's properties located at 135 4th Avenue, Encinitas, California 92024

13    (the "4th Avenue Property") moved out. Petitioner is informed and believes and thereon alleges

14    that Ms. Duban had been living with her daughter, Jana, at the time Gerald moved into the 4th

15    Avenue Property.

16        15.    While the Copper Crest Property was being rebuilt, Petitioner is informed and

17    believes and thereon alleges that Ms. Duban began demanding that Gerald marry her in exchange

18    for her moving back in with him. Gerald told Petitioner that he did not love Ms. Duban and he did

19    not want to get married again at 81-years of age, but that he just wanted the arrangement they had

20    before as it was helpful to have her around to perform household chores.

21        16.    Petitioner is informed and believes and thereon alleges that Ms. Duban eventually

22    agreed to move back in with Gerald at the 4th Avenue Property on the condition that he marry her

23    and deed to her half of the 4th Avenue Property. The 4th Avenue Property was specifically

24    identified in the Codicil prepared by Petitioner's mother and therefore was supposed to be given to

25    the Children after Gerald's death, pursuant to the Oral Agreement. (NOL Ex. 1.) Petitioner is

26    informed and believes and thereon alleges that Ms. Duban paid no consideration for the 4th

27    Avenue Property.

28    ///

17.    Even though Gerald had expressed to Petitioner that he did not love Ms. Duban and did not want to marry her, on April 16, 2010, Gerald and Ms. Duban apparently secretly married. Neither Gerald nor Ms. Duban told any of the Children about the marriage.  The Children only became aware of the marriage much later when Petitioner's wife performed a records search at the courthouse.  Likewise, Gerald did not tell John Lambert about the marriage until several weeks after the fact, even though they worked together side by side on the reconstruction of Gerald's residence at the time of the marriage.  (NOL Ex. 20 (Lambert Decl., ¶¶ 2, 4, 7.)  Mr. Lambert never observed Ms. Duban display affection toward Gerald, or have warm, intimate conversations; Mr. Lambert observed the contacts between Ms. Duban and Gerald to be all business from her side.  (Id. at ¶ 8.)   After the marriage, Ms. Duban became increasingly volatile toward the Children and began isolating Gerald from his sons.

18.    Petitioner is informed and believes, and thereon alleges that Ms. Duban stayed in the 4th Street Property after Gerald moved back into the Copper Crest Property upon its reconstruction. Petitioner is informed and believes and thereon alleges that Gerald and Ms. Duban did not have a physical relationship before they got married. Gerald subsequently admitted to Robert that the marriage likewise had not been consummated. Ms. Duban is 20-years Gerald's junior.  Petitioner is informed and believes and thereon alleges that Gerald and Ms. Duban continue to sleep in separate beds.

19.    Ms. Duban eventually decided that she did not like the 4th Street Property because she thought people were watching her. Ms. Duban apparently traded the one-half interest in the 4th Avenue Property for an undivided seventy percent (70%) interest in another property that Gerald owned located at 2941 Avenida Theresa, Carlsbad, California, 92024 (the "Avenida Theresa Property"). After deciding she would have the same problem of people watching her at this property, Ms. Duban apparently decided she would trade her undivided seventy percent (70%) interest in the Avenida Theresa Property for a one-half interest in the Copper Crest Property. Ms. Duban then moved back in with Gerald. She moved into the master bedroom and Gerald moved into one of the other bedrooms.

///

20.   Ms. Duban became increasingly volatile after their marriage any time that Gerald would attempt to see the Children and she would often isolate him from them. Petitioner is informed and believes and thereon alleges that Robert was able to have coffee with Gerald every month or two, but often had trouble arranging such meetings as Ms. Duban would always claim a scheduling conflict. Petitioner is informed and believes and thereon alleges that when Robert was able to meet up with Gerald, Gerald typically complained about Ms. Duban's erratic and combative behavior. Petitioner is informed and believes and thereon alleges that at one meeting over coffee, Gerald asked Robert if he could buy him a pastry because Ms. Duban had thrown away Gerald's breakfast when he told her he was going to have coffee with Robert. On another occasion, Gerald informed Petitioner that Ms. Duban threw away his dinner after becoming upset by something he said.

21.   On March 10, 2011, Robert and Kelly scheduled dinner with Gerald at their house. Gerald called to cancel that evening and asked to reschedule in two weeks so that Ms. Duban could calm down, as she objected to him having dinner with them.

22.   On April 18, 2011, Gerald told Robert that Ms. Duban had become angry with Gerald while they were driving and walked nearly four miles from the intersection of El Camino Real and Leucadia Boulevard in Carlsbad to the 4th Avenue Property.

23.   The events described above represent only a small fraction of the number of times that Ms. Duban had lashed out verbally at Gerald, often for trying to visit the Children, or actively tried to isolate Gerald from the Children. Petitioner observed that Gerald seemed to have an endless stream of complaints about Ms. Duban's behavior. Gerald called Ms. Duban overbearing and noted that she was jealous of the time Gerald was spending with Petitioner. Gerald also told Petitioner that Ms. Duban wants to occupy all of his time and that he believed she was delusional.

24.   Eventually, Ms. Duban's behavior became so erratic and combative that Gerald grew weary of Ms. Duban's actions and filed for divorce. On February 10, 2012, Gerald filed a Petition for Dissolution of Marriage (the "Divorce Petition"). However, minutes for a Family Resolution Conference that took place on July 10, 2012 (the "Minutes") note that Gerald and Ms. Duban were attempting to reconcile their marriage at that point. On November 30, 2012, Gerald

9

McKENNA LONG &
ALDRIDGE LLP.
SAN DIEGO

1  filed a Request for Dismissal of the Divorce Petition (the "Request for Dismissal"). Copies of the

2  Divorce Petition, the Minutes, and the Request for Dismissal are attached to the NOL as

3  Exhibits 6, 7, and 8, respectively. Petitioner is informed and believes and thereon alleges that

4  Gerald decided not to go through with his divorce plan because Ms. Duban began to act nicer to

5  him after he decided to pursue a divorce and influenced him to drop the proceeding.

6      25.    Petitioner is informed and believes and thereon alleges that Gerald visited at least

7  two other divorce attorneys after he filed the Request for Dismissal. Petitioner is informed and

8  believes and thereon alleges that Gerald decided not to file any subsequent dissolution proceedings

9  based upon Ms. Duban's manipulation and Gerald's fear of her.

10  **C.  The Irrevocable Trust**

11      26.    Petitioner believes that Gerald's increasing concern with Ms. Duban's behavior and

12  fear of undue influence caused Gerald to establish the Irrevocable Trust to hold his real estate

13  assets. Gerald retained Doreen Erenea ("Erenea") to draft the Irrevocable Trust, which he

14  executed on August 30, 2012. (NOL Ex. 5.) Gerald kept the Children apprised of his intent and

15  authorized the Children to attend some meetings. On May 9, 2011, Gerald had his initial visit

16  with Erenea. Ms. Duban also insisted on accompanying Gerald to Erenea's office where Gerald

17  met alone with Erenea.

18      27.    During the process of meeting with Erenea over the Irrevocable Trust, Gerald

19  indicated that he wanted Petitioner to handle his finances and to make medical decisions for him in

20  the event he became incapacitated. Petitioner is informed and believes and thereon alleges that

21  when Ms. Duban found out about this request she became angry and demanded that she be able to

22  make medical decisions for Gerald should he become incapacitated. In a conversation with

23  Petitioner, Gerald seemed resigned to name Ms. Duban as his agent for healthcare decisions, even

24  though Petitioner expressed his belief that she held some strange and potentially dangerous views

25  on medical care.[1]

26

27  _____

28  [1] As it turns out, Petitioner's fears about Ms. Duban's views on medical care may not have been
unwarranted. When Gerald was admitted to the hospital due to a stroke, it was discovered that he
                                                                 {footnote continued}

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

10

PETITION TO INVALIDATE DEEDS, ETC.

28.     On March 29, 2012, Gerald told Petitioner that Ms. Duban was a jealous person. Gerald further remarked that Ms. Duban was paranoid and that she felt that she needed to have protection from the Children. Petitioner is informed and believes and thereon alleges that Ms. Duban suggested that the Children sign a contract wherein the Children would agree not to sue her over the one-half interest in the Copper Crest Property she acquired.

29.     Section 1.8 of the Irrevocable Trust provides that Gerald established the Irrevocable Trust to ensure that the property held in it will pass to his children upon his death. (NOL, Ex. 5, p. 2.) Petitioner is informed and believes and thereon alleges that the Irrevocable Trust was established in part-performance of the oral promise between Gerald and the Children whereby the Children agreed that Gerald could retain their mother's estate, and in return the Children would receive Gerald's and Helen's entire estate upon his death. The Irrevocable Trust explicitly states that it makes no provisions for Ms. Duban. (Id.)

30.     As provided above, Schedule A of the Irrevocable Trust, which was signed and initialed by Gerald, provides that Gerald transfers to himself and Petitioner, as co-trustees of the Irrevocable Trust, the following five real properties: 135 4th Avenue, Encinitas, CA 92024; 228 N Helix Avenue, Solana Beach, CA 92075; 234-236-238 Hill Street, Solana Beach, CA, 92075; 344-346 N Acacia Avenue, Solana Beach, CA 92075; and 347 N Sierra Avenue, Solana Beach, CA 92075. (NOL, Ex. 5, Schedule A.)

31.     On July 29, 2013, Petitioner and Gerald, as co-trustees of the Irrevocable Trust, opened a joint bank account at Chase Bank in Encinitas, California (the "Irrevocable Trust Account"). The purpose of the Irrevocable Trust Account was to handle the finances of the five real properties listed as assets of the Irrevocable Trust and to provide funds for Gerald to pay for medical expenses should he become disabled, as allowed by the Irrevocable Trust. (NOL, Ex. 5, p. 3)

[continued from previous page]
was only taking half of his prescribed dose of medication intended to prevent a stroke. Petitioner does not know if this was Gerald's decision alone or if he was influenced by Ms. Duban.

32.   Though the Irrevocable Trust was executed by Gerald on August 30, 2012, it took over a year for him to arrange for deeds transferring record title to the five real properties listed on Schedule A of the Irrevocable Trust to be prepared. Petitioner is informed and believes and thereon alleges that Ms. Duban regularly made conflicting plans on the days that Gerald was scheduled to meet with Erenea. Gerald told Petitioner on at least one occasion that Ms. Duban would not let him finalize the Irrevocable Trust. It comes as no surprise that Ms. Duban actively tried to prevent the finalization of the Irrevocable Trust, as she is not a beneficiary of the Irrevocable Trust.

33.   On October 23, 2013, Robert and Gerald stopped by Erenea's office so that Gerald could execute the deeds transferring record title to the five real properties listed on Schedule A of the Irrevocable Trust. Erenea told them that she needed to check on how she should date the titles and rescheduled the meeting. Gerald and Robert parted ways and then Gerald proceeded to drive home. On Gerald's drive home, he suffered a stroke.

34.   On October 24, 2013, Robert visited Gerald in the hospital in the morning and then again in the evening. Gerald could talk, but he had a significant amount of trouble recalling words and he had limited peripheral vision.

35.   On October 25, 2013, Robert visited Gerald at the hospital in the morning and then again at night. Gerald was doing better, but still had trouble recalling words and had the same vision problems. Later that day, Ms. Duban called Robert and asked him if he or Petitioner had gone into the Copper Crest Property while Gerald was in the hospital. Though neither Robert nor Petitioner had gone inside of Gerald's home while he was in the hospital, Ms. Duban falsely accused both of them of breaking into the Copper Crest Property to steal the checkbook for the Irrevocable Trust Account. As is explained below, nearly all of the remaining funds in the Irrevocable Trust Account were withdrawn shortly after Gerald's stroke. Petitioner believes that these funds were withdrawn for Ms. Duban's own benefit.

36.   On October 26, 2013, Robert visited Gerald in his home in the evening. Gerald was doing better than when he was in the hospital, but Gerald was still having trouble recalling

///

12

PETITION TO INVALIDATE DEEDS, ETC.

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

1   words and again had the same vision issues. Gerald had been discharged from the hospital that

2   morning with six weeks of rehabilitation prescribed.

3   D.    **Ms. Duban's Increased Isolation of Gerald**

4      37.   Ms. Duban's behavior of isolating Gerald from the Children increased dramatically

5   after Gerald suffered the stroke. On October 30, 2013, Petitioner and Robert were supposed to go

6   to Gerald's house to get the checkbook for the Irrevocable Trust Account which held rents paid on

7   the five real properties listed on Schedule A of the Irrevocable Trust. As Gerald had agreed,

8   Petitioner was going to take the checkbook so that he, as co-trustee of the Irrevocable Trust, could

9   manage the five real properties, relieving Gerald of the burden while he was recovering from the

10   stroke. Gerald later called Robert to cancel their meeting without explanation. Robert believes

11   that Ms. Duban told Gerald to cancel the meeting. Robert and Gerald then rescheduled for

12   Petitioner and Robert to come over to Gerald's house on November 3rd.

13      38.   On November 3, 2013, Gerald called Robert that morning to cancel the meeting

14   and to inform him that Ms. Duban would handle the finances for Gerald's real properties, even

15   though Petitioner was and is co-trustee of the Irrevocable Trust. Gerald said that he would just

16   sign the checks Ms. Duban presented to him. Concerned about Gerald, Robert and Kelly went to

17   his house later that day to check on him. Gerald was having trouble explaining why he did not

18   want Donald, a co-trustee of the Irrevocable Trust, to handle the finances for the five real

19   properties, as he had established. Robert and Kelly observed that Gerald was very impaired and

20   that he was clearly having trouble expressing himself.

21      39.   Ms. Duban became visibly anxious the longer Robert and Kelly spoke with Gerald

22   and repeatedly tried to interrupt Gerald when he would try to speak with Robert and Kelly. Robert

23   observed that Gerald was clearly frustrated with Ms. Duban's attempts to prevent him from

24   speaking and Gerald then asked Ms. Duban to let him speak. Ms. Duban then told Robert and

25   Kelly that they had to leave because Gerald was tired and Ms. Duban would not let Gerald talk

26   any longer. Gerald did not ask Robert or Kelly to leave.

27      40.   In an attempt to stand up for Gerald, who was still impaired from his stroke, Kelly

28   asked Ms. Duban to let Gerald speak for himself. Ms. Duban then began screaming at Gerald,

PETITION TO INVALIDATE DEEDS, ETC.

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

1   Robert, and Kelly. Ms. Duban falsely stated that no one in Gerald's family has invited him to a

2   holiday in years, even though the Children invite him to all of their holiday celebrations. Ms.

3   Duban falsely told Gerald that none of the Children or their families give him gifts, even though

4   the Children previously gave him gifts and continued to provide him with baked goods and frozen

5   meals for Christmas, in lieu of other presents, as Gerald requested in a letter several years ago.

6   Ms. Duban falsely told Gerald that no one came to visit him in the hospital after he suffered the

7   stroke, even though Robert visited Gerald every day that he was in the hospital. Ms. Duban also

8   falsely told Gerald that Kelly had her arrested after the fire, even though the Sheriff handcuffed

9   and placed her in the back of the police car as a result of her own actions. Ms. Duban also claimed

10  that Gerald begged her to marry him ten times before she agreed, though Gerald has told Robert

11  that Ms. Duban demanded that he marry her as a condition to her moving back in with him.

12  Petitioner is informed and believes and thereon alleges that Ms. Duban told Gerald these lies in the

13  hopes that she could gain influence over Gerald due to his vulnerable state post-stroke.

14       41.   Gerald tried to calm Ms. Duban without much success and eventually Ms. Duban

15  threatened to leave Gerald if he met with his attorney to finish transferring the five real properties

16  into the Irrevocable Trust. Petitioner has observed that following Gerald's stroke, it has become

17  almost impossible for Gerald to defy Ms. Duban.

18       42.   Petitioner believes that Gerald lacked contractual capacity in the immediate

19  aftermath after he suffered the stroke and that Ms. Duban used Gerald's condition to her benefit.

20  Robert is uncertain as to whether and to what extent Gerald has recovered from the stroke.

21       43.   On November 16, 2013, Robert visited Gerald at his home. Robert asked Gerald if

22  he could meet Robert at Donald's house on Sunday, but Ms. Duban protested. Ms. Duban agreed

23  to let Petitioner come over to Gerald's house the next day, but then called later that evening to say

24  it would be better for Petitioner to come over the next week and scheduled a meeting for

25  November 24, 2013.

26       44.   On November 21, 2013, Gerald called Robert to cancel their planned meeting at

27  Gerald's home on November 24, 2013, claiming that he was busy. Gerald was unable to explain

28  to Robert why he was busy.

14

PETITION TO INVALIDATE DEEDS, ETC.

EXHIBIT A, page 72

45. On November 24, 2013. Robert and Ronald went to Gerald's home to check on him, as they had both become extremely concerned about Ms. Duban's increasing isolation of Gerald. When Robert and Ronald arrived, Ms. Duban was visibly anxious and told Gerald that they had to meet a gardener at one of Gerald's other properties. Gerald told Robert and Ronald that they could come to his house the following Sunday. Robert and Ronald left Gerald's home and returned approximately 20 minutes later and saw from a distance that the gardener had actually come to Gerald's house. Robert is informed and believes and thereon alleges that Ms. Duban lied to Robert and Ronald in order to prevent them from visiting Gerald.

46. On December 1, 2013, Robert again went to Gerald's home to check on him. Ronald arrived a few minutes later. Gerald told them that he wanted to change the Irrevocable Trust so that Ms. Duban would handle the finances for the five real properties instead of Petitioner. Given Ms. Duban's influence on and isolation of Gerald, the Children were extremely concerned about this decision. Robert felt that Gerald had been coached by Ms. Duban on what to say.

47. On December 8, 2013, Robert went with Ronald to Gerald's home. Ms. Duban falsely accused Robert and Ronald of trying to get her committed after the fire when they called the police to help her as she was walking down the road in the dark. Ms. Duban also stated that she wanted to be the sole trustee and threatened to leave Gerald if he agreed to allow the Children to serve as co-trustees.

48. Petitioner is informed and believes and thereon alleges that at some point after Robert and Ronald's encounter on December 8, 2013, Gerald fired Erenea. Record title to the five real properties has yet to be transferred to the Irrevocable Trust. Petitioner is informed and believes and thereon alleges that Gerald was unduly influenced by Ms. Duban to fire his estate planning attorney so that record title to the five real properties would not be transferred to the Irrevocable Trust, of which Ms. Duban is not a beneficiary.

49. On December 10, 2013, Robert called Gerald's home and Gerald stated that Ms. Duban wanted to break up the Irrevocable Trust, establishing her real motivation for isolating Gerald.

50.     On December 16, 2013, Robert went to Gerald's home to find that the key to the main gate had been changed.  Petitioner is informed and believes and thereon alleges that Robert used the house key provided to him by Gerald to open a side gate to the property.  Petitioner is informed and believes and thereon alleges that Robert met Gerald at the door and Ms. Duban asked where Gerald was going in a stern voice and demanded that Gerald leave the door open while talking to Robert.

51.     On December 18, 2013, Thomas received an e-mail from Gerald sent from Ms. Duban's e-mail address stating he did not think it was a good idea for Thomas to stay with him for Christmas as he normally did, and requested that Thomas not stop by his home to visit.  Petitioner is informed and believes and thereon alleges that this e-mail was extremely out-of-character for Gerald, as he had always been very welcoming of Thomas' and his family's visits prior to this date.

52.     On December 27, 2013, Thomas went to Gerald's home to find that the lock on the side gate had been changed.  (NOL Ex. 9 (Thomas Decl. at ¶ 8).)

53.     Thomas returned to Gerald's home on December 29, 2013, with his wife Linda and his two sons.  (NOL Ex. 9 (Thomas Decl. at ¶ 9).)  This time there was a note on the gate stating, "Do not enter this property without our permission."  (Id.)  Without any other way to check on Gerald, Thomas jumped the fence and walked to the door at the rear of the house.  (Id. at 9-10.)  Gerald then told Thomas that he should not be there.  (Id. at 11.)  After Thomas told Gerald that Linda and his grandsons were waiting at the fence, Gerald asked Ms. Duban for permission to go see Thomas' family.  (Id.)  Ms. Duban responded to "do as he pleased."  (Id.)

54.     As Gerald walked with Thomas down the driveway he again said that Thomas should not have come because "it complicates the situation" and that he is a "prisoner" of Ms. Duban.  (NOL Ex. 9 (Thomas Decl. at ¶ 12).)  When Thomas asked if he could help him get out, Gerald responded that he may need that someday, and that he was sorry.  (Id.)  Gerald then stated that Ms. Duban did not want Thomas around.  (Id. at ¶ 13.)

///

///

55.    As Thomas and Gerald approached the gate, Thomas' sons and Linda greeted Gerald. (NOL Ex. 9 (Thomas Decl. at ¶ 14).) Gerald responded, "Hello, I am so sorry things are this way." (Id.) Gerald then unlocked the gate, with some difficulty. (Id.)

56.    While speaking with Thomas and his family, Gerald stated several times that he was sorry that they could not stay with them. (NOL Ex. 9 (Thomas Decl. at ¶ 15).) Gerald said that "Katarina will not like it if you are here. I am a prisoner here in this situation." (Id. at ¶ 15.) Linda noted that Thomas and his family wanted to see him very badly and make sure he was okay. (NOL Ex. 10 (Linda Glatts Decl., ¶ 9).) Gerald replied, "Yes, that will complicate my life and the situation will now be worse." (NOL Ex. 9 (Thomas Decl. at ¶ 15); NOL Ex. 10 (Linda Glatts Decl. at ¶ 9).) Linda offered for Gerald to come have a meal at Ronald's house, but Gerald replied, "I could not get permission to do that. Katarina would not like that." (NOL Ex. 10 (Linda Glatts Decl. at ¶ 10).)

57.    Gerald then said it would be best if Thomas and his family did not try to see him again because it would make things more difficult for him. (NOL Ex. 9 (Thomas Decl. at ¶ 17).) Thomas replied, "But dad, that means I will not be able to ever see you again." (Id.) Gerald responded by saying that Thomas was asking him to choose between Ms. Duban and Thomas, and that that would be a very hard choice. (Id.) Thomas never intended to make his father choose between Ms. Duban and himself, but merely wanted to be there for his father, who admitted to feeling like a "prisoner" to Ms. Duban. (Id.)

58.    Again, Gerald mentioned that he was a prisoner in the situation and that it would be best if he stays with Ms. Duban. (NOL Ex. 9 (Thomas Decl. at ¶ 18).) He then noted that maybe the situation will get better in a couple of years, or that maybe he would die and that would solve the situation. (Id.) Gerald told Thomas and his family that he needed to go back into the house and that it would be best if they not come back again. (Id. at ¶ 19.) Gerald again apologized for the situation. (Id.)

59.    Before Gerald left, Linda offered him a batch of home baked cookies and he said he could not take them, saying that "Katarina would not like that." (NOL Ex. 10 (Linda Decl. at

17

PETITION TO INVALIDATE DEEDS, ETC.

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

¶ 14).) Thomas and his family said their goodbyes and then left. (NQL Ex. 9 (Thomas Decl. at ¶ 21).)

60. Petitioner is informed and believes and thereon alleges that Ms. Duban does not allow Gerald to have a cellular phone. Petitioner is informed and believes and thereon alleges that Ms. Duban has either thrown away Gerald's cellular phone or keeps it on her person turned off.

61. On January 20, 2014, Petitioner followed Ms. Duban and Gerald as they left Gerald's home to go shopping. After parking, Ms. Duban left Gerald alone in the car to go into the store. Petitioner approached his father and greeted him. Slow to respond, Gerald's first comment to Petitioner was "What are you doing here?" Petitioner responded that "Katarina won't let me see you." Gerald responded that "you should not be here, this isn't good." Petitioner noticed that Gerald was nervously checking towards the store the entire time he was talking to him in the parking lot and could sense Gerald did not want Ms. Duban to see him and Petitioner talking.

62. Petitioner gave Gerald his phone number, as Ms. Duban had taken away Gerald's cell phone without letting him download the contacts from it, and reminded him that he had a key to Petitioner's house, which he could use any time. Gerald responded that he may have to do that. Petitioner then left because he did not want Ms. Duban to see him and make things harder on Gerald.

E.   Liquidation of the Irrevocable Trust Account

63. On December 30, 2013, Robert and Petitioner met at a nearby Chase Bank to obtain information regarding the Irrevocable Trust Account that Petitioner and Gerald had opened as co-trustees of the Irrevocable Trust. Donald downloaded all the statements and check images from the account.

64. Petitioner is informed and believes and thereon alleges that up until the few months prior to Gerald's stroke, Gerald had always indicated the purpose of the transaction on the memo line of checks that he drew.

65. From July 29, 2013 to December 31, 2013, multiple checks from the Irrevocable Trust Account were made out to Gerald with no indication of what they were drawn for and then

placed in a separate bank account, of which the Children were previously unaware. Petitioner believes that this separate bank account is a joint account with Ms. Duban and that she persuaded Gerald to draw these checks for her own personal gain. The checks drawn from the Irrevocable Trust Account made out to Gerald totaled approximately $32,000.

66.     Moreover, there have been no deposits into the Irrevocable Trust Account since Gerald's stroke, even though prior to his stroke there were deposits ranging from approximately $11,295.00 to $14,657.00 every month from the rent collected on the five real properties listed on Schedule A of the Irrevocable Trust.

F.     The Litigation Proceedings

67.     In January 2014, the Children consulted with counsel to discuss possible claims to protect their father. In February 2014, the Children determined to pursue a conservatorship seeking the appointment of an independent professional fiduciary as conservator on the basis of Gerald's inability to resist Ms. Duban's undue influence and isolation.

68.     Before the Children were able to file the conservatorship, on February 26, 2014, Gerald ostensibly filed a Request for Domestic Violence Restraining Order against Robert (the "Request for Restraining Order"), although Robert had not in any way harassed or threatened Gerald. The Request for Restraining Order was filed in San Diego County Superior Court, Case No. DVN22583. In light of Ms. Duban's previous actions, Petitioner believes that the Request for Restraining Order was prepared and filed at Ms. Duban's direction so as to further allow her to isolate and influence Gerald. For instance, Robert was never properly served with notice of the Request for Restraining Order because his address was listed incorrectly. Gerald was familiar with Robert's correct address. Robert acted as a concerned son attempting to check up on Gerald and ensure his well-being after becoming informed that Gerald claimed he was a "prisoner" to Ms. Duban. Accordingly, Robert opposed the request. On March 14, 2014, a hearing was held at which the Court dismissed the Request for Restraining Order without prejudice.

69.     On April 7, 2014, Petitioner filed the Petition for Appointment of Probate Conservator of the Person and Estate, and the Petition for Appointment of Temporary Conservator of the Person and Estate, in San Diego County Superior Court, Case No. 37-2014-00009999-

19

1  PR-CP-CTL (the "Conservatorship Proceedings"). In the Conservatorship Proceedings, Petitioner

2  seeks the appointment of a temporary and permanent conservator of Gerald's person and estate.

3  On June 17, 2014, the Court, Department PC-2, ordered that Gerald and Ms. Duban, and their

4  agents, successors, trustees, and assigns are prohibited from distributing, assigning, selling,

5  conveying, devising, pledging, mortgaging, creating a security interest in, or encumbering the

6  following three real property interests: 2941 Avenida Theresa, Carlsbad, CA, 92009; 7912 Terraza

7  Disoma, Carlsbad, CA, 92009; and 3572 Copper Crest Road, Encinitas, CA, 92024.

8      70.   On April 7, 2014, Petitioner filed the Petition for Order Confirming and Seeking

9  Transfer of Trust Assets; for Double Damages; and for Attorneys' Fees and Costs, in San Diego

10  County Superior Court, Case No. 37-2014-00009993-PR-TR-CTL (the "Heggstad Petition"). The

11  Heggstad Petition proceeding concerns the Irrevocable Trust, and seeks an order determining that

12  the five real properties listed on Schedule A of the Irrevocable Trust are assets of the Irrevocable

13  Trust. Petitioner has recorded and filed a Notice of Pendency of Action in that case concerning

14  the five real properties listed on Schedule A of the Irrevocable Trust.

15      71.   Since his stroke, Gerald has had at least four attorneys. Petitioner is informed and

16  believes that Ms. Duban fired Gerald's estate planning attorney, Erenea. Attorney William B.

17  Treitler purportedly represented Gerald and Ms. Duban in connection with the restraining order

18  proceedings filed on February 26, 2014. After the Court dismissed the Request for Restraining

19  Order, Gerald purportedly hired Sharon Montisano of Hughes & Pizzuto. In approximately the

20  same time period, Ms. Duban hired Gina Stein of Goodwin Brown, Gross & Lovelace LLP. On

21  May 9, 2014, Petitioner's counsel received a letter from Attorney Richard S. Van Dyke stating

22  that he is now representing both Gerald and Ms. Duban jointly. When notified, Ms. Stein and Ms.

23  Montisano expressed their surprise that they had been replaced as counsel. Thereafter, Ms. Stein

24  confirmed that she is no longer representing Ms. Duban, and Ms. Montisano confirmed that she is

25  no longer representing Gerald. Mr. Van Dyke currently represents both Gerald and Ms. Duban in

26  the Conservatorship Proceedings and the Heggstad Petition.

27  ///

28  ///

G.   **After Gerald's Stroke, and Continuing Through the Litigation Proceedings, Ms. Duban has Engaged in a Scheme to Transfer Most of Gerald's Real Properties to herself or her Personal Trust**

72.   Just days after signing the Third Restatement of the Gerald S. Glatts Trust, which listed 7912 Terraza Disoma, Carlsbad, California as an asset on Schedule A, Gerald purportedly transferred this property to Ms. Duban. (*See* NOL Ex. 27.) Gerald, as trustee, purportedly signed the Quitclaim Deed only days after his stroke on November 5, 2013. (NOL Ex. 11.) The alleged transfer was to Ms. Duban in her capacity as a married woman as her sole and separate property. (*Id.*) According to the website Zillow, Terraza Disoma is valued at $702,159 as of May 14, 2014.

73.   The same day, Gerald, as trustee of the Revocable Trust, purportedly transferred the Avenida Theresa Property—the second real property listed on Schedule A of the Third Restatement of the Gerald S. Glatts Trust—to Ms. Duban. Gerald purportedly signed the Quitclaim Deed on November 5, 2013, transferring this property to Ms. Duban; the deed was recorded on November 20, 2013. (NOL Ex. 12.) The alleged transfer was to Ms. Duban in her capacity as a married woman as her sole and separate property. (*Id.*) According to the website Zillow, the Avenida Theresa Property is valued at $768,305 as of May 14, 2014.

74.   In a Quitclaim Deed dated and recorded on January 17, 2014, Gerald purportedly deeded Ms. Duban the Copper Crest Property. (NOL Ex. 13.) The alleged transfer was to Ms. Duban in her capacity as a married woman as her sole and separate property. (*Id.*)[2] According to the website Zillow, the Copper Crest Property is valued at $1,287,262 as of May 14, 2014.

75.   The Court dismissed the Request for Restraining Order on March 14, 2014. Petitioner is informed, and believes that, following the Court's dismissal of the Request for Restraining Order, Ms. Duban had Gerald transfer additional real properties to her.

76.   On April 7, 2014, Petitioner filed the conservatorship proceedings, and the Heggstad Petition. Petitioner served notice of the hearing on these petitions on April 14, and 18, 2014.

[2] It appears that Gerald signed deeds concerning this real property also on November 5, 2013, and December 6, 2013. (NOL Exs. 29 and 30.)

77.    Prior to receiving notice of the Conservatorship Proceedings, in a Quitclaim Deed dated April 8, 2014, Gerald, as trustee, purportedly deeded Ms. Duban, as trustee of her personal trust, his real property located at 344-346 N. Acacia, Solana Beach, California.  (NOL Ex. 14.)  According to the website Zillow, the N. Acacia Property is valued at $1,233,448 as of May 14, 2014.

78.    In a Quitclaim Deed dated April 8, 2014, Gerald, as trustee of the Revocable Trust, purportedly deeded himself the real property located at 234-238 Hill Street, Solana Beach, California, in his capacity as trustee of the Revocable Trust executed in 1997.  (NOL Ex. 15.)  In another Quitclaim Deed dated April 8, 2014, Gerald, as trustee of the Revocable Trust executed in 1997, purportedly deeded Ms. Duban this real property in her capacity as trustee of her personal trust.  (NOL Ex. 16.)  According to the website Zillow, the Hill Street Property is valued at $1,310,697 as of May 14, 2014.

79.    In a Quitclaim Deed dated April 8, 2014, Gerald, as trustee, purportedly deeded himself the real property located at 228 N. Helix Avenue, Solana Beach, California, in his capacity as trustee of the Revocable Trust executed in 1997.  (NOL Ex. 17.)  In another Quitclaim Deed dated April 8, 2014, Gerald, as trustee of the Revocable Trust executed in 1997, purportedly deeded Ms. Duban this real property in her capacity as trustee of her personal trust.  (NOL Ex. 18.)  According to the website Zillow, the N. Helix Avenue Property is valued at $1,008,756 as of May 14, 2014.

80.    Petitioner is informed and believes that on April 22, 2014, Ms. Duban recorded the Quitclaim Deeds for the real properties located at the Hill Street and N. Helix Avenue.  (NOL Exs. 15 and 17.)  Petitioner is informed and believes that on April 24, 2014, Ms. Duban recorded the Quitclaim Deeds for the real properties located Acacia, Hill Street, and Helix Avenue.  (NOL Exs. 14, 16, and 18.)  In addition, in a Quitclaim Deed dated April 25, 2014, and recorded on April 29, 2014, Ms. Duban deeded the 3572 Copper Crest Property from herself as a married woman as her sole and separate property, to herself as trustee of her personal trust.  (NOL Ex. 19.)

81.    The Confidential Investigator's Report in the Conservatorship Proceedings reflects that Gerald is not aware of his recent property transfers to Ms. Duban.  On April 24, 2014, Gerald

1   told the investigator that he owns approximately eight properties in San Diego County. Gerald
2   told the investigator he has mortgages on the Terraza, Disoma and Avenida Theresa Properties, but
3   owns outright four other properties located in Solana Beach and Encinitas. (Request for Judicial
4   Notice ("RJN") No. 1.) Gerald also told the investigator that he has three properties in the
5   Revocable Trust, which were placed in Donald's name. (Id.) However, as of this interview,
6   Gerald had purportedly executed deeds transferring all but two of his real properties to Ms. Duban.
7   Gerald also admitted to the investigator that he needs assistance with his financial affairs. (Id.)

8      82.    Similarly, Gerald testified at his deposition on July 11, 2014, that he still owns
9   eight real properties in San Diego County. (NOL Ex. 24 (Gerald Glatts Depo., 54:17-56:2).) He
10  also testified that as of June 12, 2014, he was "up in the air" about what assets he wanted to pass
11  to Ms. Duban. (Id. (48:11-13).)

12     83.    Gerald made other inaccurate statements to the investigator in the Conservatorship
13  Proceedings. He told the investigator that the monthly income from his eight real properties is
14  $5,000, but the monthly rental deposits before his stroke ranged from $11,295 to $14,657. (RJN
15  No. 1; NOL Ex. 25 (Donald Glatts Decl., ¶20).) Gerald testified at his deposition that his real
16  estate assets generate about $12,000 income per month. (NOL Ex. 24 (Gerald Glatts Depo.,
17  44:19-21).) He also told the investigator that he might have signed a health care directive 20 years
18  ago, but he executed a Power of Attorney for Health Care on October 11, 2007, which nominated
19  his sons Ronald and Robert as his agents. (RJN No. 1; NOL Ex. 26.)

20     84.    Ms. Duban's interview with the investigator in the Conservatorship Proceedings
21  reflects her undue influence and isolation of Gerald. She falsely told the investigator that Gerald's
22  sons attempted to have him sign a trust document two days after he was discharged from the
23  hospital in November 2013. (RJN No. 1.) In reality, Gerald executed the Irrevocable Trust on
24  August 30, 2012, well over one year before his stroke. He also executed the Third Amendment to
25  the Revocable Trust prior to his stroke. Gerald testified at his deposition that he did not recall
26  anyone attempting to have him sign trust documents two days after he was discharged from the
27  hospital in November 2013. (NOL Ex. 24 (Gerald Glatts Depo., 64:10-21).) Ms. Duban told the
28  investigator that she could not bring Gerald to his attorney's office to sign trust documents

1   because his doctors and nurse said he could not leave his home for more than one hour. (*Id.*)

2   However, Donald saw Gerald in the community on January 20, 2014. (NOL Ex. 25 (Donald

3   Glatts Decl., ¶ 26).) Other witnesses also saw Gerald in the community after his stroke, including

4   the tenants at his rental properties. Ms. Duban admitted to the investigator that she had Gerald's

5   telephone disconnected. (*Id.*)

6         85.    Ms. Duban's scheme to take control of Gerald's real properties is reflected through

7   her recent interactions with the tenants of the real properties. Ms. Duban recently telephoned

8   Rebecca Hedieh Naraghi-Smythe ("Ms. Smythe"), a tenant at 234 Hill Street, to tell Ms. Smythe

9   that she is now the owner of the property and "my landlord." (NOL Ex. 21 (Smythe Decl., ¶ 9).)

10   Ms. Duban also told Ms. Smythe that she did not want Ms. Smythe to talk to Gerald's sons or

11   anyone associated with them. (*Id.*) Another tenant, Richard Rowell ("Mr. Rowell"), recently

12   observed that Gerald forgot the floor plan of the house he rents to Mr. Rowell. (NOL Ex. 22

13   (Richard Rowell Decl., ¶ 12).) Mr. Rowell observed that it does not appear that Gerald can make

14   or understand decisions about repairs and perform substantial work, nor manage the properties.

15   (*Id.* at ¶ 12.) Ms. Duban raised her voice with and was disrespectful to Mr. Rowell's wife, Serri

16   Rowell ("Mrs. Rowell"), after Mrs. Rowell questioned Ms. Duban about bringing a realtor to the

17   their property; Ms. Duban admitted to Mrs. Rowell that she intends to sell the property. (NOL

18   Ex. 23 (Serri Rowell Decl., ¶ 10).) Mrs. Rowell also observed that Gerald forgot her name and the

19   floor plan of her property, and does not seem to have the ability to maintain his properties. (*Id.*

20   at ¶ 11.) In October 2013, Mitchell Miller ("Mr. Miller"), a tenant at 238 Hill Street, asked Gerald

21   what would happen to the property if something were to happen to Gerald. (NOL Ex. 28 (Miller

22   Decl., ¶ 11).) Gerald quickly responded that the property would go to his four sons. (*Id.*) Ms.

23   Duban telephoned Mr. Miller on April 30, 2014, and asked whether anyone had contacted him

24   about the lawsuit; she said, "If anybody contacts you, please do not say anything." (*Id.* at ¶ 13.)

25   H.    **Other Parties**

26         86.    Petitioner is ignorant of the true names and capacities of Respondents sued herein

27   as DOES 1-10 inclusive, and therefore sues these Respondents by such fictitious names.

28   Petitioner will amend this Petition to allege their true names and capacities when ascertained.

1    Petitioner is informed and believes and thereon alleges that each of the fictitiously named

2    Respondents is responsible in some manner for the occurrences herein alleged.

3        87.    Petitioner is informed and believes and thereon alleges that at all times herein

4    mentioned, each Respondent was the agent of each of the remaining Respondents, and in doing the

5    things hereinafter alleged, was acting in the course and scope of such agency.

6                                           II.

7    THE COURT SHOULD ENTER AN ORDER QUIETING TITLE TO GERALD'S REAL
     PROPERTIES IN THE NAME OF THE TRUSTEE OF THE REVOCABLE TRUST, AND
8    ORDER MS. DUBAN TO RETURN ALL INVALID LIFETIME GIFTS AND TRANSFERS
                 TO THE TRUSTEE OF THE REVOCABLE TRUST
9

10                       (Against all Respondents and DOES 1-50)

11       88.    The above paragraphs are hereby reasserted and incorporated by this reference.

12       89.    Any interested person may bring a petition pursuant to Probate Code section 850, et

13   seq. where "the trustee has a claim to real or personal property, title to or possession of which is

14   held by another." (Prob. Code § 850(a)(3)(B).)  By virtue of being beneficiary of the Codicil, the

15   Oral Agreement, and the Revocable Trust, and the named successor trustee of the Revocable Trust

16   upon Gerald's inability to act, Petitioner is an interested person with standing to bring this action.

17   (See Prob. Code § 48 (an interested person is "an heir, devisee, child, spouse, creditor, beneficiary,

18   and any other person having a property right in or claim against a trust estate... which may be

19   affected by the proceeding").)

20       90.    Probate Code section 856 provides, "if the court is satisfied that a conveyance,

21   transfer, or other order should be made, the court shall make an order authorizing and directing the

22   personal representative or other fiduciary, or the person having title to or possession of the

23   property, to execute a conveyance or transfer to the person entitled thereto, or granting other

24   appropriate relief."

25       91.    In the Heggstad Petition, Petitioner requests that the Court confirm that the 4th

26   Avenue, Helix Avenue, Hill Street, Acacia Avenue, and Sierra Avenue properties are assets of the

27   Irrevocable Trust.  In this Petition, Petitioner requests that the Court order Ms. Duban to return the

28   Avenida Theresa, Terraza Disoma, and Copper Crest properties to the Revocable Trust.

EXHIBIT A, page 83

1   Accordingly, Petitioner requests that the Court rescind the deeds transferring to Ms. Duban the

2   Avenida Theresa, Terraza Disoma, and Copper Crest properties.

3       92.    Alternatively, if the Court does not grant the Heggstad Petition, Petitioner requests

4   that the Court order Ms. Duban to return the Helix Avenue, Hill Street, Acacia Avenue, Avenida

5   Theresa, Terraza Disoma, and Copper Crest properties to the Revocable Trust.[3]

6   A.    **The Deeds Purportedly Transferring the Real Properties to Ms. Duban are the

7       Product of Undue Influence and Should be Rescinded**

8       93.    Undue influence is the use of a confidence or authority over another to obtain an

9   unfair advantage over the other, or taking an unfair advantage of another's weakness of mind.

10   (Civ. Code § 1575.)  One who gains a thing by fraud, accident, mistake, undue influence, the

11   violation of a trust, or other wrongful act, is, unless he or she has some other and better right

12   thereto, an involuntary trustee of the thing gained, for the benefit of the person who would

13   otherwise have had it.  (Civ. Code § 2224.)  Likewise, one who wrongfully detains a thing is an

14   involuntary trustee thereof, for the benefit of the owner.  (Civ. Code § 2223; *see also* Civ. Code §

15   1689(b)(1).)  The Court has the power to direct the person having title to a property to execute a

16   conveyance to the person entitled thereto or to grant other appropriate relief.  (Prob. Code § 856.)

17       94.    In property-related transactions between spouses, Family Code section 721,

18   subdivision (b), "imposes a duty of the highest good faith and fair dealing on each spouse..." and

19   prohibits each spouse from taking unfair advantage of the other.  (*Lintz v. Lintz* (2014) 222

20   Cal.App.4th 1346.)  Because Ms. Duban is Gerald's wife, she owes him a duty of fair dealing.

21   Petitioner is informed and believes and thereon alleges that Ms. Duban acquired an interest in the

22   real properties, which were Gerald' separate property, for no consideration.  If one spouse secures

23   an advantage from a transaction, a statutory presumption arises under Family Code section 721

24   that the advantaged spouse exercised undue influence and the transaction will be set aside.  (*Lintz,*

25   222 Cal.App.4th 346 (citing *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 344).)  A

26   _____

27   [3] As of the filing of this Petition, Petitioner is not aware of Ms. Duban having transferring the 4th
Avenue and Sierra Avenue properties to herself or her Trust.  Therefore, Petitioner does not

28   request that these two properties be returned to the Revocable Trust.

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

1  spouse obtains an advantage when the spouse's position is improved, he or she obtains a favorable
2  opportunity, or otherwise gains, benefits, or profits.  (*Lintz*, 222 Cal.App.4th 1346 (citing *In re*
3  *Marriage of Mathews* (2005) 133 Cal.App.4th 624, 629).)  Ms. Duban clearly benefited from the
4  purported transfers of the real properties as she attempted to receive real properties, worth millions
5  of dollars, to which she had no community property rights, for no consideration.

6      95.    As to *inter vivos* conveyances, "the susceptibility to imposition, the extreme age
7  and infirmity, of the grantor, together with *slight evidence* of circumstances from which it may be
8  inferred that the instrument was the product of coercion, will suffice to shift the burden and
9  require [Ms. Duban] show affirmatively that the transaction was fair and free from influence."
10  (*Oneil v. Spillane* (1975) 45 Cal.App.3d 147, 155 (citations omitted) (emphasis added); *see also*
11  *Stewart v. Marvin* (1956) 139 Cal.App.2d 769, 775).)

12     96.    At the time Gerald transferred the real properties to Ms. Duban, Gerald was 84
13  years old and Ms. Duban was 20 years his junior.  Gerald executed the deeds in Ms. Duban's
14  favor in the wake of his stroke, at a time when he suffered from diminished capacity, was
15  vulnerable to undue influence, and was subject to Ms. Duban's isolation and manipulation.  Two
16  of the transfers occurred just days after Gerald signed the Third Restatement of the Gerald S.
17  Glatts Trust and suffered the stroke.  Ms. Duban benefitted substantially from the transfers, to the
18  detriment of the longstanding beneficiaries of Gerald's and Helen's estates.  Accordingly, the
19  statutory presumption of undue influence will arise, and Ms. Duban will not be able to overcome
20  the presumption.  Therefore, the Court should enter an order rescinding the purported deeds
21  transferring the real properties to Ms. Duban or her trust, or should direct Ms. Duban to convey
22  the real properties back to the acting trustee of the Revocable Trust.

23  B.   **The Deeds Purportedly Transferring the Real Properties to Ms. Duban are the**
     **Product of Fraud and Should Be Rescinded**
24

25     97.    Fraud is an intentional misrepresentation, deceit, or concealment of a material fact
26  known to the defendant with the intention on the part of the defendant of thereby depriving a
27  person of property or legal rights or otherwise causing injury.  (Civ. Code § 3294(c)(3).)  A party
28  commits fraud if he or she induces or deceives a party to enter into the contract by, among other

1   things, suggesting as fact that which is not true by one who does not believe it to be true;

2   suppressing that which is true, by one having knowledge or belief of the fact, and any other act

3   fitted to deceive. (Civ. Code § 1572; *see also Ach v. Finkelstein* (1968) 264 Cal.App.2d 667,

4   674.) Similarly, fraudulent deceit provides that one "who willfully deceives another with intent to

5   induce him to alter his position to his injury or risk, is liable for any damage which he thereby

6   suffers." (Civ. Code § 1709.)

7       98.   Constructive fraud, on the other hand, does not require a finding of fraudulent

8   intent; and is based on the breach of a duty which results in prejudice to the injured party. (See

9   Civ. Code § 1573.) Fraud may be proven by inference and circumstantial evidence. (*Vogelsang v.*

10   *Wolpert* (1964) 227 Cal.App.2d 102, 111.)

11       99.   The elements of fraud are "(a) misrepresentation (false representation,

12   concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e.,

13   to induce reliance; (d) justifiable reliance; and (e) resulting damage." (*Lazar v. Sup.Ct. (Rykoff-*

14   *Sexton, Inc.)* (1996) 12 Cal.4th 631, 638.)

15       100.   Petitioner is informed and believes and thereon alleges that Ms. Duban made

16   multiple misrepresentations to Gerald, including that the Oral Agreement does not exist, that the

17   Children are attempting to take Gerald's assets, and that the Children do not want to visit with or

18   have a relationship with Gerald. Petitioner is informed and believes and thereon alleges that Ms.

19   Duban has made these misrepresentations during the course of her marriage to Gerald, but

20   particularly after Gerald's stroke and around the dates of the property transfers. Ms. Duban had

21   knowledge of the falsity of her representations; she was well aware of the desire of the Children to

22   visit and maintain their relationship with their father; that she, not the Children, is the party who is

23   taking Gerald's assets; and that the Oral Agreement does exist as reflected by the terms of the

24   Revocable Trust and the Irrevocable Trust. Ms. Duban intended to defraud Gerald for the purpose

25   of taking control of his assets for her benefit. Gerald relied upon Ms. Duban's misrepresentations,

26   as he has transferred his real properties and money to her. As a result of Ms. Duban's fraud, the

27   Children have been deprived of the assets of Gerald's and Helen's estate.

28   / / /

EXHIBIT A, page 86

101.   Accordingly, the Court should rescind the deeds purporting to transfer the real properties to Ms. Duban or her personal trust, or direct Ms. Duban to convey the real properties back to the acting trustee of the Revocable Trust.

**C.   The Deeds Purportedly Transferring the Real Properties to Ms. Duban Are the Product of Duress and Should Be Rescinded.**

102.   An apparent consent is not real or free when obtained through duress.  (Civ. Code § 1567.)  As defined by Civil Code section 1569, duress includes the unlawful or fraudulent confinement or detention of a person or his property.

103.   Ms. Duban has committed duress upon Gerald by isolating him from his family members.  Ms. Duban used this isolation and detainment of Gerald to obtain the purported deeds for the real properties.  Gerald would not have acquiesced to such transfers but for the fear and intimidation caused by Ms. Duban's acts of duress.

104.   As a result of Ms. Duban's duress, this Court should rescind the purported deeds transferring the real properties to Ms. Duban or her personal trust, or should direct Ms. Duban to convey the real properties back to the acting trustee of the Revocable Trust.

**D.   The Deeds Purportedly Transferring the Real Properties to Ms. Duban Are the Result of Menace and Should Be Rescinded.**

105.   Consent is not real or free when obtained through menace.  (Civ. Code § 1567).  Menace includes threatening to commit acts of duress or acts of injury to a person or property.  (Civ. Code § 1570.)

106.   Petitioner is informed and believes and thereon alleges that Ms. Duban committed acts of menace upon Gerald by threatening to and actually committing acts of duress or injury upon Gerald.  Petitioner is informed and believes and thereon alleges that if it were not for this menace, Gerald would not have executed the purported deeds transferring the real properties and would not have acquiesced to such transfers.

107.   As a result of Ms. Duban's menace, this Court should rescind the purported deeds transferring the real properties to Ms. Duban or her trust, or should direct Ms. Duban to convey the real properties back to the acting trustee of the Revocable Trust.

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

EXHIBIT A, page 87

**E.** **The Deeds Purportedly Transferring the Real Properties to Ms. Duban Are the Result of Mistake and Should be Rescinded.**

108. A mistake of fact is "an unconscious ignorance or forgetfulness of a fact past or present, material to the contract," or a "belief in the present existence of a thing material to the contract, which does not exist, or in the past existence of such a thing, which has not existed." (Civ. Code § 1577.)

109. For the reasons discussed above, including Ms. Duban's actions, the Court should rescind the deeds purporting to transfer the real properties to Ms. Duban or her personal trust, or direct Ms. Duban to convey the real properties back to the acting trustee of the Revocable Trust.

**F.** **The Court Should Order Ms. Duban to Return Lifetime Gifts and Transfers Made After Gerald's Stroke**

110. Petitioner is informed and believes and thereon alleges that Ms. Duban was the beneficiary of *inter vivos* gifts or transfers of property belonging to the Revocable Trust. For instance, Petitioner is aware that in 2013, Ms. Duban caused $32,000 to be withdrawn from the Irrevocable Trust Account. For the reasons set forth above in Section II(A)-(E), Petitioner requests that the Court order Ms. Duban to return all lifetime gifts and transfers made after Gerald's stroke on October 23, 2013, to either the Revocable Trust or the Irrevocable Trust, as appropriate.

## III.

## THE COURT SHOULD AWARD DOUBLE DAMAGES, ATTORNEYS' FEES, AND COSTS

### (Against Respondent Duban and DOES 1-50)

111. The above facts are hereby reasserted and incorporated herein by this reference.

112. Probate Code section 859 provides:

> If a court finds that a person has, in bad faith wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, conservatee, minor, or trust, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of

PETITION TO INVALIDATE DEEDS, ETC.

the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs. The remedies provided in this section shall be in addition to any other remedies available in law to a person authorized to bring an action pursuant to this part.

113.   Section 859 requires the defendant to return all property, plus pay damages amounting to double the value of the property taken, i.e., triple damages. (*Estate of Kraus* (2010) 184 Cal.App.4th 103.)

114.   For the reasons discussed above, Ms. Duban wrongfully and in bad faith took, concealed, or disposed of Gerald's property and the property of his trusts. She took, concealed, or disposed of Gerald's property and the property of his trusts by the use of undue influence, in bad faith or through the commission of financial elder abuse (alleged below). Petitioner requests that the Court not only order Ms. Duban to return the property she took from Gerald and his trusts, but to additionally pay damages amounting to double the value of the property taken, i.e., triple damages.   Further, Petitioner requests that the Court order Ms. Duban to pay Petitioner's attorneys' fees and costs.

## IV.

## THE COURT SHOULD ORDER QUASI-SPECIFIC PERFORMANCE OF THE ORAL AGREEMENT TO MAKE A WILL

### (Against all Respondents and DOES 1-50)

115.   The above paragraphs are hereby reasserted and incorporated by this reference.

116.   A person may make a valid agreement binding himself to make a particular disposition of his property by will. (*Goldstein v. Hoffman* (1963) 213 Cal.App.2d 803, 811.) "Where a party contracts to make a particular disposition of property by will, the agreement necessarily includes a promise not to breach the contract by revoking the will and failing to dispose of the property as agreed." (*Id.*)

117.   The elements of a cause of action for breach of contract are (1) the contract, (2) plaintiff's performance, (3) defendant's breach; and (4) resulting damage to the plaintiff.

31

MCKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

1 (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614.) "It is to be
2 presumed that the breach of an agreement to transfer real property can not be adequately relieved
3 by pecuniary compensation." (Civ. Code § 3387.)

4 118. "Equitable relief in the form of quasi-specific performance of the contract may be
5 obtained where the remedy at law is inadequate and the promisor has failed to make the promised
6 disposition of his will." (*Westbrook v. Sup.Ct. (Fairchild)* (1986) 176 Cal.App.3d 703, 711
7 (citations omitted).) The beneficiary "of such contract need not wait until the death of the
8 promisor but may seek equitable relief against *inter vivos* conveyances made by [the promisor] in
9 fraud of their rights." (*Id.* (citations omitted) (emphasis in original).) "Where the agreement is to
10 leave specific property owned by the promisor at the time the agreement is made, the promisor
11 may be found to have given up the right to dispose of that property during his or her lifetime and
12 even an inter vivos transfer may be held to be in contravention of the agreement and a constructive
13 trust imposed thereon." (*Id.* (citing *Osborn v. Hoyt* (1919) 181 Cal.336, 340-341 ("There is no
14 force in the contention that the action was prematurely commenced in the lifetime of the testator;"
15 the plaintiff "might have maintained an action in equity to obtain a decree protecting him against
16 future possible injury to his rights"); *see also In re. Cooper's Estate* (1969) 274 Cal.App.2d 70, 79
17 ("if during her lifetime Bessie Cooper had attempted to transfer the property, by new will or
18 otherwise, to third persons in violation of the intention of the will she could have been enjoined
19 from so doing by respondents herein, as the intended beneficiaries"); *Wilkison v. Wiederkehr*
20 (2002) 101 Cal.App.4th 822, 836 ("the cases establish that quasi-specific performance may be
21 proper where a bequest of real property is involved—the classic situation where an action at law is
22 deemed inadequate"); Prob. Code § 21700(c) ("A contract to make a will or devise or other
23 instrument, or not to revoke a will or devise or other instrument, or to die intestate, if made prior
24 to the effective date of this section, shall be construed under the law applicable to the contract
25 prior to the effective date of this section").)

26 119. The Children had a valid contract with Gerald, i.e., the Oral Agreement. The
27 Children performed the Oral Agreement by forgoing their interests in Helen's estate for the past
28 35 years, in exchange for receiving the entirety of Gerald's and Helen's estates upon Gerald's

PETITION TO INVALIDATE DEEDS, ETC.

1   death, including specifically the real properties owned by Gerald and Helen.  Gerald breached the

2   Oral Agreement during his lifetime by transferring his assets, including the specific real properties

3   and the funds contained in the Irrevocable Trust Account, to Ms. Duban.  As a result of Gerald's

4   breach, the Children have suffered damages.  However, money damages will not adequately

5   compensate the Children because the real properties transferred out of Gerald's estate are unique.

6   Therefore, the Children are entitled to quasi-specific performance of the Oral Agreement.

7       120.   Ms. Duban is an involuntary trustee of Gerald's assets, including the real properties

8   as well as any other assets she has received from Gerald.  The Court should impose a constructive

9   trust on those assets, plus order Ms. Duban to pay interest.  (*In re Estate of Hoffman* (1968) 265

10  Cal.App.2d 135, 142 ("equity gives relief sometimes called quasi-specific performance,… the

11  court will, in an action by the promisee, impose a constructive trust upon any particular property

12  in the hands of the individual distributee"); *see also* Civ. Code § 2224 (one who gains a thing by

13  fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless

14  he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the

15  benefit of the person who would otherwise have had it); Civ. Code § 2223 (one who wrongfully

16  detains a thing is an involuntary trustee thereof, for the benefit of the owner).)

17                              V.

18  **THE COURT SHOULD AWARD PETITIONER DAMAGES FOR MS. DUBAN'S**
    **INTENTIONAL INTERFERENCE WITH EXPECTED INHERITANCE**

19

20                   (Against Respondent Duban and DOES 1-50)

21      121.   The above paragraphs are hereby reasserted and incorporated by this reference.

22      122.   The elements of a cause of action for intentional interference with expected

23  inheritance are as follows: (1) the plaintiff had an expectancy of an inheritance; (2) causation,

24  meaning that there was a reasonable degree of certainty of the bequest at the testator's death but

25  for the interference; (3) intent, i.e., the defendant had knowledge of the plaintiff's expectancy and

26  deliberately interfered with it; (4) the interference was conducted by independently tortious means

27  and is wrong for some reason other than the fact of the interference; and (5) the interference

28  caused damages.  (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1057-1058.)

                              33

MCKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

123.   Ms. Duban directly and purposely interfered with the Children's expected inheritance.   The Children had an expectancy of their father's inheritance under the terms of the Oral Agreement, the Codicil, the Irrevocable Trust, and the Revocable Trust. But for Ms. Duban's interference, this expectancy would not have changed.  Indeed, it could not have changed, as it was subject to the terms of a contract, the Oral Agreement. Ms. Duban knew that Gerald left all of his assets to the Children and deliberately forced Gerald to change his estate plan by, among other things, isolating Gerald from the Children, refusing to bring Gerald to Erena's office to execute deeds transferring the real properties to the Irrevocable Trust, and forcing Gerald to execute deeds transferring his real properties to her. Indeed, two of the transfers occurred just days after Gerald signed the Third Restatement of the Gerald S. Glatts Trust and suffered the stroke. On December 10, 2013, Gerald told Robert that Ms. Duban wanted to "break up" the Irrevocable Trust.  As pled above, Ms. Duban conducted this interference through undue influence, fraud, duress, and menace.  Accordingly, Ms. Duban is liable for damages for intentional interference with an expected inheritance.

## VI.

### THE COURT SHOULD ORDER THAT MS. DUBAN IS LIABLE FOR INDUCING BREACH OF CONTRACT

#### (Against Respondent Duban and DOES 1-50)

124.   The above paragraphs are hereby reasserted and incorporated by this reference.

125.   The elements of a cause of action for inducing breach of contract, "a species of intentional interference with contractual relations—are a valid contract between the plaintiff and a third party, defendant's knowledge of it, defendant's intentional acts designed to induce a breach of the contractual relationship,' consequent breach, and resulting damage." (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 585 (citing *Quelimane Co., v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 25, 55).)

126.   A valid contract to make a will, i.e., the Oral Agreement, existed between the Children and Gerald.  Gerald implemented the terms of the Oral Agreement in his various estate planning instruments.  Ms. Duban, well aware of the Oral Agreement, intentionally manipulated,

34

1  Gerald into breaching the Oral Agreement by instructing him to transfer the assets of his estate to
2  her, by preventing him from meeting with his estate planning attorney, and by isolating him from
3  the Children. As a result, Ms. Duban now claims to own all of Gerald's and Helen's assets, to the
4  detriment of the Children. Petitioner requests that the Court find Ms. Duban liable for
5  compensatory damages in an amount to be determined at trial.

6                                                    VII.

7  **THE COURT SHOULD ORDER THAT MS. DUBAN IS LIABLE FOR DAMAGES FOR**
8  **FINANCIAL ELDER ABUSE AND ISOLATION**

9                          (Against Respondent Duban and DOES 1-50)

10                                    (Request for Jury Trial)

11        127.    The above paragraphs are hereby reasserted and incorporated by this reference.

12        128.    An elder is any person residing in the State of California 65 years of age or older.
13  (Welf. & Inst. Code § 15610.27.) At the time of the transactions addressed herein, Gerald was
14  over the age of 65 years.

15        129.    Financial elder abuse occurs when a person takes, secretes, appropriates, or retains
16  real or personal property of an elder for a wrongful use, or with intent to defraud, or both; assists in
17  taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder for a
18  wrongful use or with intent to defraud or both; or takes, secretes, appropriates, obtains, or retains,
19  or assists in taking, secreting, appropriating, obtaining or retaining, real or personal property of an
20  elder by undue influence. (Welf. & Inst. Code § 15610.30(a)(1)-(3).) A person shall be deemed to
21  have committed financial elder abuse if the person took the elder's real or personal property and
22  "knew or should have known that this conduct is likely to be harmful to the elder." (Id., subd.
23  (b).) A person shall be deemed to have taken real or personal property when the elder "is deprived
24  of any property right, including by means of an agreement, donative transfer, or testamentary
25  bequest, regardless of whether the property is held directly or by a representative of an elder or
26  dependent adult." (Id., subd. (c).)

27        130.    Under Welfare and Institutions Code section 15610.70(a), undue influence is
28  "excessive persuasion that causes another person to act or refrain from acting by overcoming that

1    person's free will and results in inequity." In determining whether a result is the product of undue

2    influence, the Court shall consider the vulnerability of the victim, the influencer's apparent

3    authority, the actions or tactics used by the influencer, and the equity of the result. (Welf. & Inst.

4    Code § 15610.70(a)(1)-(4).)

5       131.   Ms. Duban took, secreted, appropriated, or retained Gerald's property for a

6    wrongful use or with intent to defraud or by undue influence. As alleged above, Ms. Duban

7    intentionally caused Gerald to transfer his interests in his real properties to her during this lifetime.

8    In addition, in 2013, Ms. Duban caused $32,000 to be withdrawn from the Irrevocable Trust

9    Account. Therefore, Ms. Duban is deemed to have committed financial elder abuse because she

10   took Gerald's property and she knew or should have known that her conduct was likely to be

11   harmful to Gerald.

12      132.   Isolation means "acts intentionally committed for the purpose of preventing, and

13   that do prevent, an elder" from receiving his telephone calls; telling a caller that the elder "is not

14   present, or does not wish to talk with the caller, or does not wish to meet with the visitor where the

15   statement is false, is contrary to the express wishes of the elder…, whether he or she is competent

16   or not; and is made for the purpose of preventing the elder… from having contact with family,

17   friends, or concerned persons;" false imprisonment, as defined by Penal Code section 236; or

18   physical restraint of the elder to prevent the elder from meeting with visitors. (Welf. & Inst.

19   Code § 15610.43(a)(1)-(4).)

20      133.   Ms. Duban has isolated and continues to isolate Gerald by, amongst other things,

21   cutting off his access to the Children and taking away his telephone. In Gerald's own words, he is

22   a "prisoner" to Ms. Duban.

23      134.   As a result of Ms. Duban's financial abuse and isolation, the Court should find that

24   she is liable for compensatory damages in an amount to be proven at trial. Additionally, Petitioner

25   is entitled to an award of attorneys' fees and costs. (Welf. & Inst. Code § 15657.5(a).) Moreover,

26   Ms. Duban was reckless, oppressive, fraudulent, and malicious in her conduct; she knew that the

27   Children were the longstanding beneficiaries of Gerald's and Helen's assets, and she intentionally

28   ///

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

1   isolated Gerald and manipulated him into giving her his assets. Accordingly, Ms. Duban is liable

2   for punitive damages in an amount to be determined at trial. (Welf. & Inst. Code § 15657.5(b).)

3       135.   Petitioner demands a jury trial on his cause of action for financial elder abuse.

4   **VIII.**

5   **THE COURT SHOULD SUSPEND GERALD'S POWERS AS TRUSTEE, ORDER HIM**

6   **REMOVED AS TRUSTEE, AND CONFIRM PETITIONER'S APPOINTMENT AS**
**TEMPORARY TRUSTEE AND SUCCESSOR TRUSTEE.**

7       136.   The above paragraphs are hereby reasserted and incorporated by this reference.

8       137.   A beneficiary of a trust may petition the court to appoint or remove a trustee.

9   (Prob. Code § 17200(b)(10).)   The Court may remove a trustee when the trustee has committed a

10  breach of trust or is unfit to administer the trust. (Prob. Code § 15642(b)(1), (2).)   The Court may

11  remove a trustee if "the trustee is substantially unable to manage the trust's financial resources or

12  is otherwise substantially unable to execute properly the duties of the office. (*Id.*, subd. (b)(7).)

13  The Court may remove a trustee if "the trustee is substantially unable to resist fraud or undue

14  influence." (*Id.*, subd. (b)(8).)

15      138.   Further, "If it appears to the court that trust property or the interests of a beneficiary

16  may suffer loss or injury pending a decision on a petition for removal of a trustee any appellate

17  review, the court may, on its own motion or on petition of a cotrustee or beneficiary, compel the

18  trustee whose removal is sought to surrender trust property to a cotrustee or to a receiver or

19  temporary trustee.   The court may also suspend the powers of the trustee to the extent the court

20  deems necessary." (*Id.*, subd. (e).)

21      139.   For the reasons set forth above, Gerald is unfit to serve as trustee of the Revocable

22  Trust.   Gerald is vulnerable to Ms. Duban's undue influence, and such vulnerability has already

23  caused him to transfer real properties to her.   Gerald has suffered from diminished capacity since

24  his stroke.   He admits that he needs assistance with his financial affairs, and Petitioner is informed

25  and believes and thereon alleges that Ms. Duban currently manages Gerald's finances and real

26  properties.   Ms. Duban told Ms. Smythe that Ms. Duban is now the owner and landlord of 234 Hill

27  Street. (NOL Ex. 21 (Smythe Decl., ¶ 9).)   Ms. Duban is almost always present with Gerald at his

28  properties, and speaks for Gerald or tells him what to say; it does not appear that Gerald can make

1    or understand decisions about repairs or perform substantial work at his properties.   (See, e.g.,
2    NOL Exs. 22 (Richard Rowell Decl., ¶¶ 6, 7, 11, 12); 23 (Serri Rowell Decl., ¶¶ 7, 8, 10, 11).)
3         140.   Therefore, Petitioner requests that the Court suspend Gerald's powers as trustee of
4    the Revocable Trust and confirm Petitioner's appointment as interim trustee.   Petitioner
5    additionally requests that the Court remove Gerald as trustee and confirm Petitioner's appointment
6    as sole successor trustee.

7                                            IX.

8    ## THE COURT SHOULD AWARD PETITIONERS' ATTORNEYS' FEES AND COSTS

9                        (Against all Respondents and DOES 1-50)

10        141.   The above paragraphs are hereby reasserted and incorporated by this reference.
11        142.   As discussed above, Petitioner is entitled to an award of attorneys' fees and costs
12    due to Ms. Duban's financial elder abuse.   (Welf. & Inst. Code § 15657.5(a); Prob. Code § 859.)
13        143.   The Probate Court maintains broad equitable powers to make awards of attorneys'
14    fees and costs against fiduciaries and agents who oppose or litigate claims in bad faith.   (Estate of
15    Ivey (1994) 22 Cal.App.4th 873, 883-885; Rudnick v. Rudnick (2009) 179 Cal.App.4th 1328,
16    1334-1335.)   "Plaintiffs who have succeeded in protecting, preserving or increasing a fund for the
17    benefit of themselves and others may be awarded compensation from the fund for the services of
18    their attorneys." (In re Marré's Estate (1941) 18 Cal.2d 191, 192.)   The Court may also order
19    costs to be paid by any party to the proceedings or out of the estate as justice may require.   (Prob.
20    Code § 1002.)
21        144.   Petitioner requests that the Court order Ms. Duban to pay Petitioner's attorneys'
22    fees and costs.   Alternatively, the Court should award Petitioner his attorneys' fees and costs from
23    the Revocable Trust under the common fund doctrine.   (See City and County of San Francisco v.
24    Sweet (1995) 12 Cal.4th 105, 110 ["The common fund doctrine recognizes the common law
25    historic power of equity to permit . . . a party preserving or recovering a fund for the benefit of
26    others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or
27    property itself."].)   Further, the Court should order Ms. Duban or Gerald to pay Petitioner's costs.
28    ///

# X.
## JURISDICTION, VENUE, AND NOTICE

145.   The above paragraphs are hereby reasserted and incorporated by this reference.

146.   Gerald and Ms. Duban both currently reside in San Diego County, California. Petitioner is informed and believes and thereon alleges that the Revocable Trust is administered in the County of San Diego, State of California. Thus, the proper venue for the commencement of this proceeding pursuant to Probate Code section 17005 is the County of San Diego, State of California.

147.   Pursuant to Probate Code sections 851 and 17203, Petitioner will provide notice at least 30 days before the time set for the hearing on the petition, including notice of the time and place of hearing, to the following individuals:

| Name and Address | Relationship |
|---|---|
| Gerald S. Glatts<br>3572 Copper Crest Road<br>Encinitas, CA 92024 | Co-trustee, Trustor, current Trust beneficiary |
| Donald A. Glatts<br>3740 Fortuna Ranch Road<br>Encinitas, California 92024 | Co-Trustee, Trust remainder beneficiary |
| Thomas R. Glatts<br>5775 Royal Oak Avenue<br>Burnaby, British Columbia V5H 3N3 | Trust remainder beneficiary |
| Ronald B. Glatts<br>1420 Dolphin Court<br>San Marcos, CA 92078 | Trust remainder beneficiary |
| Robert C. Glatts<br>320 Clark Street<br>Solana Beach, CA 92075 | Trust remainder beneficiary |
| Katarina Duban<br>3572 Copper Crest Road<br>Encinitas, CA 92024 | Respondent |
| Richard S. Van Dyke<br>Van Dyke & Associates, APLC<br>501 West Broadway, Suite 1600<br>San Diego, CA 92101 | Attorneys for Gerald and Ms. Duban |
| Jeremiah J. Moffit<br>McKenna Long & Aldridge, LLP<br>600 W. Broadway, Suite 2600<br>San Diego, CA 92101 | Attorneys for Petitioner |

PETITION TO INVALIDATE DEEDS, ETC.

McKENNA LONG &<br>ALDRIDGE LLP<br>SAN DIEGO

148.    Petitioner is informed and believes and thereon alleges that these persons constitute the only persons entitled to notice of the hearing on this matter.

## XI.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays for an order of this Court:

1.    That all notices have been given according to law;

2.    That the deeds transferring the following the three real properties are rescinded, or Ms. Duban is ordered to convey record title to the following real properties to the Revocable Trust:

(1)    2941 Avenida Theresa, Carlsbad, CA, 92009, Assessor's Parcel No. 255-144-34, legally described as follows:

PARCEL 1:
Lot 30 of the amended map of Santa Fe Ridge – Unit 2, Carlsbad tract No. 83-16, in the City of Carlsbad, County of San Diego, State of California, according to map thereof No. 11019, filed in the Office of the County Recorder of San Diego County, AUGUST 14, 1984.

PARCEL 2:
A non-exclusive easement on and over the "common area" as defined in the declaration of covenants, conditions and restrictions to which reference is hereafter made, for access, use, occupancy, enjoyment, ingress and egress of the amenities located thereon, subject to the terms and provisions of the declaration of covenants, conditions and restrictions to which reference is hereinafter made. This easement is appurtenant to Parcel 1 above described, the common area is for the use of owners and lots which are subject to the declaration of covenants, conditions and restrictions to which reference is hereafter made, and is not for the use of the general public.

(2).    7912 Terraza Disoma, Carlsbad, CA, 92009, Assessor's Parcel No. 223-311-30, legally described as follows:

///

40

PETITION TO INVALIDATE DEEDS, ETC.

McKENNA LONG &
ALDRIDGE LLP.
SAN DIEGO

1      Lot 73 of Carlsbad tract No. 75-9 (B) Unit No. 2,
2     in the City of Carlsbad, County of San Diego, State
3     of California, according to map thereof No. 9959,
       filed in the Office of the County Recorder of San
4     Diego County, DECEMBER 31, 1980.

5     (3)     3572 Copper Crest Road, Encinitas, CA,
       92024, Assessor's Parcel No. 264-223-22-00,
6     legally described as follows:

7     PARCEL A:

8     Parcel 2 of parcel map 4460, in the City of
9     Encinitas, County of San Diego, State of
       California, according to map, filed in the Office of
10    the County Recorder of San Diego County,
       February 13, 1976.

11    PARCEL B:

12
13    Easements and rights of way for road and utility
       purposes and appurtenances thereto, to be used in
14    common with others, over, under, along and across
       those portions of Lot 7 of the subdivision of
15    Rancho Las Encinitas, in the County of San Diego,
16    State of California, according to map thereof No.
       848, filed in the Office of the County Recorder of
17    San Diego County, June 27, 1898, lying within
       easement parcels "1" and "2" as follows:

18
19    EASEMENT PARCEL "1":

20    A strip of land 60.00 feet in width, the center line
       of said strip being described as follows:
21    Beginning at a point in the southerly line of said
       Lot 7, distant thereon south 86° 55' 53" West,
22    193.36 feet from the southeast corner thereof,
       being the northerly terminus of the center line of
23    road survey No. 554, as shown on record of survey
       map no. 6085, said point also being in the center
24    line of road survey No. 181; thence northeasterly
25    along said center line of road survey No. 181, as
       established by the center line of the existing
26    travelled way as follows: North 08° 15' 03" east, a
       distance of 117.52 feet to, the, beginning of a
27    tangent 1000.00 foot radius curve concave
       southeasterly; thence northeasterly along the arc of
28    said curve through a central angle of 19° 42' 30" a

McKENNA LONG &
ALDRIDGE LLP.
SAN DIEGO

41

PETITION TO INVALIDATE DEEDS, ETC.

distance of 343.97 feet; thence tangent to said
curve, north 27° 57' 53" east, a distance of 120.84
feet to the easterly line of said Lot 7. Said
easement to terminate in said southerly and
easterly lines respectively of said Lot 7.

EASEMENT PARCEL "2":

A strip of land 60.00 feet in width, the center line
of said strip being described as follows:
Commencing at the southerly terminus of the
1000.00 foot radius curve, described in easement
parcel "1" above, a radial line of said curve bears
north 81° 44' 57" west, to said point; thence
northeasterly along the arc of said curve through a
central angle of 12° 21' 41" a distance of 215.74
feet to the true point of beginning of the herein
described center line; thence south 86° 55' 53"
west, 510.06 feet to a point on the easterly line of
the land described in deed to Charles A. Matley
and Steven P. Krishe, recorded March 16, 1972 as
file/page 62561, book 1972 of the official records,
distant thereon south 02° 08' 56" east, 377.16 feet
from the northeast corner thereof. Said easement
to terminate in the easterly line of said Matley and
Krishe's land and in the west on the westerly line
of Parcel B-1 hereinabove described.

PARCEL C:

An easement and right of way for road and utility
purposes over, under, along and across those
portions of Parcels 1, 3 and 4 of said parcel map
4460, delineated and designated on said parcel map
as "proposed 40.00 foot private road easement"
and "existing 60.00 foot private road easement."

3.   Alternatively, if the Heggstad Petition is not granted, that the deeds transferring the following the six real properties are rescinded, or Ms. Duban is ordered to convey record title to the following real properties to the Revocable Trust:

(1).   228 N Helix Avenue, Solana Beach, CA,
92075; Assessor's Parcel No. 263-321-21-00,
legally described as follows:

/ / /

42

PETITION TO INVALIDATE DEEDS, ETC.

MCKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

Lot 16 of Block 21 of SOLANA BEACH, in the City of Solana Beach, County of San Diego, State of California, according to Map thereof No. 1749, filed in the Office of the County Recorder of San Diego County, March 5, 1923.

(2)  234-236-238 Hill Street, Solana Beach, CA, 92075, Assessor's Parcel No: 263-321-22-00, legally described as follows:

Lot 15 of Block 21 of SOLANA BEACH, in the City of Solana Beach, County of San Diego, State of California, according to Map thereof No. 1749, filed in the Office of the County Recorder of San Diego County, March 5, 1923.

(3)  344-346 N Acacia Avenue, Solana Beach, CA, 92075, Assessor's Parcel No: 263-304-17-00, legally described as follows:

Lot 19, Block 14, Solana Beach, in the City of Solana Beach, County of San Diego, State of California, according to Map thereof No. 1749, filed in the Office of the County Recorder of San Diego County, MARCH 5, 1923.

(4)  2941 Avenida, Theresa, Carlsbad, CA, 92009, Assessor's Parcel No. 255-144-34, legally described as follows:

PARCEL 1:
Lot 30 of the amended map of Santa Fe Ridge – Unit 2, Carlsbad tract No. 83-16, in the City of Carlsbad, County of San Diego, State of California, according to map thereof No. 11019, filed in the Office of the County Recorder of San Diego County, AUGUST 14, 1984.

PARCEL 2:
A non-exclusive easement on and over the "common area" as defined in the declaration of covenants, conditions and restrictions to which reference is hereafter made, for access, use, occupancy, enjoyment, ingress and, egress of the amenities located thereon, subject to the terms and provisions of the declaration of covenants, conditions and restrictions to which reference is hereinafter made. This easement is appurtenant to Parcel 1 above described, the common area is for the use of owners and lots which are subject to the

43

MCKENNA LONG & ALDRIDGE LLP SAN DIEGO

EXHIBIT A, page 101

1   declaration of covenants, conditions and
2   restrictions to which reference is hereafter made,
    and is not for the use of the general public.

3   (5)   7912 Terraza Disoma, Carlsbad, CA,
4   92009, Assessor's Parcel No. 223-311-30, legally
    described as follows:

5   Lot 73 of Carlsbad tract No. 75-9 (B) Unit No. 2,
6   in the City of Carlsbad, County of San Diego, State
7   of California, according to map thereof No. 9959,
    filed in the Office of the County Recorder of San
8   Diego County, DECEMBER 31, 1980.

9   (6)   3572 Copper Crest Road, Encinitas, CA,
10  92024, Assessor's Parcel No. 264-223-22-00,
    legally described as follows:

11  PARCEL A:

12  Parcel 2 of parcel map 4460, in the City of
13  Encinitas, County of San Diego, State of
14  California, according to map, filed in the Office of
    the County Recorder of San Diego County,
15  February 13, 1976.

16  PARCEL B:

17  Easements and rights of way for road and utility
18  purposes and appurtenances thereto, to be used in
    common with others, over, under, along and across
19  those portions of Lot 7 of the subdivision of
    Rancho Las Encinitas, in the County of San Diego,
20  State of California, according to map thereof No.
21  848, filed in the Office of the County Recorder of
    San Diego County, June 27, 1898, lying within
22  easement parcels "1" and "2" as follows:

23  EASEMENT PARCEL "I":

24  A strip of land 60.00 feet in width, the center line
25  of said strip being described as follows:
    Beginning at a point in the southerly line of said
26  Lot 7, distant thereon south 86° 55' 53" West,
    193.36 feet from the southeast corner thereof,
27  being the northerly terminus of the center line of
    road survey No. 554, as shown on record of survey
28  map no. 6085; said point also being in the center

line of road survey No. 181; thence northeasterly along said center line of road survey No. 181, as established by the center line of the existing travelled way as follows: North 08° 15' 03" east, a distance of 117.52 feet to the beginning of a tangent 1000.00 foot radius curve concave southeasterly; thence northeasterly along the arc of said curve through a central angle of 19° 42' 30" a distance of 343.97 feet; thence tangent to said curve, north 27° 57' 53" east, a distance of 120.84 feet to the easterly line of said Lot 7. Said easement to terminate in said southerly and easterly lines respectively of said Lot 7.

EASEMENT PARCEL "2":

A strip of land 60.00 feet in width, the center line of said strip being described as follows:
Commencing at the southerly terminus of the 1000.00 foot radius curve, described in easement parcel "1" above, a radial line of said curve bears north 81° 44' 57" west to said point; thence northeasterly along the arc of said curve through a central angle of 12° 21' 41" a distance of 215.74 feet to the true point of beginning of the herein described center line; thence south 86° 55' 53" west, 510.06 feet to a point on the easterly line of the land described in deed to Charles A. Matley and Steven P. Krishé, recorded March 16, 1972 as file/page 62561, book 1972 of the official records, distant thereon south 02° 08' 56" east, 377.16 feet from the northeast corner thereof. Said easement to terminate in the easterly line of said Matley and Krishe's land and in the west on the westerly line of Parcel B-1 hereinabove described.

PARCEL C:
An easement and right of way for road and utility purposes over, under, along and across those portions of Parcels 1, 3 and 4 of said parcel map 4460, delineated and designated on said parcel map as "proposed 40.00 foot private road easement" and "existing 60.00 foot private road easement."

4.    That Ms. Duban shall return all gifts and transfers provided following Gerald's stroke under Probate Code section 850 et seq.;

5.      That Petitioner is awarded double damages, attorneys' fees and costs under Probate Code section 859;

6.      That Gerald breached his contract to make a will, and as a result, Petitioner is entitled to quasi-specific performance of the Oral Agreement.

7.      That a constructive trust is imposed on all assets received by Ms. Duban;

8.      That Ms. Duban is liable for damages for intentional interference with an expected inheritance;

9.      That Ms. Duban induced Gerald to commit a breach of contract, and as a result Petitioner is entitled to an award of compensatory damages in an amount to be determined at trial;

10.     That Ms. Duban is liable for compensatory damages for financial elder abuse and isolation in an amount to be determined at trial;

11.     That since Ms. Duban is liable for financial elder abuse and isolation, she must pay Petitioner's attorneys' fees and costs;

12.     That Ms. Duban's conduct in committing financial elder abuse and isolation was reckless, oppressive, fraudulent, and malicious, and she is liable for punitive damages in an amount to be determined at trial;

13.     That Gerald's powers as trustee of the Revocable Trust are immediately suspended and Petitioner is appointed as interim trustee;

14.     That Gerald is removed as trustee, and Petitioner is appointed as sole successor trustee;

15.     That Petitioner is awarded attorneys' fees and costs;

16.     That Ms. Duban and/or Gerald shall pay Petitioner's costs; and

17.     For such other and further relief as this Court deems just and proper.

DATED: September 17, 2014        McKENNA LONG & ALDRIDGE LLP

By:                        
Jeremiah J. Moffit
Attorneys for Donald Glann

PETITION TO INVALIDATE DEEDS, ETC.

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

<u>VERIFICATION</u>

I, Donald Glatts, am a party in the foregoing action. I have read the foregoing PETITION TO INVALIDATE DEEDS AND LIFETIME TRANSFERS ON THE BASIS OF UNDUE INFLUENCE, FRAUD, DURESS, AND MENACE; FOR DOUBLE DAMAGES; ATTORNEYS' FEES AND COSTS; FOR QUASI-SPECIFIC PERFORMANCE OF CONTRACT TO MAKE A WILL; FOR DAMAGES FOR INTENTIONAL INTERFERENCE WITH EXPECTED INHERITANCE; FOR DAMAGES FOR INTENTIONAL INTERFERENCE WITH CONTRACT; FOR COMPENSATORY DAMAGES, PUNITIVE DAMAGES, AND ATTORNEYS' FEES AND COSTS FOR FINANCIAL ELDER ABUSE AND ISOLATION; FOR TRUSTEE'S SUSPENSION AND REMOVAL; AND FOR ATTORNEYS' FEES AND COSTS and know the contents thereof. The matters stated therein are true of my own knowledge except as to matters stated therein on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed in _San Diego_, California on September 5, 2014.

_[signature]_

Donald Glatts

USW 804602124.2

47

PETITION TO INVALIDATE DEEDS, ETC.

MCKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

**Exhibit 3**

1 | JEREMIAH J. MOFFIT (SBN 229878)
CATHERINE M. SWAFFORD (SBN 23933)
2 | McKENNA LONG & ALDRIDGE LLP
600 West Broadway, Suite 2600
3 | San Diego, California 92101-3372
Telephone:   619.236.1414
4 | Facsimile:   619.232.8311
E-Mail:   jmoffit@mckennalong.com
5 |            cswafford@mckennalong.com

6 | Attorneys for Donald Glatts, Petitioner

7 |

8 |                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 |                COUNTY OF SAN DIEGO, PROBATE DIVISION

10 |

THE ORIGINAL OF THIS DOCUMENT
WAS RECORDED ON SEP 23, 2014
DOCUMENT NUMBER 2014-0411651
Ernest J. Dronenburg, Jr., COUNTY RECORDER
SAN DIEGO COUNTY RECORDER'S OFFICE
TIME:   4:35   PM

11 | In re the                               Case No. 37-2014-00031294-PR-TR-CTL

12 |   GERALD S. GLATTS TRUST dated         NOTICE OF PENDENCY OF ACTION
13 |   December 10, 1981, as amended and
        restated on September 23, 1997,
14 |   October 14, 2011, and October 23,
        2013.

15 |                                         Petition Filed: September 17, 2014
16 |                                         Dept.:    PC-2
      DONALD GLATTS,                         Judge:    Julia C. Kelety
17 |
                Petitioner,
18 |
         v.
19 |
      KATARINA DUBAN, an individual; Gerald
20 |   Glatts, individually and as trustee; and DOES
      1 through 10, inclusive,
21 |
22 |                Respondents.

23 |        PLEASE TAKE NOTICE that the above-captioned action commenced on September 17,

24 | 2014, by Donald A. Glatts, individually and as named Successor Trustee of the Gerald S. Glatts

25 | Trust dated December 10, 1981, as amended and restated on September 23, 1997, October 14,

26 | 2011, and October 23, 2013 ("Petitioner"), concerns and affects title to and/or possession of real

27 | property in that Petitioner seeks the transfer of title to real property located in San Diego County

28 | described as follows:

McKENNA LONG &
ALDRIDGE LLP
SAN DIEGO

NOTICE OF PENDENCY OF ACTION

EXHIBIT A, page 107

1.    2941 Avenida Theresa, Carlsbad, CA, 92009, Assessor's Parcel No. 255-144-34, legally described as follows:

PARCEL 1:
Lot 30 of the amended map of Santa Fe Ridge – Unit 2, Carlsbad tract No. 83-16, in the City of Carlsbad, County of San Diego, State of California, according to map thereof No. 11019, filed in the Office of the County Recorder of San Diego County, AUGUST 14, 1984.

PARCEL 2:
A non-exclusive easement on and over the "common area" as defined in the declaration of covenants, conditions and restrictions to which reference is hereafter made, for access, use, occupancy, enjoyment, ingress and egress of the amenities located thereon, subject to the terms and provisions of the declaration of covenants, conditions and restrictions to which reference is hereinafter made. This easement is appurtenant to Parcel 1 above described; the common area is for the use of owners and lots which are subject to the declaration of covenants, conditions and restrictions to which reference is hereafter made, and is not for the use of the general public.

2.    7912 Terraza, Disoma, Carlsbad, CA, 92009, Assessor's Parcel No. 223-311-30, legally described as follows:

Lot 73 of Carlsbad tract No. 75-9 (B) Unit No. 2, in the City of Carlsbad, County of San Diego, State of California, according to map thereof No. 9959, filed in the Office of the County Recorder of San Diego County, DECEMBER 31, 1980.

3.    3572 Copper Crest Road, Encinitas, CA, 92024, Assessor's Parcel No. 264-223-22-00, legally described as follows:

PARCEL A:
Parcel 2 of parcel map 4460, in the City of Encinitas, County of San Diego, State of California, according to map filed in the Office of the County Recorder of San Diego County, February 13, 1976.

PARCEL B:
Easements and rights of way for road and utility purposes and appurtenances thereto, to be used in common with others, over, under, along and across those portions of Lot 7 of the subdivision of Rancho Las Encinitas, in the County of San Diego, State of California, according to map thereof No. 848, filed in the Office of

2

the County Recorder of San Diego County, June 27, 1898, lying within easement parcels "1" and "2" as follows:

EASEMENT PARCEL "1":
A strip of land 60.00 feet in width, the center line of said strip being described as follows:
Beginning at a point in the southerly line of said Lot 7, distant thereon south 86° 55' 53" West, 193.36 feet from the southeast corner thereof, being the northerly terminus of the center line of road survey No. 554, as shown on record of survey map no. 6085; said point also being in the center line of road survey No. 181; thence northeasterly along said center line of road survey No. 181, as established by the center line of the existing travelled way as follows: North 08° 15' 03" east, a distance of 117.52 feet to the beginning of a tangent 1000.00 foot radius curve concave southeasterly; thence northeasterly along the arc of said curve through a central angle of 19° 42' 30" a distance of 343.97 feet; thence tangent to said curve, north 27° 57' 53" east, a distance of 120.84 feet to the easterly line of said Lot 7. Said easement to terminate in said southerly and easterly lines respectively of said Lot 7.

EASEMENT PARCEL "2":
A strip of land 60.00 feet in width, the center line of said strip being described as follows:
Commencing at the southerly terminus of the 1000.00 foot radius curve, described in easement parcel "1" above, a radial line of said curve bears north 81° 44' 57" west to said point; thence northeasterly along the arc of said curve through a central angle of 12° 21' 41" a distance of 215.74 feet to the true point of beginning of the herein described center line; thence south 86° 55' 53" west, 510.06 feet to a point on the easterly line of the land described in deed to Charles A. Matley and Steven P. Krishe, recorded March 16, 1972 as file/page 62561, book 1972 of the official records, distant thereon south 02° 08' 56" east, 377.16 feet, from the northeast corner thereof. Said easement to terminate in the easterly line of said Matley and Krishe's land and in the west on the westerly line of Parcel B-1 hereinabove described.

PARCEL C:
An easement and right of way for road and utility purposes over, under, along and across those portions of Parcels 1, 3 and 4 of said parcel map 4460, delineated and designated on said parcel map as "proposed 40.00 foot private road easement" and "existing 60.00 foot private road easement."

3

This action is now pending in the above-named court. The object of Petitioner's action is, among other things, a Petition to Invalidate Deeds and Lifetime Transfers on the Basis of Undue Influence, Fraud, Duress, and Menace; for Double Damages, Attorneys' Fees and Costs; for Quasi-Specific Performance of Contract to Make a Will; for Damages for Intentional Interference with Expected Inheritance; for Damages for Intentional Interference with Contract; for Compensatory Damages, Punitive Damages, and Attorneys' Fees and Costs for Financial Elder Abuse and Isolation; for Trustee's Suspension and Removal; and for Attorneys' Fees and Costs.

DATED: September 1?, 2014            McKENNA LONG & ALDRIDGE LLP

By: _____
Jeremiah J. Moffit
Attorneys for Donald A. Glatts, individually and as named Successor Trustee of the Gerald S. Glatts Trust dated December 10, 1981, as amended and restated on September 23, 1997, October 14, 2011, and October 23, 2013

USW 804679636.1

EXHIBIT A, page 110

1   Jeremiah J. Moffit, State Bar No. 229878
    MCKENNA LONG & ALDRIDGE LLP
2   600 West Broadway, Suite 2600
    San Diego, California 92101-3372
3   Telephone No.: 619.699.2451
    Fax No.: 619.446.8269
4   Email: jmoffit@mckennalong.com

5   Attorney for Petitioner, Donald A. Glatts

6

7

8                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF SAN DIEGO, PROBATE DIVISION

10

11  In re the                              Case No. 37-2014-00031294-PR-TR-CTL
                                           ROA #1
12  GERALD S. GLATTS TRUST dated
    December 10, 1981, as amended and      PROOF OF SERVICE
13  restated on September 23, 1997, October
    14, 2011, and October 23, 2013.        Petition Filed: September 17, 2014
14                                         Dept.:   PC-2
15                                         Judge:   Hon. Julia C. Kelety

16  DONALD GLATTS,

17                Petitioner,

18  v.

19  KATARINA DUBAN, an individual; Gerald
    Glatts, individually and as trustee; and DOES 1-
20  through 10, inclusive,

21                Respondents.

22

23

24        At the time of service, I was over 18 years of age and not a party to this action.  I am
    employed in the County of San Diego, State of California.  My business address is 600 West
25  Broadway, Suite 2600, San Diego, CA 92101-3372.

26        On September 22, 2014, I caused to be served true copies of the following document(s)

27  NOTICE OF PENDENCY OF ACTION

28

    UsW 804689327.1                        1.
                                   PROOF OF SERVICE

on the interested parties in this action as follows:

SEE ATTACHED SERVICE LIST

☒   BY CERTIFIED MAIL/RETURN RECEIPT REQUESTED: I placed in a separate envelope, addressed to each addressee as indicated above, with Certified Mail postage fully prepaid, for collection and mailing on the day indicated below, following the ordinary business practices at McKenna Long & Aldridge LLP, at 600 West Broadway, Suite 2600, San Diego, California, I certify that I am familiar with the ordinary business practices of my place of employment with regard to collection for mailing Certified Mail with the United States Postal Service. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit or mailing affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 22, 2014, at San Diego, California.

Kerry Winterson

2

PROOF OF SERVICE

EXHIBIT A, page 112



SERVICE LIST

<u>Name and Address</u>

| | |
|---|---|
| Gerald S. Glatts, individually and as Trustee of the Gerald S. Glatts Trust dated 12/10/1981 and amended 09/23/1997<br>3572 Copper Crest Rd.<br>Encinitas, CA 92024 | Katarina Duban, individually and as as Trustee of the KATARINA DUBAN TRUST DATED JANUARY 13, 2009<br>3572 Copper Crest Rd.<br>Encinitas, CA 92024 |

USW:804689327.1

3
PROOF OF SERVICE

EXHIBIT A, page 113

Exhibit 4

AFTER RECORDING, RETURN TO:
AMERICAN TITLE, INC.
P.O. BOX 641010
OMAHA, NE 68164-1010
ATI# 20141002252

DOC# 2014-0559457

Dec 18, 2014  04:59 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES:  $42.00

Recording Requested By/Return To:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557
MAC B6963-013
Billings, MT 59107-9900

This Instrument Prepared by:
Wells Fargo Bank, N.A.
DONA MILLER
DOCUMENT PREPARATION
2324 OVERLAND AVE
BILLINGS, MT 59102
866-537-8489

[Space Above This Line For Recording Data]

## SHORT FORM OPEN-END DEED OF TRUST

REFERENCE #: 20142679900063                     ACCOUNT #: XXX-XXX-XXX8147-1998

DEFINITIONS

Words used in multiple sections of this document are defined below.  The Fictitious Deed of Trust includes other defined words and rules regarding the usage of words used in this document.

(A)  "Security Instrument" means this document, which is dated November 17, 2014, together with all Riders to this document.

(B)  "Borrower" is KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009; AND GERALD S. GLATTS, A NON-VESTED SPOUSE, HUSBAND AND WIFE; whose address is 3572 COPPER CREST RD   ENCINITAS, CA 92024. Borrower is the trustor under this Security Instrument.

(C)  "Lender" is Wells Fargo Bank, N.A.. Lender is a National Bank organized and existing under the laws of the United States of America.  Lender's address is 101 North Phillips Avenue, Sioux Falls, SD 57104.

(D)  "Trustee" is American Securities Company P.O. Box 31557, Billings, MT 59107.

(E)  "Debt Instrument" means the loan agreement or other credit instrument, signed by Borrower and dated November 17, 2014.  The Debt Instrument states that Borrower owes Lender, or may owe Lender, an amount that may vary from time to time up to a maximum principal sum outstanding at any one time of FIVE HUNDRED THOUSAND AND 00/100THS Dollars (U.S. $500,000.00) plus interest.

CALIFORNIA-SHORT FORM OPEN-END SECURITY INSTRUMENT                                    (page 1 of 5 pages)
CA107006, HCWF#997v7 (8/16/14)  CA:402006-2014                          Documents Processed 11-14-2014 20:01:44

EXHIBIT A, page 115

Borrower has promised to pay this debt in Periodic Payments and to pay the debt in full not later than seven (7) calendar days after December 17, 2044.

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means all amounts owed now or hereafter under the Debt Instrument, including without limitation principal, interest, any prepayment charges, late charges, and other fees and charges due under the Debt Instrument, and also all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [mark as applicable]:

     N/A  Leasehold Rider
     X   Third Party Rider
     N/A  Other(s) [specify]      N/A

(I) "Fictitious Deed of Trust" means the Fictitious Open-End Deed of Trust dated June 14, 2007, and recorded on August 29, 2007, as Instrument Number 2007-0573812 in Book n/a at Page n/a of the Official Records in the Office of the Recorder of San Diego County, State of California.

TRANSFER OF RIGHTS IN THE PROPERTY

    This Security Instrument secures to Lender: (i) the repayment of the Loan, and all future advances, renewals, extensions and modifications of the Debt Instrument, including any future advances made at a time when no indebtedness is currently secured by this Security Instrument; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Debt Instrument. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|      County | of | San Diego |
|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

SEE ATTACHED EXHIBIT A

APN/PARCEL: 264-223-22-00

which currently has the address of

3372 COPPER CREST RD
[Street]

ENCINITAS _____, California  92024 _____, ("Property Address"):
[City]                                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  The Property shall also include any additional property described in Section 20 of the Fictitious Deed of Trust.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the execution date of this Security Instrument.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

FICTITIOUS DEED OF TRUST

By the execution and delivery of this Security Instrument, Borrower agrees that all of the provisions of the Fictitious Deed of Trust are hereby incorporated in their entirety into this Security Instrument.  Borrower agrees to be bound by and to perform all of the covenants and agreements in the Fictitious Deed of Trust.  A copy of the Fictitious Deed of Trust has been provided to Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it. Borrower also acknowledges receipt of a copy of this document and a copy of the Fictitious Deed of Trust.

In accordance with California Civil Code Section 2924b, the undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address of the Borrower set forth above. NOTICE: A copy of any Notice of Default and any Notice of Sale will be sent to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

_Gerald S. Glatts_____

GERALD S GLATTS                                                           -Borrower

_Katarina Duban_  _TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY_

KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY        -Borrower, _13, 2009_

13, 2009

CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT                     (page 4 of 5 pages)
CA107006, HCWF#997v7 (8/16/14). CA-107006-0314;                    Documents Processed 11-14-2014 20:01:44

EXHIBIT A, page 118

For An Individual Acting In His/Her Own Right.
State of California        )
                           ) ss,
County of _San Diego_      )

On _November 17, 2014_ before me, _Sarah Michelle Van Coops-Bush_ Notary Public, personally appeared _Katarina Duhan, Trustee of the Katarina Duhan Trust Dated January 13, 2009, and Gerald S. Glatts, a non-vested spouse, husband and wife_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity, upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_Sarah Michelle Van Coops-Bush_
Signature

[NOTARIAL SEAL]        _Sarah Michelle Van Coops-Bush_
                       Print Name



My commission expires: _March 8, 2018_

Loan Originator's Name: Leah Catherine Santos Andres
NMLSR ID: 1032907



CALIFORNIA- SHORT FORM OPEN-END SECURITY INSTRUMENT          (page 5 of 5 pages)
CA107006, HCWF#997v7 (8/16/14)   CA-107006-0314:          Documents Processed 11-14-2014 20:01:48

# EXHIBIT A

Reference:   20142679900063.                                   Account: XXX-XXX-XXX8147-1998

Legal Description:

THE FOLLOWING DESCRIBED PROPERTY SITUATED IN SAN DIEGO COUNTY, STATE OF CALIFORNIA, TO-WIT: PARCEL A: PARCEL 2, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS SHOWN AT PAGE 4460 OF PARCEL MAPS, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976. PARCEL B: EASEMENTS AND RIGHTS OF WAY FOR ROAD AND UTILITY PURPOSES AND APPURTENANCES THERETO, TO BE USED IN COMMON WITH OTHERS, OVER, UNDER, ALONG AND ACROSS THOSE PORTIONS OF LOT 7 OF THE SUBDIVISION OF RANCHO LAS ENCINITAS, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 848, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JUNE 27, 1898, LYING WITHIN EASEMENT PARCELS "1" AND "2" AS FOLLOWS: EASEMENT PARCEL "1" A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS: BEGINNING AT A POINT IN THE SOUTHERLY LINE OF SAID LOT 7, DISTANT THEREON SOUTH 86 DEGREES 55 MINUTES 53 SECONDS WEST, 193.36 FEET FROM THE SOUTHEAST CORNER THEREOF, BEING THE NORTHERLY TERMINUS OF THE CENTER LINE OF ROAD SURVEY NO. 554, AS SHOWN ON RECORD OF SURVEY MAP NO. 6085, SAID POINT ALSO BEING IN THE CENTER LINE OF ROAD SURVEY NO. 181: THENCE NORTHEASTERLY ALONG SAID CENTER LINE OF ROAD SURVEY NO. 181, AS ESTABLISHED BY THE CENTER LINE OF THE EXISTING TRAVELED WAY AS FOLLOWS: NORTH 08 DEGREES 15 MINUTES 03 SECONDS EAST, A DISTANCE OF 117.52 FEET TO THE BEGINNING OF A TANGENT 1000.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY: THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 19 DEGREES 42 MINUTES 30 SECONDS A DISTANCE OF 343.97 FEET; THENCE TANGENT TO SAID CURVE, NORTH 27 DEGREES 57 MINUTES 53 SECONDS: EAST, A DISTANCE OF 120.84 FEET TO THE EASTERLY LINE OF SAID LOT 7, SAID EASEMENT TO TERMINATE IN SAID SOUTHERLY AND EASTERLY LINES RESPECTIVELY OF SAID LOT 7. EASEMENT PARCEL "2" A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHERLY TERMINUS OF THE 1000.00 FOOT RADIUS CURVE, DESCRIBED IN EASEMENT PARCEL "1" ABOVE, A RADIAL LINE OF SAID CURVE, BEARS NORTH 81 DEGREES 44 MINUTES 57 SECONDS WEST TO SAID POINT, THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 12 DEGREES 21 MINUTES 41 SECONDS A DISTANCE OF 215.74 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED CENTER LINE; THENCE SOUTH 86 DEGREES 55 MINUTES 53 SECONDS WEST, 510.06 FEET TO A POINT ON THE EASTERLY LINE OF THE LAND DESCRIBED IN DEED TO CHARLES A. MATLEY AND STEVEN P. KRISHE, RECORDED MARCH 16, 1972 ON FILE/PAGE 62561, PAGE 1972 OF OFFICIAL RECORDS, DISTANT THEREON SOUTH 02 DEGREES 08 MINUTES 56 SECONDS EAST, 377.16 FEET FROM THE NORTHEAST CORNER THEREOF, SAID EASEMENT TO TERMINATE IN THE EASTERLY LINE OF SAID MATLEY AND KRISHE'S LAND, AND IN THE WEST ON THE EASTERLY LINE OF PARCEL "C" HEREINAFTER DESCRIBED. PARCEL C: AN EASEMENT AND RIGHT OF WAY FOR ROAD AND UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS THOSE PORTIONS OF PARCELS 1, 3 AND 4, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, AS SHOWN AT PAGE 4460 OF PARCEL MAPS, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976, DELINEATED AND DESIGNATED ON SAID PARCEL MAP AS "PROPOSED 40.00 FOOT PRIVATE ROAD EASEMENT"

Exhibit A, HE101033 GDP V1 07/2004                                         1/2
HE101033-082214                                           Documents Processed 11-14-2014 20:01:37

EXHIBIT A, page 120

AND "EXISTING 60.00 FOOT PRIVATE ROAD EASEMENT".

EXHIBIT A, page 121

Reference Number:   20142679900063
Account Number:     XXX-XXX-XXX8147-1998

Wells Fargo Bank, N. A.

## THIRD PARTY RIDER

THIS THIRD PARTY RIDER is made on November 17, 2014 is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned Trustee(s) to secure the Debt Instrument from GERALD S GLATTS, KATARINA DUBAN, (individually and collectively referred to as the "Debtor") to Wells Fargo Bank, N. A. (the "Lender") of the same date and covering the property described in the Security Instrument (the "Property") and located at:

3572 COPPER CREST RD , ENCINITAS, CA 92024
[Property Address]

In addition to the covenants and agreements made in the Security Instrument, the undersigned Trustee(s) and Lender further covenant and agree as follows:

With respect to the KATARINA DUBAN TRUST (the "Trust"), the Security Instrument constitutes a third party mortgage/deed of trust and grant of security interest by the undersigned as Trustee(s) of said Trust in the Property to secure the Debt Instrument of the Debtor to the Lender.
Consequently, references in the Security Instrument to "Borrower" refer to the undersigned Trustee(s) and the Debtor if the context in which the term is used so requires. Without limiting the generality of the foregoing, the use of the term "Borrower" in the context of warranties, representations and obligations pertaining to the Property shall refer to the undersigned Trustee(s). The use of the term "Borrower" in the context of the requirements under the Debt Instrument shall refer to the Debtor.

Except with respect to the obligation(s) of the undersigned as individuals, and not as Trustee(s); with respect to the Debt Instrument before the date first set forth herein above and the obligation(s) of the undersigned as individuals with respect to the Debt Instrument prior to the transfer of the Property into the Trust, the Trust and the undersigned, as Trustee(s), are not liable for the debt evidenced by the Debt Instrument and are a party hereunder only insofar as their interest in the Property is made subject to the Security Instrument.

Further, revocation of the Trust, transfer of the Property by the Trust, or death of any Debtor shall constitute an event of default under the Security Instrument.

3rd Party Rider: HE101137 HCWF#132 v10 (8/16/14)
HE-101137-0314

Documents Processed 11-14-2014 20:01:36                    -1/2-

By signing below, the undersigned Trustee(s) accept(s) and agree(s) to the terms and provisions contained in this Third Party Rider.

_Kalon F. Dubon_ TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009

KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009.

Attach this Rider to the Security Instrument before Recording

Loan Originator's Name: Leah Catherine Santos Andres
NMLSR ID: 1032907

3rd Party Rider, HE101137, HCWF#132.v10 (8/16/14)
HE101137.0314

Documents Processed 11-14-2014 20:01:36

2/2

**Exhibit 5**

DOC# 2017-0054097

Feb 01, 2017   04:59 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.
SAN DIEGO COUNTY RECORDER
FEES: $65.00
PCOR: INC
PAGES: 11

WHEN RECORDED MAIL TO:

Withers Bergman LLP
ATTN: Jeremiah Moffit
101 W. Broadway, Ste. 1000
San Diego, CA 92101

MAIL TAX STATEMENTS TO:

Donald Glatts, Trustee
3740 Fortuna Ranch Road
Encinitas, CA 92024

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## ORDER QUIETING TITLE TO REAL PROPERTIES

| Property Location | Assessor's Parcel No. |
|---|---|
| 135 4th Avenue, Encinitas, California | 258-022-04-00 |
| 228 N. Helix Avenue, Solana Beach, California | 263-321-21-00 |
| 234-236-238 Hill Street, Solana Beach, California | 263-321-22-00 |
| 344-346 N. Acacia, Solana Beach, California | 263-304-17-00 |
| 347 N. Sierra Avenue, Solana Beach, California | 263-302-09-00 |
| 3572 Copper Crest Road, Encinitas, California | 264-223-22-00 |
| 2941 Avenida Theresa, Carlsbad, California | 255-144-34-00 |
| 7912 Terraza Disoma, Carlsbad, California | 223-311-30-00 |

5383033.1

EXHIBIT A, page 125



1  Jeremiah J. Moffit, State Bar No. 229878
2  Matthew R. Owens, State Bar No. 278857
   WITHERS BERGMAN LLP
3  101 West Broadway, Suite 1000
   San Diego, California 92101
4  Telephone No.: 619.564.5131
   Fax No.: 619.923.8839
5  Email: jeremy.moffit@withersworldwide.com

6  Attorneys for Donald Glatts, individually, as
   named Executor, and as Trustee of the Gerald S.
7  Glatts Trust; Ronald Glatts; Robert Glatts; and
   Thomas Glatts

F I L E D
Clerk of the Superior Court
JAN 20 2017
By: T. Cutts _____ Deputy.

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9              FOR THE COUNTY OF SAN DIEGO, PROBATE DIVISION

10  In re:                                    Case No. 37-2014-00031294-PR-TR-CTL

11  The GERALD S. GLATTS TRUST                [PROPOSED] ORDER QUIETING TITLE
    DATED DECEMBER 10, 1981, AS              TO REAL PROPERTIES
12  AMENDED AND RESTATED ON
    SEPTEMBER 23, 1997, OCTOBER 14,
13  2011 AND OCTOBER 23, 2013                 [IMAGED FILE]

14                                            Date:
15  KATARINA DUBAN, an individual,            Time:
                                              Dept.:  PC-2
16          Petitioner,                       Judge:  Hon. Julia C. Kelety

17      v.

18  DONALD A. GLATTS, an individual
    and beneficiary; RONALD E. GLATTS,
19  an individual and beneficiary; ROBERT
    C. GLATTS, an individual and
20  beneficiary; and THOMAS R. GLATTS,
    an individual and beneficiary; and DOES
21  1 through 50, inclusive;

22          Respondents

23

24

25

26

27

28

[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES

1  The *Ex Parte Application for Approval of Settlement; Quiet Title to Real Properties;*

2  *Request for Continued Jurisdiction Over the Parties; and Memorandum of Points and Authorities*

3  *in Support Thereof* ("Application"), filed by Donald Glatts ("Donald"), came on for hearing at

4  8:45     a.m./p.m. on 1/20/17    in Department PC-2 of the San Diego

5  County Superior Court, the Honorable Julia C. Kelety presiding. Jeremiah J. Moffit of Withers

6  Bergman LLP appeared on behalf of Donald. Michael Nalu of the Nalu Law Firm appeared on

7  behalf of Katarina Duban ("Katarina"). Gregory Borawski of Brierton, Jones & Jones LLP

8  appeared on behalf of Marilyn Kriebel ("Kriebel").

9       After considering the Application and supporting papers, the file in this matter, and the

10  arguments of counsel,

11       THE COURT FINDS AND ORDERS AS FOLLOWS:

12       1.      The Application is GRANTED;

13       2.      Notice of the Application was given as required by law;

14       3.      Title to the eight parcels of real property is quieted as set forth below:

15           a.      Katarina. Title to the following real property is quieted and settled in favor

16  of Katarina Duban and against the world such that she holds One Hundred Percent (100%) legal

17  and record title:

18           *4th Avenue Property*

19             o    APN: 258-022-04

20             o    Commonly known as: 135 4th Avenue, Encinitas, California

21             o    Legal description:

22  LOT 12 IN BLOCK 25 OF PITCHERS SUBDIVISION, IN THE
CITY OF ENCINITAS, COUNTY OF SAN DIEGO, STATE OF

23  CALIFORNIA, ACCORDING TO MAP THEREOF NO. 187,
FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN

24  DIEGO COUNTY, APRIL 4, 1887.

25

26           b.      Irrevocable Trust. Title to the following four parcels of real property is

27  quieted and settled in favor of Donald Glatts, as Trustee of the Glatts Family Irrevocable Trust

28  dated August 30, 2012 (the "Irrevocable Trust"), and against the world, such that Donald, as

---

[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES

Trustee of the Irrevocable Trust, holds One Hundred Percent (100%) legal and record title:

- *North Helix Property*
  - APN: 263-321-21
  - Commonly known as: 228 N. Helix Avenue, Solana Beach, California
  - Legal description:

  LOT 16 OF BLOCK 21 OF SOLANA BEACH, IN THE CITY OF SOLANA BEACH, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1749, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MARCH 5, 1923.

- *Hill Street Property*
  - APN: 263-321-22
  - Commonly known as: 234-236-238 Hill Street, Solana Beach, California
  - Legal Description:

  LOT 15 OF BLOCK 21 SOLANA BEACH, IN THE CITY OF SOLANA BEACH, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1749, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MARCH 5, 1923.

- *North Acacia Property*
  - APN: 263-304-17
  - Commonly known as: 344-346 N. Acacia, Solana Beach, California
  - Legal description:

  LOT 19 IN BLOCK 14 OF SOLANA BEACH, IN THE CITY OF SOLANA BEACH, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1749, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MARCH 5, 1923.

- *North Sierra Property*
  - APN: 263-302-09
  - Commonly known as: 347 N. Sierra Avenue, Solana Beach, California
  - Legal description:

2

[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES

LOT 5, BLOCK 19 OF SOLANA BEACH, IN THE CITY OF SOLANA BEACH, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1749 FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, MARCH 5, 1923.

c.    Revocable Trust. Title to the following three parcels of real property is quieted and settled in favor of Donald Glatts, as Trustee of the Gerald S. Glatts Trust dated December 10, 1981, as amended and restated (the "Revocable Trust"), and against the world, such that Donald, as Trustee of the Revocable Trust, holds One Hundred Percent (100%) legal and record title:

     i.    *Copper Crest Property:*

- o    APN: 264;223-22-00;
- o    Commonly known as: 3572 Copper Crest Road, Encinitas, California
- o    Legal description:

PARCEL A:

PARCEL 2 OF PARCEL MAP 4460, IN THE CITY OF ENCINITAS, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, FEBRUARY 13, 1976;

PARCEL B:

EASEMENTS AND RIGHTS OF WAY FOR ROAD AND UTILITY PURPOSES AND APPURTENANCES THERETO, TO BE USED IN COMMON WITH OTHERS, OVER, UNDER, ALONG AND ACROSS THOSE PORTIONS OF LOT 7 OF THE SUBDIVISION OF RANCHO LAS ENCINITAS, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 848, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JUNE 27, 1898, LYING WITHIN EASEMENT PARCELS "1" AND "2" AS FOLLOWS:

EASEMENT PARCEL "1":

A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

3

[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES

BEGINNING AT A POINT IN THE SOUTHERLY LINE OF SAID LOT 7, DISTANT THEREON SOUTH 86° 55' 53" WEST, 193.36 FEET FROM THE SOUTHEAST CORNER THEREOF, BEING THE NORTHERLY TERMINUS OF THE CENTER LINE OF ROAD SURVEY NO. 554, AS SHOWN ON RECORD OF SURVEY MAP NO. 6085, SAID POINT ALSO BEING IN THE CENTER LINE OF ROAD SURVEY NO. 181; THENCE NORTHEASTERLY ALONG SAID CENTER LINE OF ROAD SURVEY NO. 181, AS ESTABLISHED BY THE CENTER LINE OF THE EXISTING TRAVELLED WAY AS FOLLOWS: NORTH 08° 15' 03" EAST, A DISTANCE OF 117.52 FEET TO THE BEGINNING OF A TANGENT 1000.00 FOOT RADIUS CURVE CONCAVE SOUTHEASTERLY; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 19° 42' 30". A DISTANCE OF 343.97 FEET; THENCE TANGENT TO SAID CURVE, NORTH 27° 57' 53" EAST, A DISTANCE OF 120.84 FEET TO THE EASTERLY LINE OF SAID LOT 7. SAID EASEMENT TO TERMINATE IN SAID SOUTHERLY AND EASTERLY LINES RESPECTIVELY OF SAID LOT 7.

EASEMENT PARCEL "2":

A STRIP OF LAND 60.00 FEET IN WIDTH, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHERLY TERMINUS OF THE 1000.00 FOOT RADIUS CURVE, DESCRIBED IN EASEMENT PARCEL "1" ABOVE, A RADIAL LINE OF SAID CURVE BEARS NORTH 81° 44' 57" WEST TO SAID POINT; THENCE NORTHEASTERLY ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 12° 21' 41" A DISTANCE OF 215.74 FEET TO THE TRUE POINT OF BEGINNING OF THE HEREIN DESCRIBED CENTER LINE; THENCE SOUTH 86° 55' 53" WEST, 510.06 FEET TO A POINT ON THE EASTERLY LINE OF THE LAND DESCRIBED IN DEED TO CHARLES A. MATLEY AND STEVEN P. KRISHE, RECORDED MARCH 16, 1972 AS FILE/PAGE 62561, BOOK 1972 OF OFFICIAL RECORDS, DISTANT THEREON SOUTH 02° 08' 56" EAST, 377.16 FEET FROM THE NORTHEAST CORNER THEREOF. SAID EASEMENT TO TERMINATE IN THE EASTERLY LINE OF SAID MATLEY AND KRISHE'S LAND AND IN THE WEST ON THE WESTERLY LINE OF PARCEL B-1 HEREINABOVE DESCRIBED.

PARCEL C:

4

AN EASEMENT AND RIGHT OF WAY FOR ROAD AND UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS THOSE PORTIONS OF PARCELS 1, 3 AND 4 OF SAID PARCEL MAP 4460, DELINEATED AND DESIGNATED ON SAID PARCEL MAP AS "PROPOSED 40.00 FOOT PRIVATE ROAD EASEMENT" AND "EXISTING 60.00 FOOT PRIVATE ROAD EASEMENT".

a. *Avenida Theresa Property:*

o   APN: 255-144-34

o   Commonly known as: 2941 Avenida Theresa, Carlsbad, California

o   Legal description:

PARCEL 1:

LOT 30 OF THE AMENDED MAP OF SANTA FE RIDGE - UNIT 2, CARLSBAD TRACT NO. 83-16, IN THE CITY OF CARLSBAD, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 11019, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, AUGUST 14, 1984.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT ON AND OVER THE "COMMON AREA" AS DEFINED IN THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS TO WHICH REFERENCE IS HEREAFTER MADE, FOR ACCESS, USE, OCCUPANCY, ENJOYMENT, INGRESS AND EGRESS OF THE AMENITIES LOCATED THEREON, SUBJECT TO THE TERMS AND PROVISIONS OF THE DECLARATION OF COVENANTS, CONDITIONS, AND, RESTRICTIONS TO WHICH REFERENCE IS HEREINAFTER MADE. THIS EASEMENT IS APPURTENANT TO PARCEL 1 ABOVE DESCRIBED. THE COMMON AREA IS FOR THE USE OF OWNERS OF LOTS WHICH ARE SUBJECT TO THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS TO WHICH REFERENCE IS HEREAFTER MADE, AND IS NOT FOR THE USE OF THE GENERAL PUBLIC.

2. Terraza Disoma Property:

   o  APN: 223-311-30

   o  Commonly known as: 7912 Terraza Disoma, Carlsbad, California

   o  Legal description:

LOT 73 OF CARLSBAD TRACT NO. 75-9 (B) UNIT NO. 2, IN
THE CITY OF CARLSBAD, COUNTY OF SAN DIEGO, STATE
OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 9959,
FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN
DIEGO COUNTY, DECEMBER 31, 1980.

4.      Any deeds signed by Gerald Glatts purportedly transferring title to the above-referenced Real Properties out of the Revocable Trust or out of the Irrevocable Trust, respectively, are invalidated and rescinded, and title in those properties is quieted and settled in favor of the Irrevocable Trust, the Revocable Trust, and/or Katarina, as set forth above. Those deeds include, without limitation, the following:

   a. The Grant Deed for the real property located at 3572 Copper Crest Road, Encinitas, California, dated December 16, 2011, and recorded with the San Diego County Recorder's Office on December 16, 2011, as Document Number 2011-0678561.

   b. The Quitclaim Deed for the real property located at 7912 Terraza Disoma, Carlsbad, California, dated November 5, 2013, and recorded with the San Diego County Recorder's Office on November 14, 2013, as Document Number 2013-0674393.

   c. The Quitclaim Deed for the real property located at 3572 Copper Crest Road, Encinitas, California, dated November 5, 2013, and recorded with the San Diego County Recorder's Office on November 14, 2013, as Document Number 2013-0674394.

   d. The Quitclaim Deed for the real property located at 2941 Avenida Theresa, Carlsbad, California, dated November 5, 2013, and recorded with the San Diego County Recorder's Office on November 20, 2013, as Document Number 2013-0685006.

6

[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES

e. The Trust Transfer Deed for the real property located at 3572 Copper Crest Road, Encinitas, California, dated December 6, 2013, and recorded with the San Diego County Recorder's Office on December 10, 2013, as Document Number 2013-0712617.

f. The Quitclaim Deed for the real property located at 3572 Copper Crest Road, Encinitas, California, dated January 17, 2014, and recorded with the San Diego County Recorder's Office on January 17, 2014, as Document Number 2014-0023528.

g. The Quitclaim Deed for the real property located at 344-346 N. Acacia Avenue, Solana Beach, California, dated April 8, 2014, and recorded with the San Diego County Recorder's Office on April 24, 2014, as Document Number 2014-0163551.

h. The Quitclaim Deed for the real property located at 234-238 Hill Street, Solana Beach, California, dated April 8, 2014, and recorded with the San Diego County Recorder's Office on April 22, 2014, as Document Number 2014-0159642.

i. The Quitclaim Deed for the real property located at 234-238 Hill Street, Solana Beach, California, dated April 8, 2014, and recorded with the San Diego County Recorder's Office on April 24, 2014, as Document Number 2014-0163552.

j. The Quitclaim Deed for the real property located at 228 N. Helix Avenue, Solana Beach, California, dated April 8, 2014, and recorded with the San Diego County Recorder's Office on April 22, 2014, as Document Number 2014-0159643.

k. The Quitclaim Deed for the real property located at 228 N. Helix Avenue, Solana Beach, California, dated April 8, 2014, and recorded with the San Diego County Recorder's Office on April 24, 2014, as Document Number 2014-0163553.

l. The Quitclaim Deed for the real property located at 3572 Copper Crest Road, Encinitas, California, dated April 25, 2014, and recorded with the San Diego County Recorder's Office on April 29, 2014, as Document Number 2014-0171322.

5. A certified copy of this order may be recorded with the San Diego County Recorder's Office thereby confirming record title as to the eight parcels of real property referenced

7
[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES



1  above.

2  6.    This order confirming title shall not constitute a change of ownership for property

3  tax reassessment purposes pursuant to Revenue and Taxation Code Section 62, subdivision (b).

4

5  IT IS SO ORDERED.

6

7  Date:  1/20/17

         JUDGE OF THE SUPERIOR COURT

8

9           JULIA CRAIG KELETY

CLERK'S CERTIFICATE

8

[PROPOSED] ORDER QUIETING TITLE TO REAL PROPERTIES

## TRUE COPY CERTIFICATION

(Government Code 27361.7)

*San Diego, CA*
Place of Execution

I certify under penalty of perjury that this material is a true copy of the original material contained in this document.

*Superior Court of California*
*County of San Diego*
*Copy of the*

*2/1/17*
Date

*Cameron Romero*
Signature of Declarant

*Cameron Romero*
Type or Print Name

Rec. Form 886 (8-17-97)

EXHIBIT 4

| | |
|---|---|
| 1 | SUZANNE M. HANKINS (State Bar No. 157837) |
| | smh@severson.com |
| 2 | JARLATH M. CURRAN, II (State Bar No. 239352) |
| | jmc@severson.com |
| 3 | SEVERSON & WERSON, A Professional Corporation |
| | The Atrium |
| 4 | 19100 Von Karman Avenue, Suite 700 |
| | Irvine, California 92612 |
| 5 | Telephone: (949) 442-7110 |
| | Facsimile: (949) 442-7118 |
| 6 | |
| | MARK D. LONERGAN (State Bar No. 143622) |
| 7 | mdl@severson.com |
| | SEVERSON & WERSON, A Professional Corporation |
| 8 | One Embarcadero Center, Suite 2600 |
| | San Francisco, California 94111 |
| 9 | Telephone: (415) 398-3344 |
| | Facsimile: (415) 956-0439 |
| 10 | |
| | Attorneys for Defendant |
| 11 | WELLS FARGO BANK, N.A. |

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
07/10/2017 at 04:41:00 PM
Clerk of the Superior Court
By Laurie Moyneur,Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

### COUNTY OF SAN DIEGO — NORTH COUNTY DIVISION

| | |
|---|---|
| DONALD GLATTS, Trustee of the Gerald S. Glatts Trust DTD December 10, 1981, as amended and restated, <br><br> Plaintiff, <br><br> vs. <br><br> WELLS FARGO BANK, N.A. and DOES 1 through 25, inclusive, <br><br> Defendants. | Case No. 37-2017-00011090-CU-BC-NC <br> Assigned for All Purposes to: <br> Hon. Jacqueline M. Stern <br> Dept. N-27 <br><br> **WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT** <br><br> **IMAGED FILE** <br><br> Action Filed:   March 23, 2017 <br> Trial Date:     None Set |

55002.0508/10755677.1

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT

1    Defendant WELLS FARGO BANK, N.A. ("Wells Fargo" or "Defendant") hereby

2  responds to the verified Complaint of DONALD GLATTS, Trustee of the Gerald S. Glatts Trust

3  DTD December 10, 1981, as amended and restated ("Plaintiff") as follows:

4                        <u>GENERAL ALLEGATIONS</u>

5         1.    In response to paragraph 1 of the Complaint, Wells Fargo admits that in November

6  2014, it issued a home equity line of credit in the amount of $500,000.00 (the "HELOC") to

7  borrowers Gerald S. Glatts and Katarina Duban. Wells Fargo further admits that the HELOC is

8  secured by a Deed of Trust recorded against the property located at 3572 Copper Crest Road,

9  Encinitas, California (the "Property"). As to the remaining allegations, Wells Fargo lacks

10  sufficient knowledge or information to form a belief as to the truth of the allegations and, on that

11  basis, denies each and every allegation contained therein.

12        2.    In response to paragraph 2 of the Complaint, Wells Fargo lacks sufficient

13  knowledge or information to form a belief as to the truth of the allegations and, on that basis,

14  denies each and every allegation contained therein.

15        3.    In response to paragraph 3 of the Complaint, Wells Fargo admits that a Petition was

16  filed by Donald Glatts on September 17, 2014 in San Diego County Superior Court, Case No.

17  37-2014-0031294-PR-TR-CTL. As to the remaining allegations of paragraph 3, Wells Fargo

18  lacks sufficient knowledge or information to form a belief as to the truth of the allegations and, on

19  that basis, denies each and every allegation contained therein

20        4.    In response to paragraph 4 of the Complaint, Wells Fargo admits that a Notice of

21  Pending Action was recorded against the Property on September 23, 2014, in the County of San

22  Diego Recorder's Office as Document Number 2014-0411651 (the "Notice of Pending Action").

23  As to the remaining allegations, Wells Fargo lacks sufficient knowledge or information to form a

24  belief as to the truth of the allegations and, on that basis, denies each and every allegation

25  contained therein.

26        5.    In response to paragraph 5 of the Complaint, Wells Fargo admits that it approved a

27  $500,000 home equity line of credit in November 2014, to borrowers Gerald S. Glatts and

28  Katarina Duban. Wells Fargo further admits that, at the time the HELOC was funded, the Notice

55002.0508/10755677.1                        2

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT

1  of Pending Action had been recorded against the Property in the San Diego County Recorder's
2  Office.

3        6.     In response to paragraph 6 of the Complaint, Wells Fargo admits that the Notice of
4  Pending Action was recorded against the Property on September 23, 2014, in the County of San
5  Diego Recorder's Office as Document Number 2014-0411651. Wells Fargo further admits that, in
6  November 2014, it originated a home equity line of credit in the amount of $500,000.00 to Gerald
7  S. Glatts and Katarina Duban. Wells Fargo further admits that a Deed of Trust securing the
8  HELOC was recorded against the Property on December 18, 2014, in the San Diego County
9  Recorder's Office as Document Number 2014-0559457.

10        7.     In response to paragraph 7 of the Complaint, Wells Fargo admits that it began
11  issuing monthly statements for the HELOC in December 2014, with payments due commencing
12  January 15, 2015. Wells Fargo further admits that it received monthly payments on the HELOC
13  through May 2017. As to the remaining allegations, Wells Fargo lacks sufficient knowledge or
14  information to form a belief as to the truth of the allegations and, on that basis, denies each and
15  every allegation contained therein.

16        8.     Paragraph 8 of the Complaint is a mere legal conclusion and does not call for an
17  admission or denial of fact and, consequently, Wells Fargo does not admit or deny this allegation.

18        9.     In response to paragraph 9 of the Complaint, Wells Fargo admits an Order Quieting
19  Title to Real Properties was filed on January 20, 2017 in San Diego County Superior Court Caser
20  Number 37-2014-00031294-PR-TR-CTL. Wells Fargo further admits that the Order Quieting
21  Title was recorded against the Property on February 1, 2017, in the San Diego County Recorder's
22  Offices as Document Number 2017-0054097, and that title to the Property was confirmed in favor
23  of Donald Glatts, as Trustee of the Gerald S. Glatts Trust dated December 10, 1981, as amended
24  and restated.

25        10.    In response to paragraph 10 of the Complaint, Wells Fargo admits an Order
26  Quieting Title to Real Properties was filed on January 20, 2017 in San Diego County Superior
27  Court Caser Number 37-2014-00031294-PR-TR-CTL. Wells Fargo further admits that the Order
28  Quieting Title was recorded against the Property on February 1, 2017, in the San Diego County

1  Recorder's Offices as Document Number 2017-0054097, and that title to the Property was
2  confirmed in favor of Donald Glatts, as Trustee of the Gerald S. Glatts Trust dated December 10,
3  1981, as amended and restated.

4      11.    In response to paragraph 11 of the Complaint, Wells Fargo lacks sufficient
5  knowledge or information to form a belief as to the truth of the allegations and, on that basis,
6  denies each and every allegation contained therein.

7      12.    In response to paragraph 12 of the Complaint, Wells Fargo admits it transacts
8  business throughout the State of California, and in the County of San Diego, and further admits
9  that venue is proper in the County of San Diego where the Property is located.

10  **FIRST CAUSE OF ACTION**
11  (Quiet Title)

12      13.    Wells Fargo incorporates by reference paragraphs 1 through 12 of this verified
13  answer.

14      14.    In response to paragraph 14 of the Complaint, Wells Fargo admits that Plaintiff is
15  seeking quiet title to the real property located at 3572 Copper Crest Road, Encinitas, California
16  92024.

17      15.    In response to paragraph 15 of the Complaint, Wells Fargo admits that Plaintiff is
18  seeking quiet title against Wells Fargo and any assignees of the Deed of Trust securing the
19  HELOC recorded December 18, 2014 in the San Diego County Recorder's Office as Document
20  Number 2014-0559457.

21      16.    In response to paragraph 16 of the Complaint, Wells Fargo lacks sufficient
22  knowledge or information to form a belief as to the truth of the allegations and, on that basis,
23  denies each and every allegation contained therein.

24      17.    In response to paragraph 17 of the Complaint, Wells Fargo acknowledges the relief
25  Plaintiff requests in the Complaint, but denies that Plaintiff is entitled to such relief.

26      18.    In response to paragraph 18 of the Complaint, Wells Fargo acknowledges the relief
27  Plaintiff requests in the Complaint, but denies that Plaintiff is entitled to such relief.

28  **SECOND CAUSE OF ACTION**

55002.0508/10755677.1        4

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT

1  (Declaratory Relief)

2  19.  Wells Fargo incorporates by reference paragraphs 1 through 18 of this verified

3  answer.

4  20.  Wells Fargo denies the allegations in paragraph 20.

5  21.  In response to paragraph 21 of the Complaint, Wells Fargo acknowledges the relief

6  Plaintiff requests in the Complaint, but denies that Plaintiff is entitled to such relief, and further

7  denies all of the remaining allegations of paragraph 21.

8  22.  In response to paragraph 22 of the Complaint, Wells Fargo acknowledges the relief

9  Plaintiff requests in the Complaint, but denies that Plaintiff is entitled to such relief.

10  ### THIRD CAUSE OF ACTION

11  (Restitution/Unjust Enrichment)

12  23.  Wells Fargo incorporates by reference paragraphs 1 through 22 of this verified

13  answer.

14  24.  In response to paragraph 24 of the Complaint, Wells Fargo lacks sufficient

15  knowledge or information to form a belief as to the truth of the allegations and, on that basis,

16  denies each and every allegation contained therein.

17  25.  Wells Fargo denies the allegations in paragraph 25.

18  26.  In response to paragraph 26 of the Complaint, Wells Fargo acknowledges the relief

19  Plaintiff requests in the Complaint, but denies that Plaintiff is entitled to such relief.

20  ### PRAYER FOR RELIEF

21  In response to the prayer for relief, Wells Fargo denies that Plaintiff is entitled to the relief

22  sought.

23  As separate and distinct affirmative defenses to the Complaint and to each allegation

24  contained therein, Wells Fargo hereby alleges the following.

25  ### FIRST AFFIRMATIVE DEFENSE

26  (Responsibility of Third Parties)

27  1.  Any injury or damage to Plaintiff was a result of the intentional, negligent or

28  otherwise wrongful acts of third parties, and any claims against Wells Fargo shall be reduced in

55002.0508/10755677.1

5

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT

1  proportion to the faults of the third parties.

**SECOND AFFIRMATIVE DEFENSE**

**(Compliance with Governing Law)**

2.    Wells Fargo's compliance with the statutes, rules, and regulations which govern the subject matter of this lawsuit preclude its liability to Plaintiff.

**THIRD AFFIRMATIVE DEFENSE**

**(Commercial Reasonableness)**

3.    Wells Fargo is informed and believes, and thereon alleges, that at all times relevant herein, Wells Fargo acted in a commercially reasonable manner and was acting in accordance with reasonable lending and servicing standards applicable to Wells Fargo.

**FOURTH AFFIRMATIVE DEFENSE**

**(Requested Relief Not Available)**

4.    Plaintiff's prayer requests remedies that are not available to Plaintiff.

**FIFTH AFFIRMATIVE DEFENSE**

**(Failure to Exercise Due Care)**

5.    Wells Fargo is informed and believes, and thereon alleges, that any recovery by Plaintiff is barred in whole or in part in that Plaintiff and/or his agents failed to exercise the quality and quantity of care and caution for which reasonable individuals and/or entities in similar circumstances would have exercised; said failure and negligence of Plaintiff and/or his agents proximately caused and contributed to the actual damages, and recovery, if any, by Plaintiff is thereby diminished or barred.

**SIXTH AFFIRMATIVE DEFENSE**

**(No Causation)**

6.    Wells Fargo is informed and believes, and thereon alleges, that Wells Fargo's actions were not a substantial factor in causing Plaintiff's harm.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Consent)**

7.    Wells Fargo is informed and believes, and thereon alleges, that Plaintiff at all times

55002.0508/10755677.1

6

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT

1 | gave his consent, express or implied, to the acts, omissions and conduct alleged in the Complaint.

2 | **EIGHTH AFFIRMATIVE DEFENSE**

3 | **(Damages Caused by Negligence of Plaintiff)**

4 |     8.    Wells Fargo is informed and believes, and thereon alleges, that at all times alleged

5 | in the Complaint, Plaintiff failed to exercise ordinary and reasonable care on his own behalf and

6 | negligently and carelessly was the proximate cause of some portion, up to and including the whole

7 | thereof, of Plaintiff's alleged injuries and damages, if any, and Plaintiff's recovery, therefore,

8 | should be barred and/or reduced according to the law, up to and including the whole thereof.

9 | **NINTH AFFIRMATIVE DEFENSE**

10 | **(Damages Caused by Negligence of Others)**

11 |     9.    Wells Fargo is informed and believes, and thereon alleges, that at all times alleged

12 | in the Complaint, Plaintiff's agent(s), attorney(s) or others failed to exercise ordinary and

13 | reasonable care on Plaintiff's behalf and negligently and carelessly was/were the proximate cause

14 | of some portion, up to and including the whole thereof, of Plaintiff's alleged injuries and

15 | Plaintiff's recovery, therefore, should be barred and/or reduced according to the law, up to and

16 | including the whole thereof.

17 | **TENTH AFFIRMATIVE DEFENSE**

18 | **(Unknown Affirmative Defenses)**

19 |     10.    Wells Fargo presently has insufficient knowledge and information on which to

20 | form a belief as to whether it has additional affirmative defenses and Wells Fargo reserves the

21 | right to assert additional affirmative defenses in the event discovery indicates such defenses would

22 | be appropriate.

23 | WHEREFORE, Wells Fargo prays for judgment as follows:

24 |     1.    That Plaintiff takes nothing by way of the Complaint;

25 |     2.    For recovery of Wells Fargo's costs of suit herein; and

26 |     3.    For such other and further relief as this Court finds just and proper.

27 |

28 |

55002.0508/10755677.1

7

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT



DATED: July 7, 2017

SEVERSON & WERSON
A Professional Corporation

By: _____
JARLATH M. CURRAN, II
Attorneys for Defendant
WELLS FARGO BANK, N.A.

55002.0508/10755677.1

8

WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT

EXHIBIT A, page 144

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Amber N. Ott, am Vice President Loan Documentation of WELLS FARGO BANK, N.A., and am authorized to make this verification on its behalf.

I have read the foregoing **VERIFIED ANSWER TO THE COMPLAINT**, and know its contents. I am informed and believe that the matters stated therein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed on this 12th day of June, 2017, in Denver, Colorado.

By: _Amber N. Ott_

Amber N. Ott

Vice President Loan Documentation

Wells Fargo Bank, N.A.

55002.0508/10755677.1

9

VERIFICATION

EXHIBIT A, page 145

## PROOF OF SERVICE

2       At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Orange, State of California. My business address is The Atrium,
3   19100 Von Karman Avenue, Suite 700, Irvine, CA 92612.

4       On July 10, 2017, I served true copies of the following document(s):

5   **WELLS FARGO BANK, N.A.'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT**

6

7   on the interested parties in this action as follows:

8   John J. McNutt, Esq,             Attorneys for Plaintiff
   Gray, Plant, Mooty,            Donald Glatts, Trustee of the Gerald
   Mooty & Bennett, P.A.         S. Glatts Trust DTD December 10,
9   The Watergate – Suite 700        1981, as amended and restated
   600 New Hampshire Ave., N.W.
10  Washington, DC 20037

11     ☒   **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and
12  mailing, following our ordinary business practices. I am readily familiar with Severson & Werson's practice for collecting and processing correspondence for mailing. On the same day that
13  the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

14      I declare under penalty of perjury under the laws of the State of California that the
15  foregoing is true and correct.

16      Executed on July 10, 2017, at Irvine, California.

18  _____
            JODY C. MCLAIN

55002.0508/10755697.1          10                      PROOF OF SERVICE

# EXHIBIT 5

DOC# 2017-0383049

Aug 22, 2017  03:11 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $21.00

PAGES: 2

Recording Requested By:
WELLS FARGO BANK, N.A.

When Recorded Return To:
Current Trustor:
GERALD S GLATTS
ATTN: WITHERS BERGMAN LLP
101 W BROADWAY STE 1000
SAN DIEGO, CA  921018008

## FULL RECONVEYANCE

WF HOME EQUITY #:6826822408147169B "GLATTS" Lender ID:0  San Diego, California

AMERICAN SECURITIES COMPANY as present Trustee for the Deed of Trust executed by KATARINA DUBAN, TRUSTEE OF THE KATARINA DUBAN TRUST DATED JANUARY 13, 2009 AND GERALD S. GLATTS, A NON -VESTED SPOUSE, HUSBAND AND WIFE as Trustor(s), Dated: 11/17/2014 Recorded: 12/18/2014 in Book/Reel/Liber: N/A Page/Folio: N/A as Instrument No.: 2014-0559457 of official Records in the office of the County Recorder of San Diego, California having been requested in writing, by the holder of the obligations secured by said Deed of Trust, to reconvey the estate granted to trustee under said Deed of Trust, does hereby reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired by Trustee under said Deed of Trust.

The undersigned hereby directs the County Recorder/Clerk/Register to cancel of record said security instrument without impairing or satisfying the remaining obligation under the promissory note/credit agreement that was secured by said security instrument.

IN WITNESS WHEREOF, AMERICAN SECURITIES COMPANY as the Trustee has caused its corporate name to be affixed by a duly authorized officer on the date shown in the acknowledgment certificate below:

By: AMERICAN SECURITIES COMPANY as Trustee
On August 1st, 2017

SANDRA ROMERO , Vice President Loan Documentation

*GRR*SRRWFMB*08/01/2017 09:00:17 AM* WFMC57WFMH00000000000000000748145* CASAN D* 6826822408147169B CASAN O_TRUST_REL NPIF *1*SRRWFMB*

EXHIBIT A, page 148